IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

DENNIS JOSEPH RAIMONDO, (a.k.a. JUSTIN RAIMONDO), an individual, and ERIC ANTHONY GARRIS, an individual,

Plaintiffs,

v.

FEDERAL BUREAU OF INVESTIGATION,

Defendant.

Civil Action No. 13-CV-02295-JSC

**DECLARATION OF DAVID M. HARDY**

I, DAVID M. HARDY, declare as follows:

(1) I am currently the Section Chief of the Federal Bureau of Investigation's ("FBI") Record/Information Dissemination Section ("RIDS"), Records Management Division, in Winchester, Virginia. I have held this position since August 1, 2002. Prior to my joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2) In my official capacity as Section Chief of RIDS, I supervise approximately 218 employees who staff a total of ten FBIHQ units and two field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests

for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007 and the OPEN FOIA Act of 2009; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 13526,[1] and the preparation of declarations in support of Exemption 1 claims asserted under the FOIA.[2] I have been designated by the Attorney General of the United States as an original classification authority and declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3) Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. Specifically, I am familiar with the FBI's handling of FOIA/Privacy Act ("FOIPA") requests submitted by Dennis Joseph Raimondo and Eric Anthony Garris (collectively, "plaintiffs") to the FBI for records concerning themselves, as well as plaintiffs' FOIA request to the FBI for records concerning the magazine, www.antiwar.com. In addition, I am familiar with the FBI's handling of the plaintiffs' requests for amendment/expungement of records pursuant to Privacy Act, 5 U.S.C. § 552a(d)(2) and/or 5 U.S.C. § 552a(e)(7).

(4) The FBI processed a total of 290 pages of records responsive to plaintiffs' FOIPA requests. These records referenced or merely mentioned the plaintiffs and the online magazine,

[1] 75 Fed. Reg. 707 (2010).
[2] 5 U.S.C. §552(b)(1).

www.antiwar.com. The records were found within investigative files pertaining to criminal or national security investigations of third parties. Of these pages, 26 pages were released in full; 104 pages were released in part; 117 pages were withheld in full pursuant to applicable FOIA exemptions and 43 pages were withheld in full as duplicates.

(5) In accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), this declaration and the accompanying index are submitted in support of defendant's motion for summary judgment in order to provide the Court and plaintiffs with an explanation of the FBI's recordkeeping system, the procedures used to search for, review, and process the responsive records, and of the FBI's justification for withholding information in full or in part pursuant to FOIA Exemptions 1, 3, 4, 6, 7(A), 7(C), 7(D) and 7(E). 5 U.S.C. §§ 552 (b)(1), (b)(3), (b)(4), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). This declaration also explains the procedures followed to address plaintiffs' requests for amendment/expungement or records pursuant to Privacy Act.

(6) I have been advised that in this lawsuit, plaintiff Garris also challenges the collection and maintenance of an FBI memorandum dated September 18, 1972 ("hereinafter September 18, 1972 Memo") and requests the expungement of a portion of that document. I understand that in this lawsuit, Garris alleges, in part, that he is referenced on one page of the September 18, 1972 Memo, and that FBI's maintenance of this page of the September 18, 1972 Memo violates subsection (e)(7) of the Privacy Act, 5 U.S.C. § 552a(e)(7), which provides that any agency maintaining a system of records shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within

the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). In this declaration, I address the September 18, 1972 Memo at ¶¶117-123.

## ADMINISTRATIVE HISTORY OF PLAINTIFFS' FOIPA REQUESTS

(7) By separate letters dated October 4, 2011, Justin Raimondo, *a.k.a.* Dennis Raimondo, and Eric Garris, by and through their counsel, Linda Lye, Staff Attorney with the American Civil Liberties Union Foundation of Northern California, submitted FOIA/Privacy Acts requests to the FBI's San Francisco Field Office; the Santa Rosa "Satellite Office;" and FBI Headquarters ("FBIHQ"), Records Management Division ("RMD"), in Winchester, Virginia. The requests sought any and all FBI records concerning themselves. Attached to Raimondo's request letter was a Certification of Identity, Form DOJ-361 identifying the Full Name of Requester as "Justin Raimondo." Attached to Garris' request letter was a Certification of Identity, Form DOJ-361 identifying the Full Name of Requester as "Eric Garris." (*See* Exhibit A.)[3]

(8) By separate letters, both dated October 19, 2011, the FBI acknowledged receipt of Raimondo and Garris' FOIPA requests and assigned Raimondo's request FOIPA No. 1175592-000 and Garris' request FOIPA No. 1175595-000. Through the letters, FBI advised that it was searching the indices to the Central Records System ("CRS") for information responsive to the FOIPA requests. (*See* Exhibit B.) By separate letters, both dated November 2, 2011, the FBI informed Raimondo and Garris that it was unable to identify any responsive main files (records indexed to the designated subject of the file), and offered them each the opportunity to supply

[3] Due to a DOJ-wide policy change, in September 2012 the documents in the FBI FOIPA Document Processing System ("FDPS"), the internal repository and application utilized by RIDS to process, track and respond to FOIA and Privacy Act requests received by the FBI, were automatically converted from Word Perfect to Word. This may have affected the formatting of some of the documents in FDPS that are associated with this case and have been attached hereto as exhibits.

additional information to enable the FBI to conduct another search. The FBI also notified each of them of their right to appeal the FBI's decision to the Department of Justice ("DOJ"), Office of Information Policy ("OIP") within 60 days from the date of the response letters. (*See* Exhibit C.)

(9) On December 30, 2011, OIP received two separate letters, both dated December 22, 2011, from counsel for Raimondo and Garris, appealing the FBI's "no records" response sent to both of her clients, and alleging that the FBI's search was inadequate because it failed to conduct a database search for files in which Raimondo and Garris were listed as a reference (*i.e.*, a cross-reference search). (*See* Exhibit D.)

(10) By separate letters, both dated January 4, 2012, OIP acknowledged receipt of Raimondo's and Garris' appeals and assigned Raimondo's appeal Appeal Number AP-2012-00972 and Garris' appeal Appeal Number AP-2012-00977. (*See* Exhibit E.)

(11) By letter dated March 29, 2012, OIP advised counsel that after considering Raimondo's appeal, it was affirming the FBI's action on her client's request.[4] OIP's March 29, 2012 letter further advised that the FBI's "no record" response was correct and that the FBI conducted an adequate, reasonable search for records responsive to Raimondo's request. In addition, concerning her client's request for a cross-reference search, OIP advised counsel to provide additional information sufficient to enable the FBI to determine with certainty that any cross-references it locates are identifiable to the subject of Raimondo's request. (*See* Exhibit F.)

(12) By letter dated May 24, 2012, Julia Harumi Mass, Staff Attorney with the American Civil Liberties Union Foundation of Northern California, submitted via facsimile to

[4] OIP's March 29, 2012 letter also included standard language the FBI includes in all of its response letters that, to the extent that the request sought access to records that would either confirm or deny an individual's placement on any government watch list, the FBI properly refused to confirm or deny the existence of any records responsive to her client's request because the existence of such records is protected from disclosure pursuant to 5 U.S.C. §552(b)(7)(E).

RMD and to OIP a letter to provide "additional information and clarification" regarding seven FOIPA requests, including Raimondo's and Garris' request.[5] The letter explained that "[e]ach of the original requests sought files about each requester and specified the requester's connection to the online magazine Antiwar.com. As such, the FBI needed to search for records related to antiwar.com in order to determine whether there were responsive records for the requesters." The May 24, 2012 letter further explained that an FBI document, dated April 30, 2004 contained references "that suggest additional records related to Antiwar.com and/or some of the [seven] requestors exist." The letter went on to state:

> Based on the 2004 Memo, we expect there should be many records related to Antiwar.com. The requesters seek not only records that name them individually, but *all* records related or referring to Antiwar.com, without redactions for requesters' names or other identifying information. Thus, at the very least, the 2004 Memo should be produced, with any identifying information regarding any of the requesters unredacted.

(13) The May 24, 2012 letter further acknowledged receipt of OIP's response affirming the FBI's original "no records" response to Raimondo's FOIPA request and provided additional information concerning Raimondo, including his full legal name. Raimondo's full legal name was not provided on the Certification of Identity submitted with his initial FOIPA request. The May 24, 2012 letter also acknowledged that Garris had not received a response from OIP concerning his appeal of the FBI's "no records" response, but was taking the opportunity to share additional information concerning Garris, including his full legal name which had not been included on the Certificate of Identity submitted with Garris' initial FOIPA request. Finally, the letter clarified that a typographical error had occurred in all correspondence

[5] The other five FOIPA requests addressed in the May 24, 2012 are not at issue in this lawsuit.

concerning the name of another third party subject, who was also being represented by the same counsel as plaintiffs in a separate FOIPA request.[6] (*See* Exhibit G.)

(14) By separate letters both dated June 8, 2012, the FBI acknowledged receipt of the May 24, 2012 letter asking that a search for cross-reference records for Raimondo and Garris be conducted. The FBI reopened Raimondo's and Garris' FOIPA requests. The FBI assigned Raimondo's reopened request FOIPA No. 1175592-001, and Garris' reopened request FOIPA No. 1175595-001. The FBI also advised Raimondo and Garris that that it was searching the indices to the CRS for information responsive to their requests. (*See* Exhibit H.) In addition, on June 8, 2012, the FBI acknowledged receipt of plaintiffs' request via the May 24, 2012 letter for records concerning the subject "Antiwar.com" and assigned it FOIPA No. 1192179-000. The FBI further advised that it was searching the indices to the CRS for information responsive to plaintiffs' request. (*See* Exhibit I.)

(15) In separate letters both dated September 6, 2012, the FBI informed Raimondo and Garris that it was searching for, retrieving, scanning, and evaluating files that may be responsive to their requests. (*See* Exhibit J.)

(16) By letter dated September 17, 2012, OIP advised counsel for plaintiffs that after considering Garris' appeal, it was affirming the FBI's action on the request. OIP further advised that the FBI's "no record" response was correct and that the FBI conducted an adequate, reasonable search for records responsive to Garris' request. In addition, concerning her client's request for a cross-reference search, plaintiffs' counsel was advised to provide information sufficient to enable the FBI to determine with certainty that any cross-references it locates are identifiable to the subject of her client's request. (*See* Exhibit K.)

---

[6] The third party individual mentioned in the May 24, 2012 letter is not a subject of this litigation.

(17) By letters dated November 9, 2012, the FBI advised plaintiffs that Raimondo's FOIPA request (FOIPA No. 1175592-001) and Garris' FOIPA request (FOIPA No. 1175595-001) were both being closed administratively and consolidated with plaintiffs' request for records concerning Antiwar.com (FOIPA No. 1192179-000). The FBI explained that the material responsive to Raimondo's and Garris' individual requests was being processed in conjunction with plaintiffs' request for records concerning Antiwar.com because the three FOIPA requests shared the same information. (*See* Exhibit L.)

(18) By letter dated April 22, 2013, plaintiffs requested a waiver of fees "associated with the requests of Raimondo, Garris and/or Antiwar.com under 5 U.S.C. § 552(a)(4)(A)(iii), 28 C.F.R. § 16.11(k)(1), and 28 C.F.R. § 16.11(d) because Eric Garris and Justin Raimondo are representatives of the news media and disclosure of the requested information is in the public interest." (*See* Exhibit M.)[7]

(19) On May 21, 2013, plaintiffs filed a Complaint under FOIA and the Privacy Act seeking disclosure of records maintained by the FBI related to each of them and the online magazine, Antiwar.com.

(20) The FBI made its first interim release of records to plaintiffs on or about October 1, 2013.[8] These records were located as a result of the FBI's search for cross-reference files in response to plaintiffs' May 24, 2012 letter. The FBI advised plaintiffs that it had reviewed 170 pages; that it was releasing in full or in part 47 pages; and that it withheld certain information pursuant to Privacy Act Exemption (j)(2) and FOIA Exemptions 1, 3, 4, 6, 7(A), 7(C), 7(D) and

[7] There were no costs associated with the processing of plaintiffs' requests.

[8] The FBI reprocessed three pages (bates-numbered Antiwar-143 through Antiwar-145), which had been initially released in part to the plaintiffs on October 1, 2013, in order to allow for the release of additional segregable information. The reprocessed pages were re-released to the plaintiffs on November 18, 2013 and bates-numbered, "Revised Antiwar-143 through Revised Antiwar-145." Of the reprocessed pages, two (2) of the pages were released in part and one (1) page was released in full.

7(E). The FBI further advised plaintiffs that:

> No "main" investigative files pertaining to "www.Antiwar.com," "Dennis Joseph Raimondo," aka "Justin Raimondo," or "Eric Anthony Garris" were located. The cross-reference material contained in this release comprise mentions of "www.Antiwar.com," "Dennis Joseph Raimondo," aka "Justin Raimondo," or "Eric Anthony Garris" as references within files about other subjects or individuals. Additional pages have been included to provide context. These context pages precede or follow the responsive cross-references pages where necessary to provide context to those pages where "www.Antiwar.com," "Dennis Joseph Raimondo," aka "Justin Raimondo," or "Eric Anthony Garris" are mentioned. When pages also contained information about other subject matters or individuals, the notation "Outside the Scope" was also made in addition to applicable FOIA exemptions.

The FBI also advised plaintiffs that they could appeal the FBI's determination by filing an administrative appeal with OIP within sixty days from the date of the letter. (*See* Exhibit N.). Within the records reviewed for the October 1, 2013 release, FBI identified information concerning another government agency. These records, bates-numbered Antiwar-59 and Antiwar-60, were referred to the other government agency for consultation.

(21) The FBI made its second interim release of records to plaintiffs on or about November 18, 2013. The FBI advised plaintiffs that it had reviewed 54 pages; that it was releasing 36 pages in full or part; and that it withheld certain information pursuant to FOIA Exemptions 1, 3, 6, 7(A), 7(C), 7(D) and 7(E). The FBI further advised plaintiffs that the release contained cross-reference material and advised plaintiffs of their appeal rights to OIP. (*See* Exhibit O.)

(22) On or about January 6, 2013, the FBI made its third and final interim release of records to plaintiffs. The FBI advised plaintiffs that it had reviewed 69 pages; that it was releasing 50 pages in full or part; and that it withheld certain information pursuant to FOIA Exemptions 1, 3, 6, 7(A), 7(C), 7(D) and 7(E). The FBI further advised plaintiffs that the release contained cross-reference material and of their appeal rights to OIP. (*See* Exhibit P.)

(23) By letter dated February 7, 2014, the FBI advised plaintiffs that it completed its consultation with another government agency and provided to the plaintiffs a release of those records, with deletions made pursuant to FOIA Exemption 1, 5 U.S.C. § 552(b)(1). (*See* Exhibit Q.)

(24) Through its counsel, on January 15, 2014, FBI provided plaintiffs with a description of the search conducted in response to plaintiffs' FOIPA requests for records concerning them and to plaintiffs' FOIPA request for records concerning Antiwar.com. At that time, FBI also provided an initial *Vaughn* index identifying those pages which it has withheld in full or in part, with correlating FOIA exemptions.

**<u>THE CENTRAL RECORDS SYSTEM</u>**

(25) The Central Records System ("CRS") is an extensive system of records consisting of administrative, applicant, investigative, intelligence, criminal, personnel, and other files compiled and maintained by the FBI in the course of fulfilling its missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions. This system consists of a numerical sequence of files, called FBI "classifications," which are organized according to subject matter. The broad array of CRS file classification categories include types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters. For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three sequential components: (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned individual case file number for that particular subject matter. Within each case file, documents

are "serialized," or assigned a document number in the order which the document is added to the file, typically in chronological order. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter (or program). In terms of organizational scope, the CRS spans the entire FBI, including records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide. Although the CRS is primarily designed to serve as an investigative tool, the FBI utilizes the CRS to conduct searches that are likely to yield documents responsive to FOIA and Privacy Act requests.

**THE CRS GENERAL INDICES AND INDEXING**

(26) The General Indices to the CRS are the index or "key" to locating documents within the information contained in the CRS. The CRS is indexed in a manner that meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties. The general indices are arranged in alphabetical order and comprise an index on a variety of subject matters, including individuals, organizations, events, or other subjects of investigative interest that are indexed for future retrieval. The entries in the General Indices fall into two categories:

(a) A "main" entry – This entry pertains to records indexed to the main subject(s) of a file, known as "main" file records. The "main" entry carries the name of an individual, organization, or other subject matter that is the designated subject of the file.

(b) A "reference" entry - This entry, sometimes called a "cross-reference," pertains to records that merely mention or reference an individual, organization, or other subject matter that is contained in another "main" file record about a different subject matter.

(27) CRS files are located via the General Indices (automated and manual), which are likewise arranged in alphabetical order, and consist of an index on various subjects, including the

names of individuals and organizations. The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent ("SA") assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA and other personnel at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter or individual.

(28) Searches made in the General Indices to locate records concerning a particular individual or organization, such as plaintiffs and Antiwar.com, are made by searching the subject requested in the index.

**AUTOMATED CASE SUPPORT**

(29) The mechanism that the FBI uses to search the CRS is the Automated Case Support System ("ACS"), an electronic, integrated case management system that became effective for all field offices, Legal Attaches ("Legats"), and FBIHQ on or about October 16, 1995.

(30) Because the CRS cannot electronically query the case files for data, such as an individual's name or social security number, the required information is duplicated and moved to the ACS so that it can be searched. As part of the ACS implementation process, over 105

million records from the CRS were converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices. Automation did not change the CRS; instead, automation has facilitated more economical and expeditious access to records maintained in the CRS.

(31) ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases:

(a) Investigative Case Management ("ICM") - ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads.

(b) Electronic Case File ("ECF") - ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept, in that only the creator of a document serializes it into a file. This provides a single-source entry of serials into the computerized ECF system. All original serials are maintained in the Office of Origin's case file.

(c) Universal Index ("UNI") - UNI is the automated index of the CRS and provides all offices of the FBI a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index searching. Individual names may be recorded with applicable identifying information such as date of birth, race, sex, locality, Social Security Number, address and/or date of an event. Moreover, ACS implementation built upon and incorporated prior automated FBI indices; therefore a search employing the UNI application of ACS encompasses data that was already indexed in the prior automated systems superseded by ACS. As such, a UNI search in ACS is capable of locating FBI records created before its 1995 FBI-wide implementation to the present day in both paper and electronic format. Currently, UNI consists of approximately 111 million searchable records and is updated daily with newly indexed material.

## ADEQUACY OF SEARCH

(32) In this case, RIDS conducted a search for both main entries and cross references responsive to both plaintiffs' requests. To locate responsive information subject to the FOIA, RIDS employed both index and text searches of the CRS.

### Searches for Records Responsive to FOIPA No. 1175592-000/001 (Dennis Joseph Raimondo)

(33) On or about October 20, 2011, the FBI conducted a CRS search of its automated indices and the FBIHQ and San Francisco manual indices[9] in order to identify all potentially responsive main files indexed to Justin Raimondo, *a.k.a.* Dennis Raimondo.[10] The FBI conducted a search using a six-way phonetic breakdown of the name Justin Raimondo which included the following variations: "Justin Raimondo," and "J. Raimondo," and a "string" (ST)[11] search of the alias, Dennis Raimondo. The FBI located no main files responsive to Raimondo's request.

(34) On or about August 8, 2012, to locate any main files and cross-reference files responsive to plaintiff's request, the FBI conducted another CRS search of its automated indices and manual indices for both FBIHQ and the San Francisco Field Office using a six-way breakdown of the name Dennis Joseph Raimondo, as well as, a three-way phonetic breakdown of the name Justin Raimondo, which included the following variations: "Dennis Joseph

---

[9] Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation remain searchable by manual review of index cards, known as the "manual indices." The manual indices only contain records created before 1959. A search of the manual indices is triggered for requests on individuals if the person was born on or before January 1, 1958; and for requests seeking information about organizations or events on or before January 1, 1973. Records created after these dates would be captured through a UNI search. The FBI conducted a manual indices search in addition to the automated indices search due to the date of birth of plaintiffs.

[10] When a requester directs their FOIPA requests to a specific FBI Field Office, the FBI only searches for responsive files in that particular Field Office. In this case, plaintiffs directed the FOIA/PA requests to the Santa Rosa "Satellite" Office, the San Francisco Field Office, and FBIHQ, RMD, Winchester, VA. The records of the Santa Rosa "satellite" office (known as a resident agency ("RA")) are subsumed within the records of the San Francisco Field Office; as a result, the FBI searched for responsive records in both FBIHQ and the San Francisco Field Office.

[11] An "ST" and/or "string" search means the computer will search the index and return those names whose starting characters match the name entered in the Name field.

Raimondo," Dennis J. Raimondo," "D. J. Raimondo," "D. Joseph Raimondo," "Dennis Raimondo," "Joseph Raimondo," "Justin Raimondo," and "J. Raimondo." As a result of this search, the FBI located one (1) cross-reference which was responsive and one (1) cross-reference which was unable to be located. Additionally, due to the specific nature of the request and additional information provided by plaintiffs' counsel, the FBI took the extraordinary step of conducting text searches of the ECF, using the terms, "Dennis Raimondo" and "Justin Raimondo" to determine whether it could locate any additional responsive files. As a result of these text searches, the FBI identified eight (8) responsive records.

**Searches for Records Responsive to FOIPA No. 1175595-000/001 (Eric Anthony Garris)**

(35) On or about October 20, 2011, the FBI also conducted a CRS search of its automated indices and the San Francisco manual indices in order to identify all potentially responsive main files indexed to Eric Garris. At that time, the FBI did not conduct a search of the FBIHQ's manual indices because the manual index cards through the letter "H" had been boxed up in preparation for automation.[12] The FBI conducted a search using a six-way phonetic breakdown of the name, Eric Garris, which included the following: "Eric Garris" and "E. Garris." The FBI located no main files responsive to plaintiff's request.

(36) On or about August 8, 2012, to locate any main and cross-references responsive to plaintiff's request, the FBI conducted another CRS search of its automated indices and manual indices for both FBIHQ and the San Francisco Field Office using a six-way breakdown of the name Eric Anthony Garris, which included the following variations: "Eric Anthony Garris," "Eric A. Garris," "E. Anthony Garris," "E. A. Garris," "Eric Garris," and "Anthony Garris." As a

[12] Within the past several years, the FBI has undertaken a long-term project to upload all of its manual indices, both for FBIHQ and for all field offices, to a searchable database. The project was conducted on a rolling basis, and it necessarily made certain portions of the manual indices unavailable for searches when the uploading was taking place.

result of this search, the FBI located two (2) responsive cross-references and one (1) cross-reference which was unable to be located. Additionally, due to the specific nature of the request and additional information provided by plaintiffs' counsel, the FBI took the extraordinary step of conducting a text search of the ECF using the term "Eric Garris" to determine whether it could locate any additional responsive files. As a result of this text search, the FBI identified four (4) responsive records.

**Searches for Records Responsive to FOIPA No. 1192179-000**

(37) The FBI conducted a CRS search using the automated indices and manual indices for both FBIHQ and the San Francisco Field Office on or about June 8, 2012 to identify all responsive main and reference files indexed to "antiwar.com." The FBI employed a three-part search methodology. First, the FBI conducted a search using a three-way phonetic breakdown, which included the following "antiwar.com," "antiwar," and "www.antiwar.com." Second, the FBI conducted an "on-the-nose" (OTN) [13] using the terms "antiwar.com," "antiwar" and "www.antiwar.com." Third, the FBI searched using a "string" (ST) search using the terms "antiwar.com" and "internet http:\antiwar.com". The FBI was unable to identify any main or cross-reference files responsive to plaintiffs' request. Additionally, due to the specific nature of the request and additional information provided by plaintiffs' counsel, the FBI took the extraordinary step of conducting text searches to identify all potentially responsive main and cross-reference files using the search terms identified above in response to this request. As a result of these text searches, the FBI identified additional responsive records.

[13] An "OTN" and/or "on the nose" search means that the computer will search the index and return those names whose characters match exactly the name entered in the Name field and only that name.

## JUSTIFICATION FOR NON-DISCLOSURE UNDER THE PRIVACY ACT

(38) When an individual requests records about himself from the FBI, we first consider the request under the Privacy Act, which generally provides individuals a right of access to records about them maintained in government files, unless a Privacy Act exemption applies. *See* 5 U.S.C. § 552a. One such exemption is Exemption (j)(2), which exempts from mandatory disclosure systems of records "maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals . . . ." 5 U.S.C. § 552a(j)(2). The FBI has exempted law enforcement investigative records maintained in the CRS from the Privacy Act's disclosure requirements pursuant to (j)(2). *See* 63 Fed. Reg. 8671, 8684 (1998).

(39) In response to plaintiff Raimondo's and plaintiff Garris' requests for records relating to themselves, the FBI located responsive records which relate to investigative matters that are part of the FBI's primary mission. The investigatory records at issue were retrieved by RIDS through a search of the CRS, which is a system of records specifically exempt from the Privacy Act, 5 U.S.C. § 552a. Records responsive to the plaintiffs' requests were compiled as a result of the FBI's fulfillment of its law enforcement duties. Specifically, the responsive records were compiled in the course of the FBI's investigation into alleged criminal wrongdoing by third parties and national security investigations, including assessments carried out to detect, obtain information about, or prevent or protect against federal crimes or national security threats.[14] Although access to the records responsive to plaintiffs' FOIPA requests for records concerning

[14] Plaintiffs are not the subjects of the material located in response to their FOIPA requests. Therefore, the subject/title of the FBI's investigations were withheld in most instances, pursuant to FOIA Exemptions 6 and 7(C). As a result, the FBI is unable to provide a more detailed description of the investigative records. Should the court desire to review a see-through copy of the redacted records, the FBI can provide them for *in camera* review.

themselves was denied under the Privacy Act, RIDS has processed these records under the access provisions of the FOIA to achieve maximum disclosure.

## VAUGHN INDEX -- DOCUMENT CATEGORY GROUPINGS

(40) The FBI has made every effort to provide plaintiffs with all material in the public domain and has taken all reasonable efforts to ensure that no segregable, non-exempt portions were withheld from plaintiffs. The *Vaughn* Index attached hereto provides a detailed description of the withheld material within the document categories (hereinafter the "Index"). This Index specifies the relevant page ranges, dates of records, specific FOIA exemptions applied to the pages within each category, and a description of the action taken with respect to each responsive page (*i.e.,* released in part ("RIP"), withheld in full ("WIF") or duplicate). The document categories in the Index are as follows:

A) Mere Mentions of Antiwar Threat Assessment Material
B) Mere Mentions from Pending Third-Party Files
C) Sensitive Law Enforcement Techniques and Procedures
D) Miscellaneous Garris Material

All of the pages divided into these categories have been consecutively Bates stamped "Antiwar-1" through "Antiwar-290." Pages withheld in their entirety (e.g., removed pursuant to exemptions or as duplicates) were replaced by a Deleted Page Information Sheet ("DPIS"), which identified the reason and/or applicable FOIA exemptions relied upon to withhold the page in full. Copies of the pages released in part and in full will be made available to the Court upon request.

## JUSTIFICATION FOR NON-DISCLOSURE UNDER THE FOIA: OVERVIEW OF EXEMPTIONS APPLIED

(41) The exemptions asserted by the FBI as grounds for non-disclosure for all or portions of the documents are FOIA Exemptions 1, 3, 4, 6, 7(A), 7(C), 7(D), and 7(E). Several

types of information contained in the documents were withheld under the same exemption(s) and justifications across all the document categories, Categories A through D. To avoid repetition in the explanation, justification and harm analysis of the withheld material in the discussion of Categories A through D, I will first address these universal exemptions and justifications. Also, prior to the category-specific discussion, I will address certain threshold matters related to the application of the exemptions. Particularized justifications unique to one or a subset of document categories are contained in the category-by-category discussion at ¶¶ 65-98.

**EXEMPTION (b)(1) – CLASSIFIED INFORMATION**

(42) The FBI's analysis of the withholding of classified information contained in these documents is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552(b)(1).[15] Exemption (b)(1) protects from disclosure those records that are:

(a) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and

(b) are in fact properly classified pursuant to such Executive Order.

(43) Before I consider an Exemption (b)(1) claim for withholding agency records, I determine whether the information in those records is information that satisfies the requirements of E.O. 13526, the Executive Order which governs the classification and protection of information that affects the national security,[16] and whether the information complies with the various substantive and procedural criteria of the Executive Order. E.O. 13526, which was signed by President Barack Obama on December 29, 2009, is the Executive Order that currently

[15] The FBI's *in camera, ex parte* declaration provides additional detail concerning the classified information withheld, as a more detailed description on the public record of the withheld material would expose the very classified information that is exempt from disclosure.

[16] Section 6.1 (cc) of E.O. 13526, defines "National Security" as "the national defense or foreign relations of the United States."

applies to the protection of national security information. I am bound by the requirements of E.O. 13526, when making classification determinations.

(44) In order for information to be properly classified, and thus properly withheld from disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in E.O. 13526 § 1.1 (a):

(1) an original classification authority is classifying the information;

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in § 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

(45) As I will explain in further detail below, in my role as an original classification authority, I have determined that the information withheld pursuant to Exemption (b)(1) is under the control of the United States Government, is classified and requires a classification marking at the "Secret" level since the unauthorized disclosure of this information reasonably could be expected to cause serious damage to national security. See E.O. 13526 § 1.2(a)(2). In addition to these substantive requirements, certain procedural and administrative requirements of E.O. 13526 must be followed before information can be considered properly classified, such as, proper identification and marking of documents. In particular, I made certain that all procedural requirements of E.O. 13526 were followed:

(1) each document was marked as required and stamped with the proper classification designation;

(2) each document was marked to indicate clearly which portions are classified, which portions are exempt from declassification as set forth in E.O. 13526 § 1.5(b);

(3) the prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were adhered to;

(4) the declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed; and

(5) any reasonably segregable portions of these classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

## DEFENDANT'S BURDEN OF ESTABLISHING EXEMPTION (b)(1) CLAIMS

(46) The information withheld in this case pursuant to Exemption 1 was examined in light of the body of information available to me concerning the national defense and foreign relations of the United States. This information was not examined in isolation. Instead, the information was evaluated with careful consideration given to the impact that disclosure of this information will have on other sensitive information contained elsewhere in the United States' intelligence files, including the secrecy of that other information. Equal consideration was given to the impact that other information, either in the public domain or likely known or suspected by present or potential adversaries of the United States, would have upon the information I examined, and upon attempts by a hostile entity to analyze such information. In those instances where, in my judgment, the disclosure of this information could reasonably be expected to cause a serious damage to the national security, and its withholding outweighed the benefit of disclosure, I exercised my prerogative as an original classification authority and designated that information as classified in the interest of national security at the "Secret" level, and invoked FOIA Exemption (b)(1) to prevent disclosure. Likewise, the justifications for the withheld classified information have been prepared with the intent that they be read with consideration

given to the context in which the classified information is found, but also other information already in the public domain, as well as information likely known or suspected by hostile intelligence entities. It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to the intelligence activities (including special activities), intelligence sources or methods, or foreign relations and activities could reasonably be expected to jeopardize the national security of the United States, and as a result, the information appearing in these documents have been appropriately classified pursuant to E.O. 13526 and withheld pursuant to FOIA Exemption (b)(1).

**FINDINGS OF DECLARANT REGARDING EXEMPTION (b)(1)**

(47) With the above requirements in mind, I personally and independently examined the FBI information withheld pursuant to Exemption (b)(1). As a result of this examination, I determined that the classified information in records in Category A, B and C continues to warrant classification at the "Secret" level, and is exempt from disclosure pursuant to either E.O. 13526 E.O. 13526 § 1.4 category (b) foreign government information; E.O. 13526 §1.4 category (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; and E.O. 13526 § 1.4 category (d) foreign relations or foreign activities, as the unauthorized disclosure of this information could reasonably be expected to cause serious damage to the national security. A more detailed discussion of the (b)(1) withholdings asserted during the processing of plaintiffs' FOIPA requests are described, *infra*, within the specific categories in which they were applied.

**EXEMPTION (b)(7) THRESHOLD**

(48) Exemption (b)(7) of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could

reasonably be expected to cause one of the harms enumerated in the subpart of the exemption. See 5 U.S.C. § 552(b)(7). In this case, the harm that could reasonably be expected to result from disclosure concerns interference with enforcement proceedings (b)(7)(A), invasion of personal privacy (b)(7)(C), revealing the identity of confidential sources (b)(7)(D), and revealing sensitive investigative techniques and procedures (b)(7)(E).

(49) Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duties of that agency. Pursuant to 28 USC §§ 533, 534, and Executive Order 12,333 as implemented by guidelines issued by the Attorney General, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States. Under this investigative authority, the responsive records herein were compiled for a myriad of law enforcement and national security investigative purposes, including, but not limited to, investigations concerning civil rights matters and violent criminal threats, domestic terrorism investigations, international terrorism investigations, and counterintelligence investigations. The responsive records were found within third party investigative files, wherein the names of the plaintiffs, Dennis Joseph Raimondo, *aka* Justin Raimondo, and Eric Anthony Garris and/or the online magazine Antiwar.com were referenced. Accordingly these records meet the threshold requirement of Exemption (b)(7). The remaining inquiry is whether disclosure would "interfere

with ongoing law enforcement proceedings," "constitute an unwarranted invasion of personal privacy," "reveal the identity of confidential sources," or "reveal sensitive law enforcement techniques."

**EXEMPTION (b)(7)(A)**
**PENDING LAW ENFORCEMENT PROCEEDINGS**

(50) 5 U.S.C. § 552 (b)(7)(A) exempts from disclosure:

> Records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to interfere with enforcement proceedings.

Application of this exemption requires: the existence of law enforcement records; a pending or prospective law enforcement proceeding; and a determination that release of the information could reasonably be expected to interfere with the enforcement proceeding. Typically, the FBI asserts Exemption (b)(7)(A) for a variety of different documents in an investigative file, which the FBI then groups into functional categories and describes in greater detail. In this case, however, the FBI has asserted Exemption (b)(7)(A) in a limited fashion to protect the names, identifying information of or activities of third party subjects and file numbers of pending FBI investigations. The release of the file number, names, identifying information of and activities of third parties of an on-going FBI investigation could result not only in the acknowledgment of the existence of the investigation but also in the identification of suspects and thus jeopardize the investigation. The FBI has applied Exemption (b)(7)(A) to protect the file numbers, names, identifying information of and activities of third parties of these open investigations.

**EXEMPTIONS (b)(6) AND (b)(7)(C)**
**CLEARLY UNWARRANTED AND UNWARRANTED INVASION OF PERSONAL PRIVACY**

(51) 5 U.S.C. § 552 (b)(6) exempts from disclosure:

> personnel and medical files and similar files when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy.

(52) 5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy.[17]

(53) When withholding information pursuant to these exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure. In asserting these exemptions, each item of information was examined to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue. For the purposes of these exemptions, the only recognized public interest is that which sheds light on the operations and activities of the federal government. In making this analysis, the public interest in disclosure of this information was determined by assessing whether the information in question would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats and to uphold and enforce the criminal laws of the United States. In each instance where information was withheld, it was determined that individual privacy rights

[17] The practice of the FBI is to assert Exemption (b)(6) in conjunction with (b)(7)(C). Although the balancing test for (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard, and the test for (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions.

outweighed the public interest. The FBI concluded that the information should be withheld under Exemptions (b)(6) and (b)(7)(C) and determined that the individuals' privacy interests were not outweighed by any public interest in disclosure. Every effort has been made to release all segregable information contained in these records without invading the privacy interests of these individuals. There are three withholding subcategories as described in detail below. These harm justifications apply to all (b)(6)/(b)(7)(C) material withheld in Categories A, B, C, and D.

**Names and/or Identifying Information of FBI Special Agents and Support Personnel**

(54) FOIA Exemptions (b)(6) and (b)(7)(C) have been asserted to protect the names of FBI Special Agents ("SAs") and support personnel who were responsible for conducting, supervising, and/or maintaining the investigative activities, as well as, the day-to-day operations of the FBI reported in the documents. These responsibilities include, but are not limited to, conducting interviews and compiling the resulting information, as well as, reporting on the status of investigations. Assignments of SAs and personnel to any particular investigation are not by choice. Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations. The privacy consideration is also to protect FBI SAs and support personnel, as individuals, from unnecessary, unofficial questioning as to the conduct of the investigation or other investigations, whether or not they are currently employed by the FBI.

(55) FBI SAs conduct official inquiries into various criminal violation and national security cases. They come into contact with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years. These individuals may seek revenge on the agents and other

federal employees involved in a particular investigation. The publicity associated with the release of an agent's identity in connection with a particular investigation could trigger hostility toward a particular agent. The support employees were, and possibly are, in positions of access to information regarding official law enforcement investigations, and therefore could also become targets of harassing inquiries for unauthorized access to investigations if their identities were released. As a result, they maintain a substantial privacy interest in not having their identities disclosed. In contrast, there is no public interest to be served by disclosing the identities of the SAs to the public because their identities would not significantly increase the public's understanding of the FBI's operations and activities. Thus, disclosure of this information would constitute a clearly unwarranted and an unwarranted invasion of these employees' personal privacy. The FBI has properly protected this information pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).

**Names and/or Identifying Information of Third Parties Who Provided Information to the FBI**

(56) FOIA Exemptions (b)(6) and (b)(7)(C) have been asserted to protect the names and identifying information of individuals who were interviewed by the FBI during the course of the investigations described in the records, in conjunction with FOIA Exemption (b)(7)(D). Identifying information withheld concerning these third parties includes addresses, phone numbers, professional activities, dates of birth, and other personal information.

(57) The FBI has found that information provided by individuals during an interview is one of the most productive investigative tools used by law enforcement agencies. The largest roadblock to successfully obtaining the desired information through an interview is fear by the interviewee that his/her identity will possibly be exposed and consequently he/she could be harassed, intimidated or threatened with legal/economic reprisal or possible physical harm. To

surmount these obstacles, persons interviewed by the FBI must be assured that their names and personal identifying information will be held in the strictest confidence. The continued access by the FBI to persons willing to honestly relate pertinent facts bearing upon a particular investigation far outweighs any benefit plaintiff might derive from being furnished the names of those who cooperated with the FBI.

(58) Thus, the FBI has determined that the third party interviewees maintain a substantial privacy interest in not having their identities disclosed. After identifying the substantial privacy interests of the third parties interviewed during the course of the FBI's investigations, the FBI balanced their right to privacy against the public interest in the disclosure. Disclosure of the third parties' names and identifying information would not shed light on the operations and activities of the FBI. Accordingly, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of these individuals' personal privacy. The FBI properly redacted this information pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).

**Names and/or Identifying Information of Third Parties Merely Mentioned**

(59) FOIA Exemptions (b)(6) and (b)(7)(C) have been asserted to withhold the names and identifying information of third parties merely mentioned in the records at issue. Identifying information includes professional activities, familial relationships, addresses, photos and other personal information. The FBI obtained information concerning third parties who came into contact with the subjects of the investigations. These individuals were not of investigative interest to the FBI. These third parties maintain legitimate privacy interests in not having their identifying information disclosed. If the FBI disclosed their names and other personal information, the disclosure would reveal that these third parties were connected with the FBI's investigations in some way. Disclosure of these third parties' names and identifying information

in connection with the FBI's investigation of criminal activities carries an extremely negative connotation. Disclosure of their identities would subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. Accordingly, the FBI determined that these third parties maintain a substantial privacy interest in not having information about them disclosed. After identifying the substantial privacy interests these individuals maintain, the FBI balanced their right to privacy against the public interest in the disclosure. The FBI has determined that the personal privacy interests in non-disclosure outweighed the public in disclosure, as disclosure would not shed any light on the operations and activities of the FBI. Thus, disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy. Accordingly, the FBI redacted this information pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).

**<u>EXEMPTION (b)(7)(D)</u>**
**<u>CONFIDENTIAL SOURCE INFORMATION</u>**

(60) 5 U.S.C. § 552 (b)(7)(D) provides protection for:

> records or information compiled for law enforcement purposes [which] could reasonably be expected to disclose the identity of a confidential source, including a state, local or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

(61) Numerous confidential sources report to the FBI on a regular basis and are "informants" within the common meaning of the term. Some of these sources provide information under an express assurance of confidentiality. As relevant here, the FBI is protecting sources under express assurance of confidentiality. Not only has the FBI promised to protect their identities and information they provided, but also, the information provided by these individuals is singular in nature, and if released, could reveal their identity. This general harm

analysis applies to all information withheld under Exemption 7(D) in Categories B, C, and D. Additional justifications for the assertion of Exemption (b)(7)(D) are described below within the specific document categories in which they are applied.

**EXEMPTION (b)(7)(E)**
**INVESTIGATIVE TECHNIQUES AND PROCEDURES**

(62) 5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

> law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

(63) Within the responsive documents, FOIA Exemption (b)(7)(E) has been applied to various investigative techniques and procedures utilized by the FBI to pursue its law enforcement and intelligence gathering missions when disclosure of this information could reasonably be expected to risk circumvention of the law. This general harm analysis applies to all information withheld under Exemption 7(E).

**Names, Numbers, and/or Alpha Designators of Sensitive FBI Squads and Units**

(64) Exemption 7(E) has been asserted to protect the names, numbers, and/or alpha designators of certain sensitive FBI squads and units. The existence of these particular squads and units is not known to the general public. Revealing their names, numbers, and alpha designators would reveal their existence, as well as the level of focus the FBI has applied to certain areas within the realm of counter-terrorism. Providing criminals with the level of focus the FBI is applying to a certain type of terrorist activity would provide terrorists with an idea as to where the FBI is focusing its limited resources. Terrorists could then plan and structure their activities in a manner that avoids detection and disruption by the FBI, making it easier for them

to circumvent the law. Therefore, this information has been redacted pursuant to Exemption 7(E).

**Investigative Focus of Specific Investigations**

(65) FOIA Exemption (b)(7)(E) was asserted to protect the investigative focus of specific FBI investigations. Revealing the broader investigative focuses as they relate to interconnected Domestic Terrorism ("DT") and International Terrorism ("IT") investigations would reveal the scope of the FBI's DT and IT programs and the strategies it plans to pursue in preventing and disrupting terrorist activity. Release of this type of information would allow terrorists to gauge the FBI's strengths and weakness within certain areas of the DT and IT arena and structure their activities in a manner that avoids detection and disruption by the FBI. For example, if terrorists knew that certain individuals were being investigated based on their association with one particular individual, group, or terrorist organization they would be able to discern that their association with this particular individual may cause them to be the subjects of an FBI investigation. They may then decide to cut ties with this individual and find different ways to pursue terrorism against the United States thus, circumventing the FBI's counter-terrorism efforts. As releasing the focus of specific FBI DT and IT investigations would enable terrorists to circumvent the law, this information is exempt from disclosure pursuant to Exemption 7(E). Additional justifications for the assertion of Exemption (b)(7)(E) are described within the specific document categories in which they were applied.

## EXPLANATION OF WITHHELD MATERIAL FOR EACH DOCUMENT CATEGORY

### CATEGORY A - Mere Mention of Antiwar Threat Assessment Material[18]

[18] Responsive material which has been designated and made part of Category A can be found at documents Bates-numbered pages Antiwar 26-35, 42-44, 45-54, 57-142 and 143-145. Bates-numbered pages Antiwar 26-35 and 42-54 were removed as being duplicative to material made part of Category A.

(66) Category A contains 97 responsive pages consisting of electronic communications[19] ("EC") discussing a threat assessment conducted of the plaintiffs and the online magazine Antiwar.com. Of these pages, 10 pages were released in part, 64 pages were withheld in full pursuant to applicable FOIA exemptions and 23 pages were withheld in full, as they were determined to be duplicative of the Bates-numbered pages being discussed herein. Exemptions applied in this category that was universally applied throughout the document categories have been explained above, at ¶¶ 41-64. Information in the ECs included in Category A is also being withheld pursuant to FOIA Exemption (b)(1), application of FOIA Exemption (b)(3), application of FOIA exemption (b)(4), and additional applications of Exemption (b)(7)(E).

**Exemption (b)(1) - E.O. 13526, § 1.4(c): Intelligence Activities, Sources And Methods**

(67) FOIA Exemption (b)(1) was asserted to withhold classified information and records concerning intelligence activities (including covert action), intelligence sources or methods, or cryptology pursuant to E.O. 13526 § 1.4(c) as the unauthorized disclosure of information that could reasonably be expected to cause serious damage to the national security.

(68) E.O. 13526 § 1.4(c) exempts intelligence activities (including covert action), intelligence sources or methods, or cryptology. An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of a national security interest. An intelligence method is used to indicate any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity or method has two characteristics. First, the intelligence activity or method – and information generated by it – is needed by U.S.

---

[19] An electronic communication, or "EC," is a document used to communicate within the FBI in a consistent format that can be uploaded by the originating Division or office, transmitted, and downloaded by recipient Divisions or offices within the FBI's internal computer network.

intelligence/counterintelligence agencies to carry out their missions. Second, confidentiality must be maintained with respect to the activity or method if the viability, productivity and usefulness of its information is to be preserved.

(69) The classification redactions were made to protect the following from disclosure: information that would reveal the actual intelligence activities and methods used by the FBI against specific targets of foreign counterintelligence investigations or operations; information that would identify a target of a foreign counterintelligence investigation; and information that would disclose the intelligence gathering capabilities of the activities or methods directed at specific targets. The criteria utilized in determining what actions by an individual or organization warrant the commencement of an investigation, or cause a certain activity to be given investigative attention over others, could be revealed through disclosure of these intelligence methods or activities. The FBI protected information specific to intelligence activities and methods because disclosure could reasonably be expected to cause serious damage to the national security. The withheld information contained the names of individuals who were and are of investigative interest. Public disclosure of such information would reveal the identity of the target and disrupt current national security investigations. As a result, I have determined that this information is properly classified at the "Secret" level, properly classified pursuant to E.O. 13526 § 1.4(c) and is exempt from disclosure pursuant to FOIA Exemption (b)(1). This harm justification applies to all (b)(1) material withheld under E.O. 13526 § 1.4(c) as indicated in the attached Index.

**Exemption (b)(1) - E.O. 13526, § 1.4(d): Foreign Relations or Foreign Activities**

(70) FOIA Exemption (b)(1) was asserted to withhold classified information and records concerning foreign relations and foreign activities of the United States pursuant to E.O.

13526 § 1.4(d), including confidential sources. Information that effects the foreign relations of the United States does not lose its sensitivity with the passage of time.

(71) The information withheld identifies intelligence information gathered by the United States about a foreign country, and information from a foreign country. Both are sensitive. This condition exists in part due to the delicate nature of international diplomacy. This type of information must be handled with case so as not to jeopardize the fragile relationships that exist among the United States and certain foreign governments. The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; enable hostile entities to assess United States intelligence gathering activities in or about a foreign country and devise countermeasures against these activities; or compromise cooperative foreign sources which may jeopardize their safety and curtail the flow of information from these sources. Thus, information concerning foreign relations or foreign activities which is withheld by the FBI is properly classified in accordance with Section 1.4(d) of E.O. 13526, and exempt from disclosure pursuant to FOIA Exemption (b)(1). This harm justification applies to all (b)(1) material withheld under E.O. 13526 § 1.4(d) as indicated in the attached Index.

**<u>EXEMPTION (b)(3)</u>**
**<u>INFORMATION PROTECTED BY STATUTE</u>**

(72) 5 U.S.C. § 552(b)(3) exempts from disclosure information:

> Specifically exempted from disclosure by statute… provided that such statute (A) requires that the matters be withheld from the public in such manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

**National Security Act of 1947, 50 U.S.C. § 3024(i)(1)**

(73) Exemption 3 was asserted to withhold information pursuant to Section 102A(i)(1) of the National Security Act of 1947 ("NSA"), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), 50 U.S.C. §3024(i)(1), which provides that the Director of National Intelligence ("DNI") "shall protect from unauthorized disclosure intelligence sources and methods."[20] As relevant to U.S.C. § 552(b)(3)(B), the National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009.[21] On its face, this federal statute leaves no discretion to agencies about withholding from the public information about intelligence sources and methods. Thus, the protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute. See CIA v. Sims, 471 U.S. 159 (1985).

(74) In order to fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC") for the classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(1). The FBI is one of 17 member agencies comprising the IC, and as such, must protect intelligence sources and methods.

(75) As described above, Congress enacted the NSA, as amended by the IRTPA, to protect the IC's sources and methods of gathering intelligence. Disclosure of such information presents the potential for individuals to develop and implement countermeasures, which would result in the loss of significant intelligence information, relied upon by national policymakers

[20] Section 1024(i)(1) of the National Security Act was previously codified at 50 U.S.C. § 403(i)(1). As a result of the reorganization of Title 50 of the U.S. Code, Section 102A(i)(1) is now codified at 50 U.S.C. § 3024(i)(1).

[21] The OPEN FOIA Act of 2009 was enacted October 28, 2009, Pub.L. 111-83, 123 Stat. 2142, 2184; 5 U.S.C. §552(b)(3)(B).

and the IC. Given that Congress specifically prohibited the disclosure of information pertaining to intelligence sources and methods used by the IC as a whole, I have determined that the FBI's intelligence sources and methods would be revealed if any of the withheld information is disclosed to plaintiffs, and thus, the FBI is prohibited from disclosing the information under 50 U.S.C. § 3024(i)(1). Thus, this information was properly withheld pursuant to Exemption 3, based on 50 U.S.C. § 3024(i)(1). This harm justification applies to all (b)(3) material withheld under 50 U.S.C. § 3024(i)(1) as indicated in the attached Index. Other applicable Exemption (b)(3) withholding statutes asserted during the processing of plaintiffs' FOIA requests are described below within the specific document categories in which they were applied.

**Exemption (b)(4) - Trade Secrets and Commercial or Financial Information**

(76) FOIA exemption (b)(4) was asserted to protect "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. §552(b)(4). This exemption covers two broad categories of information in federal agency records: (1) trade secrets; and (2) information that is (a) commercial or financial, and (b) obtained from a person, and (c) privileged or confidential. This exemption is intended to protect the interests of both the government and submitters of information. Its very existence encourages submitters to voluntarily furnish useful commercial or financial information to the government and provides the government with an assurance that required submissions will be reliable. The exemption also affords protection to those submitters who are required to furnish commercial or financial information to the government by safeguarding them from the competitive disadvantages that could result from disclosure. In this case, Exemption (b)(4) has been asserted on Bates-numbered pages Antiwar 67-119 and 135-142 to protect the information provided to the FBI for use in national security and criminal investigations. This information was obtained by the FBI pursuant to contractual agreement between the FBI and the company

subject to use limitations. In other words, the FBI paid a subscription to the company for these services. The company providing the records withheld pursuant to (b)(4) collects information from a variety of sources, stores the information, and makes it available to be searched by its customers, including the FBI. These records are copyrighted. The copyright information for the company providing the information to the FBI clearly appears in these records. Furthermore, the withheld copyrighted information has commercial value.

(77) Exemption (b)(4) has been asserted because disclosure of the copyrighted infromation would cause substantial harm to their competitive position. First, from a competitive harm perspective, dislcosing this information could have a negative impact on the holder's potential market, considering that the public would benefit from free information for which this company charges fees. Second, disclosure undermines the commercial nature and inherent value of this copyrighted work as copyright holders have an exclusive right to disseminate work by sale, lease or rental. *See* 17 USC § 106. Release of this copyrighted material would provide the public, at no cost, information the company usually charges fees for, thus denying the company of its proprietary rights to its dissemination. Therefore, the FBI has properly withheld this information pursuant to Exemption (b)(4).

**Exemption (b)(7)(E) - Sensitive FBI File/Sub File Numbers**

(78) Exemption (b)(7)(E) has also been asserted to protect sensitive case file numbers. The FBI has determined that this exemption is appropriate for protecting these file numbers. The release of file numbering convention identifies the investigative interest, a specific law enforcement technique utilized in the investigations at issue, or priority given to such matters. Applying a mosaic analysis, suspects could use these numbers (indicative of investigative priority), in conjunction with other information known about other individuals and/or techniques,

to change their pattern of activity to avoid detection, apprehension, or create alibis for suspected activities. Thus, the FBI properly protected this information from disclosure pursuant to FOIA Exemption (b)(7)(E).

**Exemption (b)(7)(E) - Database Information and/or Printouts**

(79) Exemption (b)(7)(E) was asserted to protect database search results located through non-public databases used for official law enforcement purposes by the FBI and/or law enforcement personnel. These non-public databases serve as repositories for counterterrorism and investigative data. They are essentially "one stop" shops that allow law enforcement to query information and develop investigative leads from a variety of source data using state-of-the-art analytical tools. FBI personnel, as well as, task force members from local, state and other federal agencies have access to these databases. Disclosure of the printouts or information compiled from these search results could enable criminals to employ countermeasures to avoid detection, thus jeopardizing the FBI's investigative mission. Because disclosure would impede the FBI's effectiveness and potentially aid in circumvention of the techniques if disclosed, the FBI properly withheld this information pursuant to Exemption (b)(7)(E).

**CATEGORY B - Mere mentions from Pending Third Party Files [22]**

(80) Category B contains 47 responsive pages consisting of ECs, Intelligence Information Reports ("IIRs")[23], FD-1023s [24], FD-36s[25], email communications to FBI Field Offices and Incident Report Summaries contained in FBI pending investigations of third party

[22] Responsive material which has been designated and made part of Category B can be found at document Bates-numbered Antiwar 1-6, 153-154, 171-181, 183-186, 192-193, 194-195, 196-197, 198-199, 224-225, 230-232, 233-234, 235-236, 242-243, 244-245, 246-247, 271, 272, 273, 275-276, 277-278, 285-286, and 289-290.

[23] An Intelligence Information Report or "IIR," is a report used to communicate raw unevaluated information within the FBI and throughout the intelligence and law enforcement communities.

[24] An FD-1023 is a Source Reporting Document used to document contact information, information provided by a Confidential Human Source (CHS) during a debriefing and to record CHS statistical accomplishments resulting from the information provided.

[25] An FD-36 (Field Airtel) is a form used to communicate information between FBIHQ and the field offices regarding an investigation. This form is no longer used by the FBI.

subjects, wherein the plaintiffs and/or their online magazine Antiwar.com are merely mentioned therein. Of these pages, 41 pages were released in part and 6 pages were withheld in full pursuant to applicable FOIA exemptions. Exemptions applied in this category that were universally applied throughout the document categories have been explained above, at ¶¶ 41-64. Also applicable to this category are Exemptions (b)(1) –[§1.4(c) and §1.4(d)], (b)(3)-[National Security Act of 1947, 50 U.S.C. § 3024(i)(1)] and (b)(7)(E)-[Sensitive FBI File/Sub File Numbers] and [Database Information and/or Printouts] explained above, at ¶¶ 66-74, 77 and 78 in Category A. Information in the records contained in Category B is also being withheld pursuant to additional applications of FOIA Exemptions (b)(1), (b)(7)(D) and (b)(7)(E), not previously discussed. In addition, information contained in Category B was also withheld as "Out of Scope."

**Exemption (b)(1) - E.O. 13526, § 1.4(b) – Foreign Government Information**

(81) FOIA Exemption (b)(1) was asserted to withhold classified foreign government information pursuant to E.O. 13526, § 1.4(b). E.O. 13526, § 6.1(s) defines foreign government information as: "(1) information provided to the United States Government by a foreign government or governments, an international organization of governments, or any element thereof, with the expectation that the information, the source of the information, or both, are to be held in confidence; (2) information produced by the United States Government pursuant to or as a result of a joint arrangement with a foreign government or governments, or an international organization of governments, or any element thereof, requiring that the information, the arrangement, or both, are to be held in confidence; or (3) information received and treated as 'foreign government information' under the terms of a predecessor order."

(82) Many foreign governments do not officially acknowledge the existence of some of their intelligence and security services, or the scope of their activities or the sensitive information generated by them. The free exchange of information between United States intelligence and law enforcement services and their foreign counterparts is predicated upon the understanding that these liaisons, and information exchanged between them, must be kept in confidence.

(83) The release of official United States Government documents that show the existence of a confidential relationship with a foreign government reasonably could be expected to strain relations between the United States and the foreign governments and lead to diplomatic, political, or economic retaliations. A breach of this relationship can be expected to have at least a chilling effect on the free flow of vital information to the United States intelligence and law enforcement agencies, which may substantially reduce their effectiveness. Although the confidential relationship of the United States with certain countries may be widely reported, they are not officially acknowledged.

(84) Disclosure of such a relationship predictably will result in the careful analysis and possible compromise of the information by hostile intelligence services. The hostile service may be able to uncover friendly foreign intelligence gathering operations directed against it or its allies. This could lead to the neutralization of friendly allied intelligence activities or methods or the death of live sources, cause embarrassment to the supplier of the information, or result in economic or diplomatic retaliation against both the United States and the supplier of the information.

(85) Even if the government from which certain information is received is not named in or identifiable from the material it supplies, the danger remains that if the information were to

be made public, the originating government would likely recognize the information as material it supplied in confidence. Thereafter, it would be reluctant to entrust the handling of its information to the discretion of the United States.

(86) The types of classified information provided by foreign government intelligence components, and withheld here under FOIA Exemption 1are: (a) information that identifies a named foreign government and detailed information provided by that foreign government; (b) documents received from a named foreign government intelligence agency and classified "Secret" by that agency; and (c) information that identifies by name, an intelligence component of a specific foreign government, an official of the foreign government, and information provided by that component official to the FBI.

(87) The cooperative exchange of intelligence information between the foreign governments and the FBI was, and continues to be, with the express understanding that the information will be kept classified and not released to the public. Disclosure of the withheld information would violate the FBI's promise of confidentiality. A breach could reasonably be expected to strain relations between the United States and the foreign governments, chill the free flow of vital information to the intelligence and law enforcement agencies, and cause serious damage to the national security and the war on transnational terrorism. This information, which is under the control of the United States Government, is properly classified at the "Secret" level and withheld pursuant to E.O. 13526, § 1.4(b), and is exempt from disclosure pursuant to Exemption 1.

**Exemption (b)(7)(D) - Confidential Source Symbol Numbers**

(88) Exemption (b)(7)(D) was asserted to protect the permanent source symbol numbers of FBI sources mentioned in the responsive documents. Permanent symbol numbers

are assigned to confidential informants who report information to the FBI on a regular basis pursuant to an express grant of confidentiality. The symbol number is used as an administrative reporting tool to protect the actual, sensitive identity of an informant in documents generated by the FBI. A symbol number consists of a two-letter abbreviation which identifies the particular FBI field office where the symbol-numbered source is operating or has operated, followed by a sequentially assigned number. For example, using a fictitious symbol number, "NY 1234" for informant "JOHN DOE," the two-letter abbreviation "NY" reveals that this is a source of the New York Field Office and the source is the 1,234th symbol-numbered source of that office. The symbol number would be used in all written reports in which JOHN DOE provided information to the FBI. Therefore, if "NY 1234" was released every time, the reader of the document would know that the source behind the symbol number was the same reporting individual, thereby potentially identifying JOHN DOE.

(89) Release of these source symbol numbers would indicate both the scope and location of FBI informant coverage within a particular geographic area. If a particular symbol number such as "NY 1234" is released to the public at repeated times and in various documents, the identity of the source could be determined. Each release of information in which the symbol number is disclosed, reveals connections to dates, times, places, events and names from which the source's identity could be deduced. A person familiar with the facts being reported by JOHN DOE could easily identify the identity of "NY 1234" as being JOHN DOE given enough instances in which "NY 1234" provided information to the FBI. Releasing the symbol number, along with information provided by the source from the source's personal perspective concerning the matters being investigated by the FBI, would allow an individual with knowledge of such matters to extrapolate the source's true identity. This is especially true given the fact that

regardless of the law enforcement investigative file in which the symbol number appears, "NY 1234" would always be the symbol number used to protect the true identity of informant JOHN DOE. The protection of these identifiers is essential to maintaining the integrity of the FBI's confidential source program where release could endanger the lives of informants or discourage cooperation by information sources. Disclosure would not serve any public interest and disclosure would impede the FBI's effectiveness. The FBI has withheld this information pursuant to Exemption (b)(7)(D).

**Exemption (b)(7)(D) – Information Provided by and/or Identifying Data Concerning Source Symbol Numbered Informants**

(90) Exemption (b)(7)(D) is also being asserted in this Category, to withhold information provided and/or identifying information concerning source symbol numbered informants. The disclosure of this information would likely reveal a confidential source's identity. The disclosure of a source's identity would forever neutralize that source as a future means of obtaining information. In addition, when the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources. It is only with the understanding of complete confidentiality that the aid of such sources can be enlisted, and only through this confidence that these sources can be persuaded to continue providing valuable assistance in the future. Thus, the FBI has properly withheld this information pursuant to FOIA Exemption (b)(7)(D).

**Exemption (b)(7)(D) – Name, Identifying Data and/or Information Provided by an Individual Under an "Express" Assurance of Confidentiality**

(91) Exemption (b)(7)(D) was also, asserted in conjunction with Exemptions (b)(6) and (b)(7)(C), to protect the name, identifying data and information provided by individuals who assisted in the investigations documented in the records at issue under an "express" assurance of

confidentiality. These sources provided the FBI valuable information regarding the activities of third parties and his/her associates. In the processed records, the FBI documented receipt of information from several sources that were identified in the records by a confidential symbol source number, a positive indication of their request for expressed assurance of confidentiality.

(92) The FBI protected the contents of the valuable information the source provided, which is singular in nature. The disclosure of the identity of these individuals could have disastrous consequences, as detailed in the Exemption (b)(6) and (b)(7)(C) discussions *supra* ¶¶ 56-58 and 61-63. The disclosure of the identity of these confidential sources that were expressly promised confidentiality has wider implications. If the FBI were to disclose the identities of confidential sources that entered into express agreements, that revelation would have a chilling effect on the activities and cooperation of other FBI confidential sources in the future. The FBI has found that it is only with the understanding of complete confidentiality that the aid of such sources can be enlisted, and only through this confidence that these sources can be persuaded to continue to provide valuable assistance in the future. Thus, the identity of, and the information provided by the sources that were expressly promised confidentiality were properly withheld pursuant to FOIA Exemption (b)(7)(D).

**Exemption (b)(7)(E) - Dates and Types of DT and IT Investigations (Preliminary or Full Investigations)**

(93) FOIA Exemption (b)(7)(E) was asserted to protect information pertaining to the types and dates of DT and IT investigations referenced in the records at issue in this case. Specifically, the information withheld, when referenced in connection with an actual investigation and not in general discussion, pertains to the type of investigation, whether it is a "preliminary" or "full" investigation and the date it was initiated. Disclosure of this information would allow individuals to know the types of activities that would trigger a full investigation as

opposed to a preliminary investigation, and the particular dates that the investigation covers, which would allow individuals to adjust their behavior accordingly. Moreover, the knowledge that a specific activity in general warrants investigation could likewise cause individuals to adjust their conduct to avoid detection. Information concerning the type and timing of particular investigations would provide criminals with a road map of how the FBI's investigations were and are progressing on certain subjects. This information would also give terrorists valuable insight into how the FBI develops its investigations on particular IT subjects, and whether or when the FBI may act on the information it has gathered. Because disclosure of this information could reasonably be expected to impede the FBI's effectiveness and potentially aid in circumvention of the law, the FBI has properly withheld this information pursuant to Exemption 7(E).

**Exemption (b)(7)(E) – Sensitive Investigative Techniques and Collection and Analysis of Information Within Specific DT and IT Investigations**

(94) Exemption 7(E) was further asserted to protect sensitive FBI intelligence gathering and investigative techniques and procedures used in DT and IT investigations, pertaining to the collection, analysis, and use of collected intelligence. Specifically, the information protected includes: description of specific intelligences collection techniques; how the technique is employed for specific purposes; information sought by the specific technique in particular circumstances; description of techniques and procedures regarding the intelligence sharing; technique regarding technical analysis of collected intelligence; techniques pertaining to the use of confidential human sources; techniques pertaining the control and dissemination of collected intelligence; techniques pertaining to the collection and analysis of collected intelligence, validation, and strategic use of collected intelligence; and techniques pertaining to interaction/coordination with other government agencies and foreign intelligence agencies. To

further describe the protected techniques will reveal the very information the FBI seeks to protect. The specific information listed in these records, the use of these techniques and procedures, and their utility within the context of these and similar DT and IT investigations are not known to the general public. Releasing these techniques and how they are utilized by the FBI would nullify their effectiveness. With prior knowledge of the FBI's strategy concerning these techniques, terrorists could predict the FBI's investigative approach, structure their activities in a manner that avoids detection and disruption by the FBI and deprive the FBI of the utility of these techniques. Furthermore, information pertaining to the FBI's collection and analysis of the information it obtains for investigative purposes as described in these records is not known to the public. The release of this information would disclose the identity of methods used in the collection and analysis of information, including how and from where the FBI collects information/intelligence and the methodologies employed to analyze it once collected. Such disclosures would enable subjects of FBI investigations to circumvent similar currently used techniques. The relative utility of these techniques could be diminished if the actual techniques were released in this matter. This in turn would facilitate the accumulation of information by investigative subjects regarding the circumstances under which the specific techniques were used or requested and the usefulness of the information obtained. Release of this type of information would enable criminals to educate themselves about the techniques employed for the collection and analysis of information and therefore allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law and engage in intelligence, terrorist, and criminal activities. The FBI has properly withheld this information pursuant to FOIA Exemption 7(E).

## OUT OF SCOPE

(95) The term "Out of Scope" has been cited in conjunction with all applicable exemptions to indicate that the information which was redacted is not related to, nor does it contain the mere mention of Dennis Joseph Raimondo, aka Joseph Raimondo, Eric Anthony Garris and/or Antiwar.com or any name or phonetic breakdowns thereof. For clarity, information designated "out of scope" is not responsive to plaintiffs' request; FOIA exemptions were nonetheless added to demonstrate that the information, although nonresponsive, is also exempt.

## CATEGORY C – Sensitive Law Enforcement Techniques and Procedures[26]

(96) Category C contains 104 responsive pages consisting of ECs, FD-302s[27], FD-1023s, email communications and Letterhead Memorandums[28] detailing the status of FBI investigations of third party subjects, wherein detailed intelligence was gathered through sensitive law enforcement techniques and procedures and the plaintiffs and/or their online magazine Antiwar.com are merely mentioned therein.

[26] Responsive material which has been designated and made part of Category C can be found at documents Bates-numbered pages Antiwar 7-25, 36-37, 38-41, 55-56, 146-148, 149-150, 167-168, 182, 187-188, 189-191, 200-201, 202-203, 204-205, 206, 207-214, 215-216, 217-218, 219-221, 222-223, 226-227, 228-229, 237-238, 239-240, 241, 248-249, 250-255, 256-258, 259-260, 261-262, 263-264, 265-266, 267-268, 269-270, 279-280, 281-282, 283-284, and 287-288. Documents Bates-numbered Antiwar 202-203, 215-216, 217-218, 248-249 and 259-260, 261-262, 263-264, 265-266, 267-268, 269-270 were removed as being duplicative to material made part of Category C.

[27] An FD-302 (Interview Form) is an internal FBI form on which the results of FBI interviews of persons are recorded. Such interview information may later be used as evidence at criminal trials. These interview forms are often incorporated into FBI Investigative Reports. The contents of these forms may also be incorporated into ECs for purposes of setting/covering leads.

[28] A Letterhead Memorandum is an interim summary that reports information, usually derived from FD-302s, concerning the subject of an investigation. It is designed to alert other field offices and/or FBIHQ about pertinent developments in an investigation. Usually, an LHM is attached to a cover sheet, which is typically an FBI letter. The LHM can also be detached from the cover sheet and disseminated to other Government agencies, as a "Law Enforcement Sensitive/For Official Use Only" document.

(97) Of these pages, 39 pages were released in part; 45 pages were withheld in full pursuant to applicable FOIA exemptions; and 20 pages were withheld in full, as they were determined to be duplicative of the Bates-numbered pages being discussed herein. All other exemptions applied in this category are exemptions that were universally applied throughout the responsive documents and have been explained *supra* ¶¶ 41-64. Also applicable to this category are Exemptions (b)(1) –[§1.4(c)], (b)(3)-[National Security Act of 1947, 50 U.S.C. § 3024(i)(1)], and (b)(7)(E)-[Sensitive FBI File/Sub File Numbers], explained above, at ¶¶66-68, 71-74 and 77 in Category A and Exemptions (b)(7)(D)-[Confidential Source Symbol Numbers]; [Information Provided by and/or Identifying Data Concerning Source Symbol Numbered Informants]; and [Name, Identifying Data and/or Information Provided by an Individual Under an "Express" Assurance of Confidentiality]; (b)(7)(E)- [Dates and Types of DT and IT Investigations (Preliminary or Full Investigations)] and [Sensitive Investigative Techniques and Collection and Analysis of Information Within Specific DT and IT Investigations]; and [Out of Scope] explained above, at ¶¶ 87-91 and 92-94 in Category B. Below are detailed justifications for the application of FOIA Exemption (b)(3) relating to 18 U.S.C. § 3123 and (b)(7)(E)-[Targets of Pen Registers/Trap and Trace Devices], unique to this category.

**Exemption (b)(3) - Information Specifically Exempted by 18 U.S.C. § 3123**

(98) Within Category C, Exemption (b)(3) was asserted to protect a pen register information of a third party subject, which is specifically exempt pursuant to 18 U.S.C. § 3123(d), the Pen Register Act. The Pen Register Act protects from disclosure information pertaining to certain court "order(s) authorizing or approving the installation and use of a pen register or a trap and trace device;" and information pertaining to "the existence of the pen register or trap and trace device or the existence of the investigation." A pen register is a device

that records phone numbers dialed to or from a target telephone. The statute mandates that a court order be obtained prior to installing or using a pen register, unless the user of the telephone consents to the device. Orders for pen registers are sealed unless otherwise ordered by the court. Exemption (b)(3) protects the court order in its entirety; the identity of the individual on whom it is placed; the location of the device; information obtained from the device; and any other specifics regarding the pen register/trap and trace device. Where documents at issue contain information that if disclosed would reveal the existence or use of a pen register or trap and trace device, or reveal the existence of an investigation involving a pen register or trap and trace device, that information is protected from disclosure by Exemption 3. As relevant to 5 U.S.C. § 552 (b)(3)(B), the Pen Register Act is a statute[29] enacted before the date of enactment of the OPEN FOIA Act of 2009.[30] Pursuant to 18 U.S.C. § 3123(d), the FBI has properly asserted FOIA Exemption (b)(3) to withhold this information from disclosure.

**Exemption (b)(7)(E) - Targets of Pen Registers/Trap and Trace Devices**

(99) Exemption 7(E) was also asserted in Category C records, to protect the targets of FBI pen registers/trap and trace devices. Releasing these targets within the context of these documents would reveal when and why the FBI decides to utilize a pen register/trap and trace device. Revealing these non-public details about the FBI's use of these devices would provide criminals with an understanding of when they should expect the FBI to deploy this investigative technique and make it easier for them to develop countermeasures to avoid disruption and

---

[29] The Electronic Communications Privacy Act (ECPA) was passed in 1986 (Pub. L. No. 99-508, 100 Stat. 1848). There were three main provisions or Titles to the ECPA. Title III created the Pen Register Act, which included restrictions on private and law enforcement uses of pen registers. The United States statutes governing pen registers are codified under 18 U.S.C., Chapter 206. Section 216 of the 2001 USA PATRIOT Act expanded the definition of a pen register to include devices or programs that provide an analogous function with internet communications.

[30] The OPEN FOIA Act of 2009 was enacted October 28, 2009, Pub. L. No. 111-83, 123 Stat. 2142, 2184; 5 U.S.C. § 552(b)(3)(B).

detection by the FBI. In this manner, release of this information may deprive the FBI the utility of this essential investigative technique and enable criminals to circumvent the law. Therefore, the FBI protected this information pursuant to Exemption 7(E).

**CATEGORY D - Miscellaneous Garris Material**[31]

(100) Category D contains 16 responsive pages consisting of material located during a cross-reference search concerning Eric Anthony Garris. This material consists of ECs, FD-71s[32], FD-36s and email communications. Of these pages 14 were released in part and 2 pages were withheld in full pursuant to applicable FOIA exemptions. The exemptions applied in this category are exemptions that were universally applied explained *supra* ¶¶ 41-64. Also applicable to this category are Exemptions (b)(7)(D)-[Confidential Source Symbol Numbers] explained above, at ¶¶ 87-88 in Category B and (b)(7)(E) –[Database Information and/or Printouts] explained above, at ¶ 78 in Category A.

**SEGREGABILITY**

(101) Plaintiffs have been provided all responsive non-exempt records or portions of records responsive to their FOIA/PA requests to the FBI. During the processing of plaintiffs' requests, each responsive page was individually examined to identify non-exempt information that could be reasonably segregated from exempt information for release. All segregable information has been released to plaintiffs. As demonstrated herein, the only information withheld by the FBI consists of information that would trigger reasonably foreseeable harm to one or more interests protected by the cited FOIA exemptions.

[31] Responsive material which has been designated and made part of Category D can be found at Bates-numbered pages Antiwar 151, 152, 155-166, 169 and 170.
[32] FD-71 (Complaint Form) – This form is used to submit complainant information collected during a phone call after normal business hours. The purpose of the form is to electronically communicate a complaint.

(102) As discussed in Paragraph No. 4, *supra*, there were 290 responsive pages of reference records concerning the plaintiffs' or merely mentioning the online magazine, Antiwar.com found within investigative files pertaining to criminal or national security investigations of third parties/entities identified. Of those pages, 26 were Released in Full ("RIF"), 104 pages Released in Part ("RIP"), 160 pages Withheld in Full ("WIF"). Each of these categories is discussed below to further address segregability.

(a). Pages RIF. RIDs determined that 26 pages could be released in full without redaction as there was no foreseeable harm to an interest protected by the FOIA exemption.

(b). Pages RIP. RIDs determined that 104 pages could be released in part with redactions per the identified FOIA exemptions herein. These pages comprise a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions on these pages.

(c). Pages WIF. Following the segregability review, RIDs determined that 160 pages were required to be withheld in their entirety. RIDs determined that 43 of these pages were duplicates of other pages processed and all information in the remaining 117 pages was fully covered by one or more of the cited FOIA exemptions, or that any non-exempt information on these pages was so intertwined with exempt material, that no information could be reasonably segregated for release. Any further segregation of this intertwined material would employ finite resources only to produce disjointed words, phrases, or sentences, that taken separately or together, would have minimal or no informational content. The FBI processed and released all reasonably segregable information from these records.

## ADMINISTRATIVE HISTORY OF PLAINTIFFS' AMENDMENT/EXPUNGEMENT REQUESTS PURSUANT TO PRIVACY ACT 5 U.S.C. § 552a(d)(2) AND/OR 5 U.S.C. § 552a(e)(7)

### May 21, 2013 Requests of Plaintiffs' Raimondo and Garris

(103) By letters dated May 21, 2013, plaintiffs, through their counsel, submitted a request for an expungement of records pursuant to the Privacy Act for both Garris and Raimondo, as well as Antiwar.com. Specifically, plaintiffs requested "the expungement of any and all records maintained by the Federal Bureau of Investigation ("the Agency") that described Mr. Garris' and Mr. Raimondo's exercise of rights guaranteed by the First Amendment." The FBI was unaware of these requests up until July 19, 2013, when it received a status inquiry from the AUSA representing the FBI in this litigation. At that time, a search of the FBI's FOIPA Document Processing System FDPS failed to locate this request. Upon receiving a copy of these requests from the AUSA, the FBI started processing them under FOIPA Number 1192179, already opened to handle plaintiffs' consolidated FOIPA requests. Copies of the May 21, 2013 letters are attached hereto as Exhibit R.

(104) On August 19, 2013 the FBI responded to the plaintiffs' May 21, 2013 requests. FBI advised plaintiffs that certain information being processed in response to their FOIPA requests had been reviewed for amendment purposes and FBI determined that the maintenance of those records satisfy the Privacy Act's requirement pursuant to 5 U.S.C. § 552a(j)(2); therefore, they are not subject to the amendment provisions. The FBI also notified the plaintiffs of their right to appeal the FBI's decision to the Office of Privacy and Civil Liberties ("OPCL"), US Department of Justice ("DOJ"), within 60 days from the date of the response letter. (*See* Exhibit S.)

(105) By letter dated September 13, 2013, the plaintiffs by and through their counsel, appealed the FBI's decision to the DOJ/OPCL. The letter, among other things, alleges that an FBI memorandum dated April 30, 2004 and two new articles attached thereto are subject to expungement pursuant to 5 U.S.C. §§ 552a(e)(7) and (d)(2) as they describe Raimondo and Garris' First Amendment activities and that they expected other documents subject to expungement. (*See* Exhibit T.)

(106) By letter dated August 28, 2014, DOJ/OPCL advised plaintiffs' counsel that since this matter is presently the subject of judicial review, further action by the office would be inappropriate and plaintiffs' appeals were being closed.

**<u>November 13, 2013 Request of Plaintiff Raimondo</u>**

(107) On November 13, 2013, counsel for plaintiff Raimondo, submitted to the FBI's San Francisco Field Office and FBIHQ, RMD, in Winchester, Virginia, a request pursuant to 5 U.S.C. § 552a(d)(2) of the Privacy Act, requesting "that the FBI amend any and all records maintained by it, whether produced to date or not yet produced, that pertain to Raimondo and that are inaccurate, irrelevant, untimely, or incomplete."

(108) In addition, plaintiff's letter alleges that the FBI maintains, in violation of 5 U.S.C. § 552a(e)(7), at least one record that pertains to him that is inaccurate in various ways. Plaintiff describes the inaccurate record as an FBI Memorandum dated April 30, 2004, provided to him in the FBI's October 1, 2013 release of records. Specifically, his letter alleges that:

> (i.) It inaccurately states "he was in possession of a document which was written in Italian." Upon information and belief, Mr. Raimondo believes that the redacted portion of the April 30 Memo, if it were unredacted, would reveal that the "he" referred to in the above quoted language is Mr. Raimondo and that the "document" referenced in the quoted language refers to the terrorist watch list posted on the public website of an Italian bank. Mr. Raimondo was never "in possession" of any such document. Rather, he

> discovered its existence using Google and linked to it on his website. The clear implication of the statement in the April 30 Memo, however is that Mr. Raimondo procured the document illegally and had physical possession of it. This is untrue and inaccurate. (*See* Antiwar-60 of the FBI's October 1, 2013 disclosure of records);
>
> (ii.) Under the section of the April 30 Memo titled "Analyst Comments," the FBI analyst again references the watch list and states it is "unclear" whether the watch list published on Antiwar.com is "singular in nature." This further implies that Mr. Raimondo somehow gained physical possession of a secret document—the watch list—and published it on Antiwar.com. As stated, this is not true. (*See* Antiwar-64.)
>
> (iii.) The April 30 Memo republishes an inaccuracy contained in a Boston Globe article dated October 13, 2002. Both the Boston Globe article and the April 30 Memo state that Mr. Raimondo "published an article in Pravda." (*See* Antiwar-63) (We note that the April 30 Memo misspells Pravda as "Pravada.") Mr. Raimondo never authorized Pravda to republish his work. If Pravda did publish Mr. Raimondo's work, they did so without his authorization.

(*See* Exhibit U.)

(109) The FBI, in consideration of the inaccuracies alleged by Raimondo, conducted an additional review and analysis of the "April 30 Memo" and determined that his claims were mere speculation, have no factual basis and were unable to be substantiated.

(110) By letter dated February 7, 2014, the FBI advised Raimondo that his request for amendment of records under the Privacy Act 5 U.S.C. § 552a(d)(2) and/or 5 U.S.C. § 552a(e)(7) was denied. The FBI also notified the Raimondo of his right to appeal the FBI's decision to the DOJ/OPCL within 60 days from the date of the response letter. (*See* Exhibit V.)

(111) To date, the Raimondo has not filed any appeals with OPCL concerning the FBI's February 7, 2014 response denying Raimondo's request for amendment of records under the Privacy Act 5 U.S.C. § 552a(d)(2) and/or 5 U.S.C. § 552a(e)(7).

**November 13, 2013 Request of Plaintiff Garris**

(112) On November 13, 2013, counsel for plaintiff Garris submitted to the FBI's San Francisco Field Office and FBIHQ, RMD, in Winchester, Virginia, a request pursuant to 5 U.S.C. § 552a(d)(2) of the Privacy Act, requesting "that the FBI amend any and all records maintained by it, whether produced to date or not yet produced, that pertain to Garris and that are inaccurate, irrelevant, untimely, or incomplete."

(113) In addition, Plaintiff's letter alleges that the FBI maintains, in violation of 5 U.S.C. § 552a(e)(7), at least two records, an FBI Memorandum dated April 30, 2004 and an FBI memorandum dated January 7, 2002, provided to Garris in the FBI's October 1, 2013 release of records, that pertain to him that are inaccurate. Garris further alleges that the two records both contain the same inaccuracy: that he, "Garris," made a threat on September 12, 2001 to hack the FBI website. Garris explains that he did not make a threat to hack the FBI website on September 12, 2001 or any other date. Rather he received a threat by email on September 12, 2001 and immediately contacted the FBI for assistance. Garris states that he was advised to forward an electronic copy of the threat to their office and he did so. Specifically, the inaccuracies identified in his letter are:

> (i.) April 30 Memo (*See* Antiwar-59, 65 from the FBI's October 1, 2013 production) states "that a written contact was received from Eric Garris [and] was documented as a threat by Garris to Hack the FBI website," and "Eric Garris has shown intent to disrupt FBI operations by hacking the FBI website," and
>
> (ii.) FBI memorandum dated January 7, 2002 (*See* Antiwar 169-70) characterizes an email forwarded by Mr. Garris to the FBI to report a threat he received as "A threat by Garris to hack FBI website." The page bates numbered Antiwar-170 contains an FBI internal email, which includes as part of its email chain the email threat *to* Mr. Garris by the individual whose name is redacted, which is the email Mr. Garris forwarded to the Agency.

(*See* Exhibit W.)

(114) The FBI in consideration of the inaccuracies alleged by Garris, conducted an additional review and analysis of the "April 30 Memo" (Antiwar-57-66), the memorandum dated January 7, 2002 (Antiwar-169), and the FBI internal memo (Antiwar-170).

(115) To correct the inaccuracies alleged by Garris and to prevent inaccurate information from being relied upon, used or incorporated into any future FBI records, an EC was prepared (dated February 4, 2004) and indexed in the FBI's CRS under the terms "Eric Garris," "Eric Anthony Garris," "egarris@antiwar.com," "antiwar.com," and "www.antiwar.com." The EC identifies the records containing the inaccurate information, provides a brief description of the information determined to be inaccurate and sets forth that "Garris in no way threatened to hack the FBI's website on September 12, 2001; instead, he reported a threat made to his website, www.antiwar.com."

(116) The FBI in a letter dated February 10, 2014, advised Garris that his request for amendment of records under the Privacy Act 5 U.S.C. § 552a(d)(2) and/or 5 U.S.C. § 552a(e)(7) was denied in part, and granted in part. The FBI also provided to Garris a copy of the aforementioned EC dated February 4, 2004. In addition, the FBI notified Garris of his right to appeal the FBI's decision to DOJ/OPCL within 60 days from the date of the response letter. (*See* Exhibit X.)

(117) By letter dated February 27, 2014, the Plaintiff, by and through his counsel, filed an appeal with DOJ/OPCL concerning the FBI's denial of his request to amend, meaning expunge or at a minimum correct said records. The letter indicates that although Mr. Garris is pleased that the Agency has acknowledged the grave inaccuracies contained in the documents, that the Agency's so-called "corrective action" is inadequate and falls far short of correcting the

erroneous allegations about Mr. Garris that still remain in the Agency's system of records. (*See* Exhibit Y.)

(118) By letter dated August 28, 2014 DOJ.OPCL advised Garris that since this matter is presently the subject of judicial review, further action by the office would be in appropriate, and his appeal was being closed.

**SEPTEMBER 18, 1972 MEMO**

(119) On October 1, 2013, in response to plaintiff Garris' FOIPA request for records concerning himself (FOIPA Request number 1175595-000/001), the FBI released, among other documents, two (2) pages from a September 18, 1972 Memo, Bates-numbered Antiwar-151 to 152. (*See* Exhibit Z). Garris was only mentioned in an excerpt contained on Bates numbered page Antiwar-152. During the course of civil discovery related to plaintiffs' claim under the Section (e)(7) of the Privacy Act, 552 U.S.C. § 552a(e)(7), FBI produced a copy of the September 18, 1972 Memo. (*See* Exhibit AA).

(120) I have examined the September 18, 1972 Memo as well as the contents of the FBI investigative file where the record is contained.

(121) The FBI is a national security organization with both intelligence and law enforcement responsibilities. Since its inception, the FBI has had responsibility for the collection of domestic intelligence and the investigation of domestic security measures, including investigative activity relating to civil disturbances and domestic terrorism. *See* 28 C.F.R. § 0.85(a),(d).

(122) The September 18, 1972 Memo is contained in FBI investigative file No. HQ 157-17818. Garris was not the subject of FBI's investigation, and the only mention of Garris contained in the file is the sole reference to him in the September 18, 1972 Memo. Initially, the investigation was opened in 1970 to probe a third party subject's affiliation with a white hate

group known as "State Craft" because the subject was also employed by the National Security Agency. The FBI's investigation revealed the third party subject's involvement with State Craft and "Youth Action," an organization connected to militant promotion of white racism and advocacy of violent revolution as a means to implement racial and political ideas; other extremist and/or criminal activities; and an alleged threat to assassinate President Richard M. Nixon.

(123) The September 18, 1972 Memo was created to document the FBI's investigative efforts into the activities of the third party subject of investigation, which included his attendance and participation at a "War Crimes Trial" sponsored by Youth Action. The purpose of the September 18, 1972 Memo was to report on the collection of information regarding the third party subject, who posed a threat to persons protected by the United States Secret Service. Under an agreement between the FBI and Secret Service concerning protective responsibilities, the FBI was responsible for furnishing information to the Secret Service about, among other subjects, threats or actions against persons protected by Secret Service, and individuals or organizations potentially dangerous because of background emotional instability or engagement in activities inimical to the United States.

(124) At the time the September 18, 1972 Memo was created, the FBI possessed information that the third party subject of investigation was going to participate in a "War Crimes Trial" sponsored by Youth Action. The FBI Los Angeles Division obtained a Youth Action pamphlet regarding a "War Crimes Trial" of prominent Americans allegedly responsible for the United States' involvement in the Vietnam War. The "defendants," including, among others, Henry Kissinger, Robert MacNamara, Nelson Rockefeller, Henry Cabot Lodge, and Dean Rusk, were to be tried for war crimes against humanity and various other crimes and felonies against American youth. Garris is mentioned in the September 18, 1972 Memo only once: he is

identified as one of the five judges at the "War Crimes Trial." The September 18, 1972 Memo summarized some of the speeches or statements made during the trial (none of which were attributed to Garris), reported the guilty "verdict" returned by the judges, and stated that each judge made a short statement of opinion on the defendants and what should be the sentence. A transcript of radio news broadcast concerning the "trial" was also included in the September 18, 1972 Memo. The broadcast quoted the prosecutor of the trial – a Youth Action officer – as stating that he sought the death penalty for the defendants and that the groups involved in the trial did not consider the trial a mock action because they sought results.

(125) Investigative file No. HQ 157-17818 was closed in April 1999. The FBI maintains investigative records for historic and accountability purposes. To that end, FBI follows the statutory framework for the management, disposal, and archival preservation of federal record codified at Chapters 29, 31, and 33 of Title 44, United States Code. This statutory framework is implemented by National Archives and Records Administrative ("NARA") at Title 36, Code of Federal Regulations. Investigative file No. 157-HQ-17818 is currently maintained by FBI pursuant to the applicable NARA approved record control schedule for disposition of investigative records.

## CONCLUSION

(126) In regards to plaintiffs' FOIPA requests, FBI has conducted a reasonable search for responsive records subject to the FOIA, has processed all such records, and has released all reasonably segregable non-exempt information from documents responsive to plaintiffs' FOIPA requests that are subject to the FOIA. The FBI properly denied access to these records pursuant to the Privacy Act, Exemption j(2), U.S.C. §522a, (j)(2). The FBI processed these records pursuant to the provisions of the FOIA in order to achieve maximum disclosure. The remaining

information was properly withheld pursuant to FOIA Exemptions 1, 3, 4, 6, 7(A), 7(C), 7(D) and 7(E), 5 U.S.C. § 552 (b)(1), (b)(3), (b)(4), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D) and (b)(7)(E). The FBI carefully examined the responsive documents and determined that the information withheld from plaintiffs, if disclosed, would reveal classified information, information protected by statue, would reveal trade secrets and/or commercial or financial information, could reasonably be expected to interfere with enforcement procedures, would reveal information created for law enforcement purposes that could cause unwarranted and clearly unwarranted invasion of the personal privacy interests of third parties; would reveal the identities of confidential sources; and reveal sensitive investigative techniques and procedures. After extensive review of the documents at issue, I have determined that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that Exhibits A through AA attached hereto are true and correct copies.

Executed this 12th day of November, 2015.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia

***DENNIS JOSEPH RAIMONDO, AKA JUSTIN RAIMONDO AND ANTHONY GARRIS v. FEDERAL BUREAU OF INVESTIGATION***

**Civil Action No. 3:13-cv-02295**
**U.S. District Court**
**Northern District of California**

## *Vaughn* Index

This Vaughn Index lists each responsive document processed[1] in this case that was either released in part ("RIP") to the plaintiffs' or withheld in full ("WIF") pursuant to applicable FOIA exemptions or as duplicates.

**Category A – Mere mention of Antiwar Threat Assessment Material**

This category consists of Electronic Communications ("ECs")[2] discussing the Threat Assessment conducted of Justin Raimondo, Eric Anthony Garris (Plaintiffs) and their online magazine Antiwar.com.

| BATES NOS. | DATES AND DESCRIPTIONS RECORDS | EXEMPTIONS | DESCRIPTIONS OF EXEMPTION CATEGORIES AND SUB-CATEGORIES | DISPOSITION |
|---|---|---|---|---|
| Antiwar 26-35<br><br>42-54 | 04/30/2004 – duplicate<br><br>07/29/2004 – duplicate | **(b)(1)**<br>Antiwar 57, 59, 60, 64, and 143 | Exemption (b)(1) was applied to withhold portions of information classified at the Secret level relating to intelligence activities, sources and methods exempt from disclosure and properly classified under E.O. 13,526 § | **WIF (64 pages)** – Antiwar 67-119, 127-129, and 135-142<br><br>**DUPLICATES (23 pages)** - Antiwar 26-35 and 42-54 |

[1] The FBI located and processed 290 responsive pages. Of these pages the FBI released 26 pages in full, released 102 pages in part and withheld in full 160 pages pursuant to applicable FOIA exemptions or as duplicates. Three (3) pages Bates-numbered Antiwar-143 through Antiwar-145 were released in part to the Plaintiffs on October 1, 2013. These three (3) pages were reprocessed, releasing in part 2 pages and releasing in full 1 page to the Plaintiffs in the FBI's November 18, 2013 release Bates-numbered, "Revised Antiwar-143 through Revised Antiwar-145."

[2] An "EC," or "electronic communication," is a document used to communicate within the FBI in a consistent format that can be uploaded by the originating Division or office, transmitted, and downloaded by recipient Divisions or offices within the FBI's internal computer network.

| | | | | |
|---|---|---|---|---|
| 57-142<br><br>143-145 | 04/30/2004 – EC capturing threat assessment, Garris. Raimondo, and Atniwar.com (Antiwar 57-66), with attachments including reports generated by subscription service, new release, news articles, and web postings<br><br>07/29/2004 – EC documenting declination of initiation of preliminary investigation of Garris, Raimondo and Antiwar.com | | 1.4(c); and foreign relations or foreign activities of the United States, including confidential sources, exempt from disclosure and properly classified under E.O. 13,526 § 1.4(d). | **RIP (10 pages)** - Antiwar 57-64, 143 and 145 |
| | | **(b)(3)** Antiwar 57, 59, 60, 64 and 143 | Exemption (b)(3) was applied to withhold portions of information pursuant to §102A(i)(1) of the National Security Act of 1947 ("NSA"), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), 50 U.S.C. §3024(i)(1). | |
| | | **(b)(4)** Antiwar 67-119[3] and 135-142[4] | Trade Secrets and Commercial or Financial Information | |
| | | **(b)(6), (b)(7)(C)** Antiwar 57-62, 69, 127-129[5] and 143 | Exemptions (b)(6) and (b)(7)(C) were applied to withhold portions of information containing the names and/or identifying information of FBI Special Agents (SA's) and/or support personnel; names and/or identifying information of third parties who provided information to the FBI; and names and/or identifying information of persons merely | |

[3] These pages were provided to the Plaintiffs in response to discovery on the Privacy Act claim. The pages were Bates Numbered USA00001-68 and marked as "Confidential Subject to Protective Order."
[4] These pages were provided to the Plaintiffs in response to discovery on the Privacy Act claim. The pages were Bates Numbered USA00069-76 and marked as "Confidential Subject to Protective Order."
[5] The FBI has determined that the assertion of Exemptions (b)(6) and (b)(7)(C) to withhold information on Bates-numbered pages Antiwar 127-129 is no longer applicable.

| | | | | |
|---|---|---|---|---|
| | | | mentioned. | |
| | | **(b)(7)(A)**<br>Antiwar 59-61 and 127-129[6] | Exemption (b)(7)(A) was applied to withhold portions of information containing the names and/or identifying information of third party subjects of, or file numbers assigned to pending investigations. | |
| | | **(b)(7)(D)**[7]<br>Antiwar 61 and 127-129 | Exemption (b)(7)(D) was applied to withhold portions of information containing the names and/or identifying information of individuals who provided information under an implied assurance of confidentiality. | |
| | | **(b)(7)(E)**<br>Antiwar 58, 59, 61-63, 143 and 145 | Exemption (b)(7)(E) was applied to withhold portions of information pertaining to the investigative focus of a specific investigation; sensitive FBI files/sub files; the names and/or numbers and/or alpha designators of sensitive FBI squads/units and information pertaining database information and/or printouts. | |
| | | **Duplicate**<br>Antiwar 26-35 and 45-54<br>Antiwar 42-44 | Antiwar 26-35 and 45-54 were assessed to be duplicates of Antiwar 57-66. Antiwar 42-44 were assessed to be duplicates of Antiwar 143-145. | |

[6] The FBI has determined that the assertion of Exemption (b)(7)(A) to withhold information on Bates-numbered pages Antiwar 127-129 is no longer applicable.

[7] The FBI has determined that the assertion of (b)(7)(D) to withhold portions of information containing the names and/or identifying information of individuals who provided information under an implied assurance of confidentiality on Bates-numbered pages Antiwar-61 and 127-129 is no longer applicable.

| | | | | |
|---|---|---|---|---|
| | | **Referred material** Antiwar 59 and 60 | Portions of information were withheld on these pages pending consultation with another government agency. This information was originally marked as "Referral/Consult" in the records released to the Plaintiffs' on October 1, 2013. Subsequent to this release, these pages were reprocessed and released to the Plaintiffs' on February 7, 2014. | |
| **Category B - Mere mentions from Pending Third Party Files**<br>This category consists of Electronic Communications ("ECs")[8], Intelligence Information Reports ("IIRs")[9], FD-1023s [10], FD-36s[11], email communications to FBI Field Offices and Incident Report Summaries contained in FBI pending investigations of third party subjects, wherein the plaintiffs and/or their online magazine Antiwar.com are merely mentioned therein. | | | | |
| **BATES NOS.** | **DATES AND DESCRIPTIONS RECORDS** | **EXEMPTIONS** | **DESCRIPTIONS OF EXEMPTION CATEGORIES AND SUB-CATEGORIES** | **DISPOSITION** |

[8] An Electronic Communication or "EC," is a document used to communicate within the FBI in a consistent format that can be uploaded by the originating Division or office, transmitted, and downloaded by recipient Divisions or offices within the FBI's internal computer network.
[9] An Intelligence Information Report or "IIR," is a report used to communicate raw unevaluated information within the FBI and throughout the intelligence and law enforcement communities.
[10] An FD-1023 is a Source Reporting Document used to document contact information, information provided by a Confidential Human Source (CHS) during a debriefing and to record CHS statistical accomplishments resulting from the information provided.
[11] An FD-36 (Field Airtel) is a form used to communicate information between FBIHQ and the field offices regarding an investigation. This form is no longer used by the FBI.

| | | | | |
|---|---|---|---|---|
| Antiwar 1-6<br><br><br><br><br><br><br><br><br>153-154<br><br><br><br><br>171-181<br><br><br><br><br><br>183-186<br><br><br><br><br><br><br><br>192-193 | 02/05/2003 – EC discussing result of searches generated by complaint emailed from the FBI Los Angeles Field Office regarding the subject of a pending investigation<br><br>04/22/2008 – EC to document review of records from investigative lead<br><br>02/09/2007 – copy of Antiwar.com article "Is Albania Sponsoring 'Freedom Fighters' Next Door?"<br><br>09/01/2005 – EC documenting receipt of suspicious email. Sender listed pages of links to other websites, such as antiwar.com/casualties<br><br>04/13/2011 – Report | **(b)(1)**<br>Antiwar 225, 230-235, 242-247, 277 and 278 | Exemption (b)(1) was applied to withhold portions of information classified at the Secret level relating to foreign government information exempt from disclosure and properly classified under E.O. 13526 § 1.4(b); to intelligence activities, sources and methods exempt from disclosure and properly classified under E.O. 13526 § 1.4(c); and foreign relations or foreign activities of the United States, including confidential sources exempt from disclosure and properly classified under E.O. 13526 § 1.4(d). | **WIF (6 pages)** - Antiwar 1-6<br><br>**RIP (41 pages)** - Antiwar 153, 154, 171, 183-186, 192-199, 224, 225, 230-236, 242-247, 271-273, 275-278, 285, 286, 289 and 290 |
| | | **(b)(3)**<br>Antiwar 225, 230-235, 242-247 and 277-278 | Exemption (b)(3) was applied to withhold portions of information pursuant to §102A(i)(1) of the National Security Act of 1947 ("NSA"), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), 50 U.S.C. §3024(i)(1) | |
| | | **(b)(7)(A)**<br>Antiwar 1-6, 153, 154, 171, 183, 192, 194, 196, 198 and 277 | Exemption (b)(7)(A) was applied to withhold information containing the names, identifying information of or activities of third party subjects of, or file numbers assigned to pending investigations. | |

| | | | | |
|---|---|---|---|---|
| | regarding investigation into complaint of emails suggesting potential violations of federal laws | **(b)(6), (b)(7)(C)** Antiwar 1-6, 153, 154, 183-186, 192-199, 225, 232, 235, 242, 244, 271-273, 275-277, 285, 286 and 290 | Exemptions (b)(6) and (b)(7)(C) were applied to withhold information containing the names and/or identifying information of FBI Special Agents (SA's) and/or support personnel; names and/or identifying information of third parties who provided information to the FBI; and names and or identifying information of persons merely mentioned. | |
| 194-195 | 08/09/2011 - Report regarding investigation into complaint of emails suggesting potential violations of federal laws | **(b)(7)(D)**[12] Antiwar 1, 183 and 244-245 | Exemption (b)(7)(D) was applied to withhold portions of information containing the names and/or identifying information of individuals who provided information under an expressed assurance of confidentiality and information containing a confidential source symbol number. | |
| 196-197 | 02/01/2012 - Report regarding investigation into complaint of emails suggesting potential violations of federal laws | | | |
| 198-199 | 02/17/2012 - Report regarding investigation into complaint of emails suggesting potential violations of federal laws | **(b)(7)(E)** - Antiwar 1, 153, 154, 183, 192, 194, 196, 198, 224, 225, 230-233, 235, 236, 242-246, 271, 272, 277, 278, 285, 289 and 290 | Exemption (b)(7)(E) was applied to withhold portions of information pertaining to the investigative focus of a specific investigation; the names and/or numbers and/or alpha designators of sensitive FBI squads/units; information pertaining database information and/or printouts; dates and types of investigations (Preliminary or Full Investigations); types of DT and IT investigations and associated dates; | |
| 224-225 | 09/00/2009 – IIR documenting sharing of intelligence obtained from an interview of a | | | |

[12] The FBI has determined that the assertion of (b)(7)(D) to withhold portions of information containing the names and/or identifying information of individuals who provided information under an implied assurance of confidentiality on Bates-numbered pages Antiwar 1 and 183 is no longer applicable.

| | | | | |
|---|---|---|---|---|
| | third party | | information pertaining to the application of sensitive investigative techniques and collection and analysis of information within specific DT and IT investigations; sensitive FBI files/sub files; and collection and/or analysis of information. | |
| 230-232 | 09/20/2007 – IIR documenting sharing of classified intelligence obtained from a confidential source | | | |
| 233-234 | 09/02/2005 - FD-36 documenting intelligence sharing regarding a classified subject | **Out of Scope** Antiwar 1-3, 153-154, 171, 183-186, 192-199, 224, 225, 230-233, 235, 236, 242-246, 271, 272, 274-278, 285, 286 289 and 290 | Term cited in conjunction with all applicable exemptions to indicate that the information which was redacted is not related to nor does it contain the mere mention of Dennis Joseph Raimondo, aka Joseph Raimondo, Eric Anthony Garris and/or www.antiwar.com or any breakdown thereof. | |
| 235-236 | Undated– IIR documenting sharing of intelligence obtained via a classified law enforcement technique | | | |
| 242-243 | 01/27/2006 – EC documenting interview of a third party | | | |
| 244-245 | 06/08/2010 - FD-1023 documenting information received by a confidential source | | | |
| 246-247 | 09/15/2005 - FD-36 documenting intelligence sharing | | | |

| | | | | |
|---|---|---|---|---|
| | regarding a classified subject | | | |
| 271 | 10/14/2010 - Report Summary of an incident occurred on September 19, 2010 | | | |
| 272 | 09/22/2010 - Report Summary of an incident occurred on September 19, 2010 | | | |
| 273 | 10/13/2010 - Report regarding investigation into email suggesting potential violations of federal laws | | | |
| 275-276 | 09/09/2011 - Report regarding investigation into emails suggesting potential violations of federal laws | | | |
| 277-278 | 01/06/2005 – EC documenting investigative lead coverage | | | |
| 285-286 | 03/19/2008 - EC documenting investigative lead | | | |

| | | | | |
|---|---|---|---|---|
| 289-290 | coverage<br><br>09/30/2009 - IIR documenting sharing of intelligence concerning a third party | | | |

**Category C - Sensitive Law Enforcement Techniques and Procedures**

This category consists of ECs, FD-302s[13], FD-1023s, email communications and Letterhead Memorandums[14] detailing the status of FBI investigations of third party subjects, wherein detailed intelligence was gathered through sensitive law enforcement techniques and procedures and the plaintiffs and/or their online magazine Antiwar.com are merely mentioned therein.

| BATES NOS. | DATES AND DESCRIPTIONS RECORDS | EXEMPTIONS | DESCRIPTIONS OF EXEMPTION CATEGORIES AND SUB-CATEGORIES | DISPOSITION |
|---|---|---|---|---|
| Antiwar 7-25<br><br>36-37 | 08/18/2004 – EC documenting investigative lead coverage<br><br>09/22/2005 – EC reporting information received via the use of a sensitive law enforcement technique | **(b)(1)** Antiwar 38-40, 55, 56, 146-148, 167, 168, 200, 201, 206-214, 219-223, 226, 237-241, 250-252, 256-258, 279, 280, 283, 284, 287 and 288 | Exemption (b)(1) was applied to withhold portions of information classified at the Secret level relating to intelligence activities, sources and methods exempt from disclosure and properly classified under E.O. 13,526 § 1.4(c). | **WIF (45 pages)** - Antiwar 8, 10-25, 38-41, 55, 56, 146-148, 167, 168, 182, 206, 207-214, 220, 221, 253-255, 287 and 288<br><br>**DUPLICATES (20 pages)** – Antiwar 202, 203, 215-218, 248, 249, and 259-270 |

[13] An FD-302 (Interview Form) is an internal FBI form on which the results of FBI interviews of persons are recorded. Such interview information may later be used as evidence at criminal trials. These interview forms are often incorporated into FBI Investigative Reports. The contents of these forms may also be incorporated into ECs for purposes of setting/covering leads.

[14] A Letterhead Memorandum is an interim summary that reports information, usually derived from FD-302s, concerning the subject of an investigation. It is designed to alert other field offices and/or FBIHQ about pertinent developments in an investigation. Usually, an LHM is attached to a cover sheet, which is typically an FBI letter. The LHM can also be detached from the cover sheet and disseminated to other Government agencies, as a "Law Enforcement Sensitive/For Official Use Only" document.

| | | | | |
|---|---|---|---|---|
| 38-41<br><br><br><br><br><br>55-56 | 01/06/2005 – EC documenting lead response related to the subject of a pending investigation<br><br>02/17/2005 – EC documenting information received from a classified source | **(b)(3)**<br>Antiwar<br>36-40, 55, 56, 146-148, 167, 168, 200, 201, 206-214, 219-223, 226, 237-241, 250-252, 256-258, 279, 280, 283, 284, 287 and 288 | Exemption (b)(3) was applied to withhold portions of information pursuant to 18 U.S.C. § 3123(d) and to withhold portions of information pursuant to §102A(i)(1) of the National Security Act of 1947 (“NSA”), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 (“IRTPA”), 50 U.S.C. §3024(i)(1). | **RIP (39 pages)** - Antiwar 7, 9, 36, 37, 149, 150, 187-191, 200, 201, 204, 205, 219, 222, 223, 226-229, 237-241, 250-252, 256-258 and 279-284 |
| 146-148<br><br><br><br><br><br><br>149-150 | 11/28/2006 – EC documenting use of a sensitive law enforcement technique to investigate a classified subject<br><br>09/12/2005 – EC documenting use of a sensitive law enforcement technique to analyzed information pertaining to a third party subject | **(b)(6), (b)(7)(C)**<br>Antiwar -7, 36-38, 55, 146-150, 182, 187-191, 200, 201, 204, 205, 207, 219, 222, 223, 226-229, 237-241, 250-252, 279, 281 and 282 | Exemptions (b)(6) and (b)(7)(C) were applied to withhold information containing the names and/or identifying information of FBI Special Agents (SA’s) and/or support personnel; names and/or identifying information of third parties who provided information to the FBI; and names and or identifying information of persons merely mentioned. | |
| 167-168 | 03/28/2003 – Email containing classified information | **(b)(7)(A)**<br>Antiwar 38-41, 146, 189-191, 222, 237, 238, 241, and 242 | Exemption (b)(7)(A) was applied to withhold information containing the names, identifying information of or activities of third party subjects of, or file numbers assigned to pending investigations. | |
| 182 | 05/20/2010 - FD-1023 documenting information provided | **(b)(7)(D)**<br>Antiwar 182, 187-191 and 205 | Exemption (b)(7)(D) was applied to withhold portions of information containing the names and/or identifying information of individuals who | |

| | | | | |
|---|---|---|---|---|
| | by a confidential source | | provided information under an expressed assurance of confidentiality and information containing a confidential source symbol number. | |
| 187-188<br><br><br>189-191<br><br><br><br><br>200-201<br><br><br><br><br><br>202-203<br><br>204-205<br><br><br><br><br><br>206 | 04/28/2006 – EC documenting statistical accomplishment<br><br>04/28/2006 – EC documenting information provided by a confidential source<br><br>04/05/2006 – EC documenting information about a classified investigative matter<br><br>04/05/2006 - duplicate<br><br>05/05/2006 – EC providing update information about third parties subjects of national security investigations<br><br>07/00/2005 – Other See further description in my in-camera declaration | **(b)(7)(E)** Antiwar 7-25, 36-41, 146-150, 182, 187, 189, 190, 200, 201, 204, 205, 207-210, 219-221, 222, 223, 226, 227, 229, 237-241, 250-255, 279, 281, 282 and 287 | Exemption (b)(7)(E) was applied to withhold portions of information pertaining to the investigative focus of a specific investigation; the types of investigations (preliminary or full) in specific DT and IT cases and the dates associated with these types of investigations; information pertaining to the application of Sensitive Investigative Techniques and Collection and Analysis of Information Within Specific DT and IT Investigations; sensitive FBI files/sub files; the names and/or numbers and/or alpha designators of sensitive FBI squads/units; collection and/or analysis of information and Targets of Pen Registers/Trap and Trace Devices. | |
| | | **Out of Scope** 36, 37, 146-150, 187-191, 200, 201, 204, 205, 207, 219, 222, 223, 226-229, 237-241, 250, 251, 256, 257, 279, 281-283 and 287 | Term cited in conjunction with all applicable exemptions to indicate that the information which was redacted is not related to nor does it contain the mere mention of Dennis Joseph Raimondo, aka Joseph Raimondo, Eric Anthony Garris and/or www.antiwar.com or any breakdown thereof. | |

| | | | | |
|---|---|---|---|---|
| 207-214 | 10/09/2007 – EC discussing classified information about a third party obtained via a sensitive law enforcement technique | | | |
| 215-216 | 04/05/2006 - duplicate | | | |
| 217-218 | 04/05/2006 - duplicate | | | |
| 219-221 | 01/27/2006 – EC documenting interview of a third party | | | |
| 222-223 | 04/20/2010 - EC providing a prosecutive report summarizing evidence pertaining to third parties | | | |
| 226-227 | 09/08/2009 - FD-302 documenting interview of a third party | | | |
| 228-229 | 06/25/2009 – EC regarding material received during execution of search warrant | | | |
| 237-238 | 08/09/2007 – LHM providing an | | | |

| | | | | |
|---|---|---|---|---|
| | investigative summary pertaining to the investigation of a third party | | | |
| 239-240 | 11/09/2006 – EC providing information pertaining to a third party subject of investigation | | | |
| 241 | 09/01/2006 – EC documenting information received from a third party regarding the subject of an FBI investigation | | | |
| 248-249 | 04/20/2010 - duplicate | | | |
| 250-255 | 05/29/2008 – EC discussing information, including classified information, pertaining to the subject of an FBI's investigation | | | |
| 256-258 | 08/27/2008 – LHM discussing the reasons for the closing of an investigative matter | | | |
| 259-260 | 04/20/2010 - duplicate | | | |

| | | | | |
|---|---|---|---|---|
| 261-262 | 09/08/2009 - duplicate | | | |
| 263-264 | 04/20/2010 - duplicate | | | |
| 265-266 | 04/20/2010 – duplicate | | | |
| 267-268 | 09/08/2009 - duplicate | | | |
| 269-270 | 04/20/2010 – duplicate | | | |
| 279-280 | 01/18/2006 – EC discussing classified information pertaining to evidence analysis regarding a third party subject of an FBI's investigation | | | |
| 281-282 | 11/10/2003 - FD-302 regarding review of hard drives seized during investigation | | | |
| 283-284 | 04/13/2006 – LHM containing a classified investigative summary analysis report pertaining to the investigation of a third party | | | |

| | | | | |
|---|---|---|---|---|
| 287-288 | 06/21/2005 – Other<br>See further description in my in-camera declaration | | | |
| | | **Duplicate**<br>Antiwar 202, 203 and 215-218<br>Antiwar 248, 249, 259, 260, 263-266, 269 and 270<br><br>Antiwar 261, 262, 267 and 268 | Antiwar 202-203, 215-216 and 217-218 were assessed to be duplicates of Antiwar 200-201.<br><br>Antiwar 248-249, 259-260, 263-264, 265-266 and 269-270 were assessed to be duplicates of Antiwar 222-223.<br><br>Antiwar 261-262 and 267-268 were assessed to be duplicates of Antiwar 226-227. | |
| **Category D – Miscellaneous Garris Material**<br><br>Material located during a cross-reference search concerning Eric Anthony Garris. This material consists of ECs, FD-71s[15], FD-36s and email communications. | | | | |
| **BATES NOS.** | **DATES AND DESCRIPTIONS RECORDS** | **EXEMPTIONS** | **DESCRIPTIONS OF EXEMPTION CATEGORIES AND SUB-CATEGORIES** | **DISPOSITION** |
| Antiwar 151-152 | 09/18/1972 – excerpt of a memorandum relating to criminal investigation of third party subject | **(b)(6), (b)(7)(C)**<br>Antiwar 151, 152, 155, 158-166, 169 and 170 | Exemptions (b)(6) and (b)(7)(C) were applied to withhold information containing the names and/or identifying information of FBI Special Agents (SA's) and/or support personnel; names | **WIF (2 pages)** - Antiwar 156-157<br><br>**RIP (14 pages)** - Antiwar 151, 152, 155, 158-166, 169, |

[15] FD-71 (Complaint Form) – This form is used to submit complainant information collected during a phone call after normal business hours. The purpose of the form is to electronically communicate a complaint.

| | | | | |
|---|---|---|---|---|
| <br>155-157<br><br>158-166<br><br>169<br><br>170 | (*see supra* ¶¶ 119-125)<br><br>06/04/2000 – FD-71 regarding complaint reported from Garris<br><br>03/02/1992 – FD-36 regarding investigative activity about alleged threat to presidential candidate<br><br>01/07/2002 – EC regarding threat to hack FBI (*see supra* ¶¶ 113-115)<br><br>09/12/2001 – Email from Garris to FBI regarding threat made to website | | and/or identifying information of third parties who provided information to the FBI; and names and or identifying information of persons merely mentioned. | 170 |
| | | **(b)(7)(A)**<br>Antiwar 169 | Exemption (b)(7)(A) was applied to withhold information containing the names, identifying information of or activities of third party subjects of, or file numbers assigned to pending investigations. | |
| | | **(b)(7)(D)**<br>Antiwar 151 | Exemption (b)(7)(D) was applied to withhold portions of information containing the names and/or identifying information of individuals who provided information under an expressed assurance of confidentiality and to withhold portions of information containing a confidential source symbol number | |
| | | **(b)(7)(E)**<br>Antiwar 156, 157 and 169 | Exemption (b)(7)(E) was applied to withhold portions of information pertaining database information and/or printouts and the names and/or numbers and/or alpha designators of sensitive FBI squads/units | |