UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DENNIS JOSEPH RAIMONDO, et al.,

           Plaintiffs,

     v.

FEDERAL BUREAU OF
INVESTIGATION,

           Defendant.

Case No.  13-cv-02295-JSC

**ORDER RE: CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 69, 82

Plaintiffs Dennis Raimondo and Eric Garris bring claims under the Freedom of
Information Act and the Privacy Act against Defendant the Federal Bureau of Investigation
("FBI").  Plaintiffs seek records regarding a 2004 threat assessment the FBI conducted of a
website, Antiwar.com, with which the Plaintiffs are affiliated, and related investigations that the
FBI conducted of Plaintiffs.  Plaintiffs also seek expungement of certain records related to the
exercise of their First Amendment rights, and Plaintiff Garris seeks expungement of a record that
admittedly contains inaccurate information.  Now pending before the Court are the parties' cross-
motions for summary judgment.[1]  (Dkt. Nos. 69 & 82.)

### BACKGROUND

In August of 2011, Raimondo and Garris discovered that they and the website,

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §
636(c).  (Dkt. Nos. 8 & 11.)

Antiwar.com, had been subject to FBI surveillance.  (Dkt. No. 28-1 ¶ 15.) [2]  In particular, Plaintiffs discovered a heavily redacted FBI memorandum from April 30, 2004 ("April 30 Memo") which suggested that the FBI had conducted a threat assessment of Antiwar.com "an anti-interventionist website that publishes news and opinion articles regarding U.S. foreign and military policy."  (*Id.* ¶ 2.)  Garris is the founder, managing editor, and webmaster of Antiwar.com, and Raimondo is the editorial director.  (*Id.* ¶¶ 8-9.)  Plaintiffs contend that the FBI initiated investigations into each of them based on First Amendment protected speech activity which was memorialized in the April 30 Memo.  (*Id.* ¶ 3.)

### 1.  Plaintiffs' Freedom of Information Act and Privacy Act Requests

In October 2011, Plaintiffs separately filed Freedom of Information Act ("FOIA") and Privacy Act requests (collectively known as "FOIPA requests") seeking disclosure of records maintained by the FBI regarding themselves.  (Dkt. No. 71 at ¶ 7.)  The FBI responded a month later in separate form letters stating that it had been unable to identify main file records responsive to Plaintiffs' requests in its Central Records System.  (*Id.* ¶ 8.)  Over the course of the next year, Plaintiffs, through counsel, pursued various administrative appeals and challenges to the FBI's denial of their FOIPA requests.  (*Id.* ¶¶ 9-11.)   In particular, in a May 24, 2012 letter, Plaintiffs requested additional information and clarification regarding seven FOIPA requests explaining that "[e]ach of the original requests sought files about each requester and specified the requester's connection to the online magazine Antiwar.com.  As such, the FBI needed to search for records related to Antiwar.com in order to determine whether there were responsive records for the requesters" and suggesting that additional records related to Raimondo, Garris and Antiwar.com existed in light of the April 30 Memo.  (*Id.* ¶ 12.)  The May 24 letter also provided Raimondo and Garris's full legal names. (*Id.* ¶ 13.)

The FBI thereafter reopened Plaintiffs' FOIPA requests and assigned the request for records regarding Antiwar.com a separate FOIPA number.  (*Id.* ¶ 14.)  On November 9, 2012, the FBI notified Plaintiffs that their FOIPA requests were being administratively closed and

---

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

consolidated with Plaintiffs' request regarding Antiwar.com.  (*Id.* ¶ 17.)

### 2.  This Lawsuit and Plaintiffs' Request Under the Privacy Act Section 552a

In May 2013, Plaintiffs filed this action seeking disclosure of documents pursuant to FOIA and the Privacy Act.  That same day, Plaintiffs separately filed requests with the FBI seeking expungement of all records maintained by the FBI that describe each Plaintiff's exercise of First Amendment rights.  (*Id*. at ¶ 103; Dkt. No. 78 at 18.)  In August 2013, the FBI responded that maintenance of records regarding Plaintiffs was proper under Section 552a(j)(2) of the Privacy Act.  (Dkt. No. 71 at ¶ 40; Dkt. No. 78 at 25.)  Plaintiffs filed a timely appeal of this decision and the FBI responded nearly a year later that because the matter was subject to judicial review the appeal had been administratively closed.  (Dkt. No. 71 at ¶¶105-106; Dkt. No. 78 at 27.)   Around the same time Plaintiffs appealed the denial of the expungement request, Plaintiffs submitted requests pursuant to Privacy Act Sections 552a(d)(2) and 552a(e)(7) seeking amendment of any records that pertain to Garris or Raimondo that are inaccurate, irrelevant, untimely, or incomplete. (Dkt. No. 71 at ¶¶ 107-108; 112-113.)  The FBI denied the request as to Raimondo, but issued an Electronic Communication ("EC") with respect to Garris.  (*Id*. at ¶¶ 109-110; 115-116; Dkt. No. 71-4 at 20.)  Plaintiff Garris appealed this action on the grounds that the EC falls short of the necessary corrective action.  (*Id*. at ¶ 117.)  The FBI denied the appeal because the matter was currently subject to judicial review.  (*Id*. at ¶ 118.)

Plaintiffs thereafter filed the operative First Amended Complaint alleging four claims for relief, including the two previously pled claims under FOIA and the Privacy Act for failure to promptly and properly disclose documents in response to Plaintiffs' FOIAP requests, and two new claims under the Privacy Act.  (Dkt. No. 28-1, FAC.)  The new Privacy Act claims are brought pursuant to Section 552a(e)(7) which provides that an agency shall not maintain "any record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity," and under Section 552a(d)(2) challenging the FBI's maintenance of records which are inaccurate, untimely, irrelevant, or incomplete, respectively.  (*Id*. at ¶¶ 86-83.)

United States District Court
Northern District of California

Because this case includes both FOIA and Privacy Act claims, the parties conducted some discovery prior to submission of the now pending cross-motions for summary judgment.

### 3.  The FBI's Document Production

Five months after this lawsuit was filed, the FBI made its first interim release of records. Having reviewed 170 pages, the FBI released in full or part 47 pages and withheld others under Privacy Act Exemption (j)(2) and FOIA Exemptions 1, 3, 4, 6, 7(A), 7(C), 7(D) and 7(E).  (Dkt. No. 71 at ¶ 20.)  This production included a less redacted version of the previously discovered April 30 Memo as well as 11 of the Memo's enclosures, a memo from September 18, 1972 (the "September 1972 Memo") which references Plaintiff Garris (*Id*. at ¶ 119-122), and a July 29, 2004 memo from the San Francisco FBI Field Office declining to initiate a preliminary investigation into Plaintiffs (the "July 2004 Memo"), (*Id*. at ¶ 20, n.8; Dkt. No. 73-5.).

The FBI made a second interim release of records the following month: of the 54 pages reviewed, the FBI released 36 in whole or part and withheld certain other information pursuant to the same FOIA exemptions previously asserted.  (*Id*. at ¶ 21.)  Three months later, the FBI made its third and final interim release of records.  Having reviewed another 69 pages, the FBI released 50 pages in full or part and withheld certain information pursuant to the same FOIA exemptions. (*Id*. at ¶ 22.)  In January 2014, the FBI provided Plaintiffs with a description of the search conducted in response to Plaintiffs' FOIPA requests and provided an initial Vaughn index. (*Id*. at ¶ 24.)  In total, the FBI has identified 290 responsive pages of records: of these, 26 pages have been released in full, 104 pages were released in part, 117 pages were withheld in full, and 43 pages were withheld in full as duplicates. (*Id*. at ¶ 4.)

### EVIDENTIARY OBJECTIONS

As a preliminary matter, the Court must address Plaintiffs' objections to the two declarations the FBI submitted in support of its motion for summary judgment.

### 1. The Campi Declaration

The FBI submitted the Declaration of Andrew Campi who is the Assistant Special Agent in Charge of the FBI's Newark Field Office.  (Dkt. No. 70.)  Plaintiffs object to those portions of the Campi Declaration which discuss the April 30 Memo because Campi has no personal

4

United States District Court
Northern District of California

1  knowledge of the memo or its attachments—he was not stationed in Newark at the time it was

2  prepared and attests that his knowledge is based on "his experience and review of information

3  provided to me in the course of my official duties, including the April 30 2004 EC and the

4  attachments thereto."  (*Id.* at ¶ 3.)

5        The FBI counters that personal knowledge can come from review of the contents of agency

6  files and records and that as the Assistant Special Agent in charge of the Newark office Campi has

7  knowledge to testify regarding the AG guidelines, the procedure regarding development of ECs

8  and the attachments thereto, any further investigative activity into Plaintiffs, and the extent to

9  which the April 30 Memo is relevant to ongoing and future activity.

10        Campi has adequate personal knowledge to address these matters.  As a general matter in

11  FOIA cases, "[a]n affidavit from an agency employee responsible for supervising a FOIA search is

12  all that is needed to satisfy the personal knowledge requirement of Federal Rule of Civil Procedure

13  56(e)." *Lahr v. National Transp. Safety Bd*., 569 F.3d 964, 989 (9th Cir. 2009).  Courts routinely

14  deny hearsay and lack of personal knowledge objections in FOIA cases based on agency affidavits

15  similar to those submitted here.  *See, e.g.*, *Our Children's Earth Found. v. Nat'l Marine Fisheries*

16  *Serv*., No. 14-1130 SC, 2015 WL 6331268, at *2 (N.D. Cal. Oct. 21, 2015) (overruling hearsay

17  and personal knowledge objections with respect to a declaration submitted by the agency's San

18  Francisco Branch Chief);  *Hersh & Hersh v. U.S. Dep't of Health & Human Servs*., No. C 06-

19  4234, 2008 WL 901539, at *4 (N.D. Cal. Mar. 31, 2008) (same with respect to a declaration

20  submitted by the Health and Human Services FOIA officer).   The same rationale applies equally

21  here notwithstanding Plaintiffs' assertion of Privacy Act claims in addition to the FOIA claims.

22        Plaintiffs' objections to the Campi Declaration are therefore overruled.

23        **2.  Hardy Declaration**

24        Plaintiffs also object to the Declaration of David M. Hardy, the Section Chief of the FBI's

25  Record/Dissemination Section, Records Management Division in Winchester Virginia.  Mr. Hardy

26  has submitted a lengthy declaration primarily addressing the FBI's claims of exemptions under

27  FOIA and the Privacy Act, and attaching the *Vaughn* Index.  (Dtk. No. 71.)  In particular,

28  Plaintiffs object to Hardy's statements regarding the September 1972 Memo as not based on his

1   personal knowledge.

2         Plaintiffs' objections to the Hardy Declaration are overruled for the same reason their

3   objections to the Campi Declaration are overruled. *See Council on Am.-Islamic Relations,*

4   *California v. F.B.I.*, 749 F. Supp. 2d 1104, 1119 (S.D. Cal. 2010) (overruling objections to a

5   declaration from David Hardy in a FOIA case).

6   **DISCUSSION**

7         Plaintiffs' claims are divisible into three categories: (1) Plaintiffs' disclosure claims under

8   FOIA, Section 522(a)(3), (a)(6), and under the Privacy Act, Sections 552a(d)(1), (g)(1)(B), (g)(3);

9   (2) Plaintiffs' Privacy Act claim based on retention of documents reflecting Plaintiffs' exercise of

10  their First Amendment Rights under Sections 552a(e)(7), (d), (g)(1)(A), (D), (g)(2)(A); and (3)

11  Plaintiff Garris's Privacy Act claim based on maintenance of inaccurate records under Sections

12  552a(d), (e)(1) and (5), (g)(1)(A), (g)(2)(A).

13  **I.      Plaintiffs' Disclosure Claims**

14        The FOIA calls for "broad disclosure of Government records." *CIA v. Sims*, 471 U.S. 159,

15  166 (1985).  To ensure broad disclosure, the FOIA "gives individuals a judicially-enforceable

16  right of access to government agency documents." *Lion Raisins v. Dep't of Agric.*, 354 F.3d 1072,

17  1079 (9th Cir. 2004); 5 U.S.C. § 552.  The FOIA specifically provides, in relevant part, that:

18  "each agency, upon any request for records which (i) reasonably describes such records and (ii) is

19  made in accordance with published rules stating the time, place, fees (if any), and procedures to be

20  followed, shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).

21  There is a strong presumption in favor of disclosure. *See U.S. Dep't of State v. Ray*, 502 U.S. 164,

22  173 (1991).  This "general philosophy of full agency disclosure [applies] unless information is

23  exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493

24  U.S. 146, 151-52 (1989) (quotation marks and citation omitted).  These exemptions "must be

25  narrowly construed." *John Doe Agency*, 493 U.S. at 154.  "[L]ike FOIA, the Privacy Act provides

26  for a cause of action to compel compliance [under Section 552a](d)(1)." *Mobley v. C.I.A.*, 806

27  F.3d 568, 586 (D.C. Cir. 2015).

28        The government agency bears the burden to prove a particular document or redaction falls

United States District Court
Northern District of California

United States District Court
Northern District of California

within one of the nine statutory exemptions from disclosure. *Ray*, 502 U.S. at 173; *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009); *see also Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009)(noting that the burden is on the government in both FOIA and Privacy Act cases to demonstrate that it acted in accordance with the applicable statute). The government may rely on affidavits to satisfy its burden of demonstrating that an exemption applies, but the affidavits must contain "reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption." *Kamman v. IRS*, 56 F.3d 46, 48 (9th Cir. 1995) (quoting *Lewis v. IRS*, 823 F.2d 375, 378 (9th Cir. 1987)); *see also Shannahan v. IRS*, 672 F.3d 1142, 1148 (9th Cir. 2012) ("To justify withholding, the government must provide tailored reasons in response to a FOIA request. It may not respond with boilerplate or conclusory statements."); *Church of Scientology v. Dep't of the Army*, 611 F.2d 738, 742 (9th Cir. 1980) (noting that the government "may not rely on conclusory and generalized allegations of exemptions"); *Chambers*, 568 F.3d at 1003 ("the court may rely on a reasonably detailed affidavit" in reviewing a Privacy Act disclosure claim). "[S]ummary judgment on the basis of such agency affidavits is warranted if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).

Even if an exemption applies, an agency may only withhold the information to which the exemption applies. *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 2012). The agency is therefore required to provide all "reasonably segregable" portions of the records to the requester. 5 U.S.C. § 552(b). "The burden is on the agency to establish that all reasonably segregable portions of a document have been segregated and disclosed." *Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 148 (9th Cir. 2008). "To meet its burden in this regard, the agency must provide[ ] a detailed justification and not just conclusory statements." *ACLU of N. Cal. v. FBI*, No. C 12-03728 SI, 2014 WL 4629110, at *3 (N.D. Cal. Sept. 16, 2014) (internal quotation marks and citation omitted). In contrast, under the Privacy Act, the head of the agency can exempt an entire system of records from disclosure, but only where they meet certain criteria. *See* 5

1  U.S.C. § 552a(j)-(k); *see also Mobley*, 806 F.3d at 586 (discussing requirements for claiming

2  exemption under subsection (j)).

3          In response to Plaintiffs' FOIA and Privacy Act requests, the FBI has asserted certain

4  statutory exemptions.  For purposes of their FOIA disclosure claim, Plaintiffs only challenge one

5  category of exemptions—those under Exemption 7.[3]  Plaintiffs contend that the same arguments

6  apply with respect their claim for disclosure under the Privacy Act, Section 552a(d)(1), because

7  the Privacy Act exemption claimed by the FBI only applies if the documents are withheld for a

8  law enforcement purpose, which mirrors the Exemption 7 standard.[4]  The Court's analysis of the

9  disclosure claim thus focuses on the FOIA claim, but applies equally to the Privacy Act disclosure

10  claim.  *See News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1189 (11th Cir. 2007)

11  ("The net effect of the interaction between the two statutes is that where the FOIA requires

12  disclosure, the Privacy Act will not stand in its way, but where the FOIA would permit

13  withholding under an exemption, the Privacy Act makes such withholding mandatory upon the

14  agency.").

15          **A.      Exemption 7, Law Enforcement Objective**

16          Exemption 7 permits the government to withhold "records or information compiled for law

17  enforcement purposes" under certain enumerated conditions.  5 U.S.C. § 552(b)(7).  Here, the FBI

18

19  [3] Plaintiffs do not contest the FBI's claim of Exemptions 1, 3, or 4.  Plaintiffs also challenge

20  Exemption 6, but the FBI has asserted Exemption 6 in conjunction with its assertion of Exemption 7(C) and the Court thus analyzes it under 7(C).

21  [4] The FBI contends that the records are exempt from disclosure under Section 552a(j)(2) which states the agency head may exempt records from disclosure if they are

22
23              maintained by an agency or component thereof which performs as
                its principal function any activity pertaining to the enforcement of
24              criminal laws … and which consists of (A) information compiled for
                the purpose of identifying individual criminal offenders and alleged
25              offenders and consisting only of identifying data and notations of
                arrests, the nature and disposition of criminal charges, sentencing,
26              confinement, release, and parole and probation status; (B)
                information compiled for the purpose of a criminal investigation,
27              including reports of informants and investigators, and associated
                with an identifiable individual; or (C) reports identifiable to an
28              individual compiled at any stage of the process of enforcement of
                the criminal laws from arrest or indictment through release from
                supervision.

has divided the withheld or redacted documents into four categories: A through D as described in the Hardy Declaration.  (Dkt. No. 71 at ¶¶ 67-100.)  Category A documents discuss the threat assessment (*Id*. at ¶¶ 67-79), Category B documents are records in pending FBI investigations of third parties which mention Plaintiffs and/or Antiwar.com (*Id*. at ¶¶ 80-95), Category C documents detail the status of FBI investigations into third party subjects which mention Plaintiffs and/or Antiwar.com (*Id*. at ¶¶ 96-99), and Category D documents are complaint forms and communications that reference Plaintiff Garris. (*Id*. at ¶¶ 100.)  Plaintiffs contend that the Category A documents were not compiled for a law enforcement purpose and therefore Exemption 7 does not apply.  Their argument that the Category B, C and D documents have not been described with sufficiently particularity and were not reasonably segregated and therefore any claimed exemption should be rejected is discussed *infra* at Section I.A.3.

### 1.     Rationale Nexus Test

"An agency which has a clear law enforcement mandate, such as the FBI, need only establish a rational nexus between enforcement of a federal law and the document for which an exemption is claimed."  *Church of Scientology*, 611 F.2d at 748 (internal quotation marks omitted).  "The rational nexus test requires courts to accord a degree of deference to a law enforcement agency's decisions to investigate."  *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803, 808 (9th Cir. 1995).  However, "generalized monitoring and information-gathering" do not suffice for Exemption 7.  *Id*. at 809.  Moreover, "[i]nformation need not have been originally compiled for law enforcement purposes in order to qualify for the 'law enforcement' exemption, so long as it was compiled for law enforcement purposes at the time the FOIA request was made." *Lion Raisins,* 354 F.3d at 1082 (citing *John Doe Agency*, 493 U.S. at 155).

The FBI has failed to satisfy its threshold burden of demonstrating a rational nexus between a legitimate law enforcement purpose and the withheld documents.  The Hardy declaration attests that the records were

> compiled for a myriad of law enforcement and national security investigative purposes, including but not limited to, investigations concerning civil rights matters and violent criminal threats, domestic terrorism investigations, international terrorism investigations, and counterintelligence investigations.

9

1   (Dkt. No. 71 at ¶ 49.)  This description is inadequate.[5]  In *Wiener v. F.B.I.*, 943 F.2d 972, 985 (9th

2   Cir. 1991), the court held that the FBI had failed to establish a rational nexus between law

3   enforcement and the at-issue documents because citation to "[t]he Civil Obedience Act and the

4   Anti-Riot Act [which] are very broad criminal statutes, prohibiting a wide variety of conduct"

5   "d[id] little to inform Wiener of the claimed law enforcement purpose underlying the

6   investigation" and without "further details of the kinds of criminal activity of which John Lennon

7   was allegedly suspected, Wiener cannot effectively argue that the claimed law enforcement

8   purpose was in fact a pretext." *Id.* at 986; *see also Am. Civil Liberties Union of N. California v.*

9   *Fed. Bureau of Investigation*, No. 10-CV-03759-RS, 2015 WL 1346680, at *4 (N.D. Cal. Mar. 23,

10  2015) (concluding that the FBI failed to establish a rational nexus because its pleadings did not

11  "tether the activities the withheld documents concern to the enforcement of any particular law.");

12  *Am. Civil Liberties Union v. Fed. Bureau of Investigation*, No. C 12-03728 SI, 2013 WL 3346845,

13  at *6 (N.D. Cal. July 1, 2013) (concluding that the FBI failed to establish a rationale nexus where

14  "the FBI refers only vaguely to 'crimes' and 'federal laws,' but does not cite the specific laws that

15  it was enforcing.").

16          The same is true here.  The FBI's vague reference to everything from "civil rights matters"

17  to "violent criminal threat, domestic terrorism investigations, international terrorism

18  investigations, and counterintelligence investigations" does not adequately identify a law

19  enforcement objective which justifies withholding under Exemption 7.  For this reason alone,

20  Defendant's motion for summary judgment as to Exemption 7 and the related Privacy Act

21  violation must be denied.

22          **2.      Specific Exemptions Claimed**

23                  **a) Exemption 7(A)**

24  Exemption 7(A) provides that "records or information compiled for law enforcement

25

26  ---

27  [5] The justification for the Privacy Act exemption in the Hardy Declaration is similarly vague and inadequate:  "the responsive records were compiled in the course of the FBI's investigation into alleged criminal wrongdoing by third parties and national security investigations, including

28  assessments carried out to detect, obtain information about, or prevent or protect against federal crimes or national security threats."  (Dkt. No. 71 at ¶ 39.)

United States District Court
Northern District of California

purposes" may be withheld if they "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7).  The FBI has asserted Exemption 7(A) to categorically shield the names, identifying information of or activities of third party subjects, and the file numbers of pending FBI investigations.  (Dkt. No. 71 at ¶ 50.)  Plaintiffs challenge the FBI's assertion of Exemption A with respect to the April 30 Memo.[6]  In particular, Plaintiffs contend that the FBI has failed to show that release of this information (minus the file numbers) could shed light on an ongoing investigation given that the Memo is nearly 12 years old.

The FBI contends that revealing information regarding the third party suspects "could result in not only []the acknowledgment of the existence of the investigation but also in the identification of suspects and thus jeopardize the investigation."   This does not explain "how releasing each of the withheld documents would interfere with the government's *ongoing* criminal investigation."  *Lion Raisins v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1084 (9th Cir. 2004) (emphasis added).  As in *ACLU v. FBI*, No. C 12-03728 SI, 2013 WL 3346845, at *7 (N.D. Cal. July 1, 2013), the FBI's conclusory statement that revealing the information could jeopardize an investigation is insufficient to invoke Exemption A.  *Id.* (concluding that the court "cannot make an assessment of the FBI's claim without any basis other than the FBI's bald assertion.").   The FBI's assertions must be sufficiently specific to allow Plaintiffs and the Court to evaluate the claimed exemption.  *See Wiener*, 943 F.2d at 985-86.

The Court thus concludes that the FBI's declaration is insufficient to allow withholding under Exemption 7(A) as to information in the April 30 Memo regarding third party subjects.

### b) Exemption 7(C)

Exemption 6 and Exemption 7(C) both exempt the release of records which would constitute an "unwarranted invasion of personal privacy." 5 U.S.C. §§ 552(b)(6), (b)(7)(C). Exemption 6 covers "personnel and medical files and similar files," and only allows withholding files the disclosure of which "would constitute a clearly unwarranted invasion of personal privacy."  Exemption 7(C) covers "records or information compiled for law enforcement

---

[6] Plaintiffs do not seek the file numbers.

United States District Court
Northern District of California

purposes," and allows withholding files which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  In this case, the FBI has asserted Exemption 6 every time it has asserted Exemption 7(C).[7]   (Dkt. No 71 at 61-76 (Vaughn Index); Dkt. No. 86 at 7-108 (Supp. Vaughn Index).)

The FBI applied Exemption 7(C) and 6 to withhold names and identifying information regarding (1) FBI agents and support personnel, (2) individuals who provided information to the FBI, and (3) third parties mentioned in documents.  (Dkt. No. 71 at ¶¶ 54-59.)  Plaintiffs only challenge the exemptions as to the second and third categories and only with respect to the April 30 Memo and the July 2004 Memo (the San Francisco field office's response to the April 30 Memo which declines to open a preliminary investigation into Plaintiffs) contending that the FBI's conclusory assertion of privacy interests with respect to these documents is untethered to the facts of this case.

In applying Exemption C courts must balance the public interest in disclosure against the privacy interests of the third parties involved.  *See U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 762 (1989).  The district court addressed a similar declaration submitted by David Hardy in *Am. Civil Liberties Union v. Fed. Bureau of Investigation*,  No. 12-03728 SI, 2013 WL 3346845, at *7-8 (N.D. Cal. July 1, 2013), and concluded that the FBI's general assertions regarding privacy interests of third parties were inadequate to allow the court to balance the privacy interests against the public interest in disclosure.   The Hardy declaration here includes the same general statements that "the FBI has determined that the third party interviewees maintain a substantial privacy interest in not having their identities disclosed" and that to alleviate fear of "harass[ment], intimidate[ion] [and threats of] legal/economic reprisal or possible physical harm" "persons interviewed by the FBI must be assured that [their information] will be held in the strictest confidence."  *Compare* Dkt. No. 71 at ¶¶ 57-58 *with ACLU*, 2013 WL 3346845, at *8

---

[7] The FBI's briefs focus only on Exemption 7(C).  In any event, "[t]he standard for Exemption 6 is higher in that it requires the disclosure of the files to constitute a "clearly unwarranted" invasion of privacy, whereas Exemption 7(C) only requires that the disclosure "could reasonably be expected to constitute" such an invasion." *Am. Civil Liberties Union of N. California v. Fed. Bureau of Investigation*, No. 12-CV-03728-SI, 2015 WL 678231, at *5 (N.D. Cal. Feb. 17, 2015), appeal dismissed (Jan. 5, 2016).

United States District Court
Northern District of California

1    ("'the FBI has determined that these third parties have substantial privacy interests in not having

2    information found about them found in records of the FBI' because in general disclosure carries a

3    'negative connotation' and can lead to 'possible harassment or criticism.'").  Further, in both

4    cases, Hardy attests without explanation that "[d]isclosure of the third parties' names and

5    identifying information would not shed light on the operations and activities of the FBI."[8]

6    (*Compare* Dkt. No. 71 at ¶ 58 *with ACLU*, 2013 WL 3346845, at *8 ("disclosure 'would shed no

7    light on the operations and activities of the FBI,' and therefore would constitute 'a clearly

8    unwarranted and unwarranted invasion of their personal privacy.'").

9         "The privacy interests of third persons whose names appear in FBI files, the public

10   interest in disclosure, and a proper balancing of the two, will vary depending upon the content of

11   the information and the nature of the attending circumstances."  *Weiner v. FBI*, 943 F.2d 972 (9th

12   Cir. 1991).  Plaintiffs believe that the FBI investigated them due to their political viewpoints and

13   that information regarding the scope of this investigation will illuminate this issue.  Thus, as in

14   *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803 (9th Cir. 1995), "[t]he public interest in this case is

15   knowing whether and to what extent the FBI investigated individuals for participating in political

16   [activity], not federal criminal activity.  Disclosing the names of the investigation subjects would

17   make it possible to compare the FBI's investigations to a roster of the [organization's] leadership."

18   *Id.* at 812.  The FBI, however, has failed to provide sufficient information to determine whether

19   the privacy interests outweigh the disclosure interests.

20        Moreover, to the extent that the FBI is asserting Exemption 7(C) over information

21   available in public sources as Plaintiffs contend, the privacy interest must necessarily be less.  *See*

22   *ACLU*, 2013 WL 3346845, at *8 ("the identities of many [] protestors [] were covered extensively

23   by the news media. These persons' privacy interests will be less than other individuals who have

24   not become public figures.").  For example, in the April 30 Memo the FBI claimed Exemption C

25

26   _____

27   [8] Hardy makes the same representations with respect to information regarding third parties merely
     mentioned in the two documents at issue.  (Dkt. No. 71 a ¶ 59 ("disclosure of their identities
     would subject these individuals to possible harassment or criticism and focus derogatory interests

28   and suspicion on them" and "would not shed any light on the operations and activities of the
     FBI.").)

United States District Court
Northern District of California

over the following: "indicated that ███████████ wrote a page length article reporting on the magnitude and value of American military and economic assistance to Israel. ███████ reported in detail on all types of assistance to Israel citing one of his sources of information as www.antiwar.com." (Dkt. No. 70-1 at 5.)  It is unclear what privacy interest, if any, the undisclosed individual could have in protecting his or her name given that the FBI is merely noting that the individual wrote a presumably publicly available article.

### c) Exemption 7(D)

Exemption 7(D) provides that "records or information compiled for law enforcement purposes" may be withheld if they "could reasonably be expected to disclose the identity of a confidential source." 5 U.S.C. § 552(b)(7).  Exemption 7(D) only applies if "the particular *source* spoke with an understanding that the communication would remain confidential." *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993) (emphasis in original).  It is the government's burden to "make an individualized showing of confidentiality with respect to each source"; confidentiality cannot be presumed. *Id.* at 174, 178.  The FBI has withdrawn its claim of Exemption D with respect to all Category A documents, thus this exemption claim no longer appears to be at issue.[9]  (Dkt. No. 85 at 29 n.9; Dkt. No. 86 at 102-108.)

### d) Exemption 7(E)

Exemption 7(E) protects records compiled for law enforcement purposes from disclosure if those records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  However, "Exemption 7(E) only exempts investigative techniques not generally known to the public." *Rosenfeld*, 57 F.3d at 815.   The Ninth Circuit recently addressed this exemption in *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 777 (9th Cir. 2015), and concluded that the exemption was properly asserted because the withheld information related to the "specific

---

[9] Except to the extent that the FBI claims Exemption 7(D) over materials in categories B-D which are analyzed below with respect to the adequacy of the *Vaughn* index and the segregablilty of the records.

*means* of conducting surveillance and credit searches rather than an application" of "a known technique." *Id*. at 777-78.

The FBI has asserted Exemption 7(E) over six categories of information: (1) names, numbers, and alpha designator FBI units, (2) FBI file/sub numbers, (3) database information and printouts, (4) investigative documents of specific investigations, (5) dates and types of terrorism investigations, (6) sensitive investigative techniques.  (Dkt. No. 71 at ¶¶ 62-65, 78-79, 93-94, 99.) Plaintiffs only challenge the exemption with respect to the April 30 Memo and the July 2004 Memo which therefore limits the FBI's assertion of the exemption to the second and third categories: FBI file/sub numbers and database information and printouts.

With respect to the file/sub numbers, the Hardy Declaration attests that

> the release of file numbering convention identifies the investigative interest, a specific law enforcement technique utilized in the investigations at issue, or priority given to such matters.  Apply a mosaic analysis, suspects could use these numbers (indicative of investigatory priority), in conjunction with other information known about other individuals and/or techniques, to change their pattern of activities to avoid detection, apprehension, or create alibis for suspected activities.

(*Id.* at ¶ 78.)  Absent is any statement that disclosure would reveal "techniques not generally known to the public." *Rosenfeld*, 57 F.3d at 815.  Plaintiffs argue that "[p]ublic knowledge of the FBI's file numbering system includes the common understanding that the first three digits in a file number are used to designate the category of the offense under investigation." (Dkt. No. 88 at 19 n.12 (citing http://newstrench.com/secret-no-more/secret-no-more-fbi-central-records-systems-classification/ (listing FBI file codes).)  Further, Plaintiffs only seek the first three digits of the file numbers—the category of the offense under investigation—which further weakens the FBI's argument that disclosure would tip off suspects as to the priority of investigative interest.

Likewise, with respect to the databases and printouts, the Hardy Declaration only states that "[d]isclosure of the printouts or information compiled from these search results could enable criminals to employ countermeasures to avoid detection, thus jeopardizing the FBI's investigative mission."  (Dkt. No. 71 at ¶ 79.)  But as with the file numbers, Hardy does not declare that information regarding these databases are not generally known to the public.  This omission is

United States District Court
Northern District of California

15

1    fatal to the FBI's Exemption 7(E) claim as is the FBI's failure to "provide non-conclusory reasons

2    why disclosure of each category of withheld documents would risk circumvention of the law."

3    *Feshbach v. S.E.C.*, 5 F. Supp. 2d 774, 787 (N.D. Cal. 1997).

4           Thus, the FBI's declaration is insufficient to allow withholding under Exemption 7(E).

5                                                                              ***

6           Accordingly, the Court DENIES without prejudice the parties' cross-motions for summary

7    judgment on Plaintiffs' FOIA and Privacy Act disclosure claims.  The current record does not

8    provide the Court with an "adequate factual basis for [a] decision" regarding the government's

9    invocation of Exemption 7.  *Lion Raisins*, 354 F.3d at 1083; *see also Maricopa Audubon Soc'y v.*

10   *United States Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1997) (requiring the government's

11   affidavits to be "detailed enough for the district court to make a de novo assessment of the

12   government's claim of exemption."); *Doyle v. F.B.I.*, 722 F.2d 554, 556 (9th Cir. 1983)(requiring

13   the government to "submit[] as detailed public affidavits and testimony as possible").  The parties

14   shall meet and confer to develop a case management plan regarding these claims.  The Court sets a

15   Case Management Conference for June 9, 2016 at 10:00 a.m. to discuss the parties' proposed

16   plan(s).

17          **3.      Adequacy of *Vaughn* Index and Reasonable Segregation of Records**

18          The remaining issue with respect to Plaintiffs' FOIA and Privacy Act disclosure claims is

19   the adequacy of the Vaughn index and the segregability of the records for the Category, B, C, and

20   D documents.  The purpose of the *Vaughn* index is to "afford the FOIA requester a meaningful

21   opportunity to contest, and the district court an adequate foundation to review, the soundness of

22   the withholding." *Wiener*, 943 F.2d at 977 (internal citation and quotations marks omitted). "[A]n

23   index must identify each withheld document, describe its contents to the extent possible, and give

24   a particularized explanation of why each document falls within the claimed exemption." *Yonemoto*

25   *v. Dep't of Veterans Affairs*, 686 F.3d 681, 695 (9th Cir. 2012) (internal citation and quotations

26   marks omitted).  While the *Vaughn* index need not "disclose facts that would undermine the very

27   purpose of its withholding,"  "it should reveal as much detail as possible as to the nature of the

28   document, without actually disclosing information that deserves protection."  *Id*.  In addition,

United States District Court
Northern District of California

16

under FOIA, any "reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." *Hamdan*, 797 F.3d at 778-79 (quoting 5 U.S.C. § 552(b)).  "An agency must describe the document or information being withheld in sufficient detail to allow the plaintiffs and the court to determine whether the facts alleged establish the corresponding exemption." *Id*. at 780.  The agency must identify the documents individually and provide an individualized explanation as to withholding.  *Id*. at 780-81.

Here, Plaintiffs object to the *Vaughn* Index with respect to the documents falling within Categories B through D as described in the Hardy Declaration; that is, all documents except those which directly mention the threat assessment and instead, reference either Plaintiff Raimondo, Garris, or Antiwar.com. Plaintiffs contend that FBI has failed to provide specific information sufficient to allow Plaintiffs to challenge the exemptions, and instead, only provide general descriptions and conclusory explanations as to why groups of documents should be withheld. According to Plaintiffs, this generality is particularly problematic because the FBI has withheld many of the referenced documents in full or with significant redactions which renders it impossible for Plaintiffs to assess the context of the withheld information.  Plaintiffs also object that the FBI has failed to provide reasonably segregated portions of responsive records.  Plaintiffs note that the FBI has withheld 117 pages in full as covered by one of more exemptions and 104 documents with such significant redactions that Plaintiffs cannot evaluate whether the material is properly withheld.

In response, the FBI filed a supplemental Hardy Declaration and supplemental *Vaughn* Index with its opposition/reply brief.  The supplemental *Vaughn* Index is over eight times as long as the prior *Vaughn* Index.  (Dkt. No. 86.)  Plaintiffs reasonably object to such a "last minute paper dump" and argue that the supplemental Index is still deficient in at least three respects: (1) it does not provide any additional information to support the FBI's assertion of any exemption other than Exemption 7(E); (2) it does not identify any specific federal law being enforced in connection with the document for which a law enforcement exemption is claimed; and (3) the additional information related to Exemption 7(E) is boilerplate, with a handful of different "explanations"

United States District Court
Northern District of California

1   repeated throughout.  However, it is apparent from Plaintiffs' brief that they have not had an

2   adequate opportunity to review and comment on the adequacy of the supplemental declaration or

3   *Vaughn* Index.  Further, in denying the FBI's motion for summary judgment on the FOIA and

4   Privacy Act disclosure claims, the Court has given the FBI guidance as to the level of specificity

5   required.  The proper remedy, then, is to have Defendant produce yet another amended *Vaughn*

6   Index and then have the parties address the adequacy of this new Index.  The parties should meet

7   and confer regarding this and be prepared to discuss it at the June 9, 2016 Case Management

8   Conference.

9   **II.      Plaintiffs' (e)(7) Privacy Act Claim**

10           The Privacy Act of 1974 "safeguards the public from unwarranted collection, maintenance,

11  use and dissemination of personal information contained in agency records . . .  by allowing an

12  individual to participate in ensuring that his records are accurate and properly used."  *Henke v.*

13  *U.S. Dep't of Commerce*, 83 F.3d 1453, 1456 (D.C. Cir. 1996) (internal citation and quotation

14  marks omitted).   "The Act gives agencies detailed instructions for managing their records and

15  provides for various sorts of civil relief to individuals aggrieved by failures on the Government's

16  part to comply with the requirements."  *Doe v. Chao*, 540 U.S. 614, 618 (2004).

17          **A.      The Section (e)(7) Claim**

18           Section 552a(e)(7) provides that a federal agency may not "maintain [any] record

19  describing how any individual exercises rights guaranteed by the First Amendment unless

20  expressly authorized by statute or by the individual about whom the record is maintained or unless

21  pertinent to and within the scope of an authorized law enforcement activity."  5 U.S.C. §

22  552a(e)(7).  "The purpose of the section (e)(7) First Amendment protection is to prevent collection

23  of protected information not immediately needed, about law-abiding Americans, on the off-chance

24  that Government or the particular agency might possibly have to deal with them in the future."

25  *MacPherson v. I.R.S.*, 803 F.2d 479, 483 (9th Cir. 1986) (quoting S. Rep. 1183, 93d Cong., 2d

26  Sess., reprinted in 1974 U.S. Code Cong. & Admin. News 6916, 6971).

27           There are two documents at issue on this claim: (1) the April 30 Memo and certain of the

28  11 attachments to the memo (Dkt. No. 70-1 at 2-11); and (2) the September 1972 Memo which

details an investigation into a third-party's affiliation with a white hate group and which describes Plaintiff Garris's participation in a "War Crimes Trial." (Dkt. No. 74-7).  Plaintiffs seek expungement of both records on the grounds that they describe Plaintiffs' exercise of their First Amendment rights.

### 1.    The records describe Plaintiffs' First Amendment activity

The FBI does not dispute that the records at issue describe Plaintiffs' exercise of their First Amendment activities—namely, political speech.[10]  Rather, the FBI contends it can maintain the documents in its files because they are "pertinent to and within the scope of an authorized law enforcement activity."

### 2.    Authorized law enforcement activity

In *MacPherson*, the Ninth Circuit recognized that "[t]here are strong policy considerations on both sides of the issue" of whether to allow law enforcement to maintain records of an individual's First Amendment conduct.  803 F.2d at 483.  On the one hand, "[t]he mere compilation by the government of records describing the exercise of First Amendment freedoms creates the possibility that those records will be used to the speaker's detriment, and hence has a chilling effect on such exercise."  *Id.* at 484 (internal quotation marks and citation omitted).  "Blanket allowance of [] incidental surveillance and recording under the guise of general investigation could permit the exception to swallow the rule."  *Id.* (internal quotation marks omitted).  On the other hand, "the legitimate investigation and surveillance of suspected criminals and civil offenders inevitably involves observation and recording of the actions of innocent people, sometimes when those people are exercising their First Amendment rights."  *Id.*  "To forbid 'incidental' surveillance of innocent people or to require excision of references to such people in surveillance records would be administratively cumbersome and damaging to the completeness and accuracy of the agency records. Blanket prohibition of such surveillance and recording unless the agency was investigating a specific offense or a specific person could thwart

---

[10] The FBI disputes that some of the attachments to the April 30 Memo demonstrate Plaintiffs' exercise of their First Amendment activities, but the Court declines to address this issue and instead focuses on the applicability of the law enforcement activity exception.

United States District Court
Northern District of California

1  agency investigations and seriously undermine agency enforcement operations." *Id.*  Indeed, the

2  very presence of the law enforcement exception "recognizes that some recording of First

3  Amendment activities will take place." *Id.* Thus, *McPherson* concluded, when determining

4  whether the section 552a(e)(7) law enforcement activity exception applies, a court must "consider

5  the factors for and against the maintenance of such records of First Amendment activities on an

6  individual, case-by-case basis." *Id.*

7  **a)  The April 30 Memo**

8  In March of 2004, while conducting research on the Internet an agent with the Newark FBI

9  office discovered a possible copy of the FBI's post-9/11 watch list on the website Antiwar.com.

10  (Dkt. No. 70 at ¶ 9; Dkt. No. 70-1 at 3.)  This prompted further review of the website and led to

11  discovery of a second 22-page spreadsheet dated May 22, 2002 with "FBI SUSPECT LIST" noted

12  in the header and "Law Enforcement Sensitive" noted in the footer of each page.  (Dkt. No. 70 at ¶

13  9; Dkt. No. 70-1 at 3.)  Both spreadsheets contained personally identifiable information of the

14  individuals listed.  (Dkt. No. 70 at ¶ 9.)  The Newark Office thus conducted a threat assessment of

15  Plaintiffs and Antiwar.com to determine whether they posed a threat to national security. The

16  threat assessment included a review of publicly available articles authored by or referencing

17  Plaintiffs and Antiwar.com.[11]  (*Id.* at ¶ 10.)  This threat assessment is memorialized in the April 30

18  Memo.  The threat assessment was forwarded to the San Francisco Field Office as it covers the

19  region where Plaintiffs and Antiwar.com are located, with a recommendation that an investigation

20  be opened into Antiwar.com.  (*Id.*)  The San Francisco Field Office ultimately declined to open a

21  preliminary investigation.  (Dkt. No. 73-5 (the July 2004 Memo).)

22  Plaintiffs do not contend that the FBI was prohibited from reviewing the postings on their

23

24  [11] Plaintiffs challenge the FBI's assertion in the Campi Declaration of what appears to be a new
   justification for the threat assessment; namely, that discovery of the watch list raised "the prospect

25  of . . . criminal offenses."  (Dkt. No. 85 at 8:20 (citing Dkt. No. 70 at ¶ 9).)   Plaintiffs are correct
   that the FBI previously represented that the sole basis for the threat assessment was "discovery of

26  one or more lists that contained information about individuals of investigative interest to the FBI
   on the www.antiwar.com site."  (Dkt. No. 73-3 at 6 (FBI's Interrogatory response); Dkt. No. 56 at

27  4:13-24 (Transcript 4/30/15 hearing).)  The FBI is thus precluded from arguing that Plaintiffs were
   in fact being investigated for alleged criminal offenses.

28

United States District Court
Northern District of California

1   website and analyzing the watch list; rather, they take issue with the FBI's *documentation* of the

2   exercise of their First Amendment activities.  In Plaintiffs' view "the FBI erred in taking the

3   further step – specifically prohibited by the Privacy Act – of memorializing and maintaining its

4   description of Plaintiffs' First Amendment protected activity."  (Dkt. No. 88 at 9:19-21.)

5       The Court disagrees.  The threat assessment was conducted pursuant to the October 31,

6   2003 Attorney General's Guidelines for FBI National Security Investigations and Foreign

7   Intelligence Collection ("2003 AG Guidelines").  (Dkt. No. 70 at ¶¶ 5-8; Dkt. No. 70-2).   The

8   2003 AG Guidelines authorized the FBI to investigate threats to national security and established a

9   threat assessment as the "lowest legal investigative activity."  (Dkt. No. 70 at ¶¶ 6-7; Dkt. No. 70-

10  2 at 16-17.)  According to the Guidelines,

11          [t]he FBI may, without opening a preliminary or full investigation,
            engage in [specified] activities to investigate or collect information
12          relating to threats to the national security, including information on
            individuals, groups, and organizations of possible investigative
13          interest, and information concerning possible targets of international
            terrorism, espionage, foreign computer intrusion, or other.
14

15  (Dkt. No. 70-2 at 17.)  Thus, conducting the threat assessment upon discovery of the two

16  spreadsheets on Antiwar.com was consistent with the FBI's mandate to investigate matters related

17  to national security.

18      In *MacPherson*, for example, the IRS had conducted surveillance of individuals and

19  organizations it believed were connected with the "tax protester" movement, and in doing so, "IRS

20  agents anonymously attended several conferences and conventions at which MacPherson was a

21  speaker" and took notes of his speeches and purchased tapes of his speeches.  *MacPherson*, 803

22  F.2d at 480.  The IRS maintained these notes and tapes in a "Tax Protest Project File" in the

23  Phoenix and Houston district offices.  *Id*.  The Ninth Circuit concluded that the FBI had recorded

24  MacPherson's speeches pursuant to authorized law enforcement activity because the "speeches

25  were given in public and distributed to anyone willing to pay the price of the tape. He was aware

26  and even acknowledged in one of his speeches that he might be speaking to IRS agents in the

27  audience ... and the IRS records of [the speeches] were necessary to give the agency a complete

28  and representative picture of the events."  *MacPherson*, 803 F.2d at 484.

21

United States District Court
Northern District of California

1    Similarly, here, the FBI reviewed Plaintiffs' publicly available articles and postings, as

2  well as documents within the FBI's and other databases, to compile its threat assessment.  (Dkt.

3  No. 70-1.)  With respect to Plaintiffs' publicly available articles, as in *MacPherson*, Plaintiffs had

4  to have been aware of the possibility that their articles and postings could be reviewed by law

5  enforcement.  The FBI's review of these articles and attachment of many to the threat assessment

6  gave them "a complete picture of" Plaintiffs and thus potentially how and why the spreadsheets

7  were on Antiwar.com.  *MacPherson*, 803 F.2d at 484.  Plaintiffs' argument to the contrary—that

8  there was no need for additional context here because unlike in *MacPherson* the threat assessment

9  was not conducted as part of a broader investigation—is unavailing.  The broader investigation

10  here was into how and why the spreadsheets appeared on Antiwar.com.  It is difficult to conceive

11  of how the FBI could have responsibly investigated publication of the spreadsheets without having

12  also reviewed the postings on Antiwar.com.

13    Plaintiffs' concession that the FBI properly reviewed the postings on Antiwar.com and

14  analyzed the watch list, but insistence that the FBI erred in "memorializing and maintaining" the

15  document cannot be reconciled.  Such a rule would place the FBI in an untenable position—agents

16  could investigate national security concerns, but they could not document their investigation if

17  doing so would in any way describe exercise of an individual's First Amendment rights.  The

18  Attorney General Guidelines statement that "[t]hese Guidelines do not authorize investigating or

19  maintaining information on United States persons solely for the purpose of monitoring activities

20  protected by the First Amendment or the lawful exercise of other rights secured by the

21  Constitution or laws of the United States," does not mean that the FBI cannot initiate an

22  investigation wherever doing so would in some way touch upon an individual's exercise of their

23  First Amendment rights.  (Dkt. No. 70-2 at 12-13.)  Indeed, *MacPherson* specifically holds that

24  the FBI can create and maintain documents that describe First Amendment activities.  *Id.* at 484.

25    In sum, the question is whether there is a genuine dispute as to whether the written threat

26  assessment is pertinent to authorized law enforcement activity.  There is not.  The record

27  establishes that the FBI initiated the assessment based on discovery of the FBI watch list on

28  Antiwar.com rather than the content of Antiwar.com.  Even if the Court rejects the Campi

United States District Court
Northern District of California

1   Declaration, the April 30 Memo itself states that the threat assessment was conducted because of

2   discovery of the watch list.  (Dkt. No. 70-1 at 3.)  Indeed, the Memo notes that "[t]he rights of

3   individuals to post information and to express personal views on the Internet should be honored

4   and protected; however, some material that is circulated on the Internet can compromise current

5   active FBI investigations"; thus, while "distribution of the information on [the watch]list[] [is]

6   wide spread" and "[m]any agencies outside of law enforcement have been utilizing this

7   information to screen their employees," "it is unclear whether www.antiwar.com may only be

8   posting research material compiled from multiple sources or if there is material posted that is

9   singular in nature and not suitable for public release."  (Dkt. No. 70-1 at 9.)

10          The April 30 Memo's inclusion of articles authored by Plaintiffs and published in sources

11   other than Antiwar.com (such as the Boston Globe) does not create a genuine dispute as to

12   whether the Memo is pertinent to authorized law enforcement activity. The FBI was investigating

13   whether the publication of the watchlist on Antiwar.com posed a national security threat.  It makes

14   sense that in conducting that investigation, agents would review public writings of the persons

15   associated with the website.  Regardless of whether those articles ultimately shed any light on the

16   investigation, the threat assessment merely documented what was done in the investigation.  If the

17   investigation itself is pertinent to an authorized law enforcement activity, the Privacy Act does not

18   regulate what can be done in the course of that investigation or how that authorized investigation

19   may be documented.

20          Finally, the San Francisco Field Office's declination of the April 30 Memo's

21   recommendation to open a preliminary investigation into Plaintiffs and Antiwar.com does not

22   mean that the initial threat assessment was not authorized law enforcement activity. (Dkt. No. 86

23   at 104.)  Rather, it suggests that the process worked just as it should—the FBI conducted an

24   investigation and concluded that there was not a national security concern.

25                                  **b)  September 1972 Memo**

26          The September 1972 Memo documents the FBI's investigation into a third party suspect

27   based on that individual's involvement with "State Craft" and "Youth Action" militant white

28   supremacy organizations which advocated violent revolution, allegedly threatened to assassinate

President Richard Nixon, and advocated other extremist and/or criminal activities.  (Dkt.  No. 71 ¶

122.)  Plaintiff Garris is mentioned only once in the Memo as one of the judges at a "War Crimes

Trial" in which the third party suspect participated; Garris is identified as a member of the Peace

and Freedom party.  (*Id.*; Dkt. No. 74-7 at 18).  Plaintiffs do not dispute that at the time the Memo

was created it was "pertinent to and within the scope of an authorized law enforcement activity. "

*** 

The Court thus concludes that the April 30 Memo and September 1972 Memo were each

obtained pursuant to authorized law enforcement activity within the meaning of section

552a(e)(7).

### 3.       Temporal Limitation on the Law Enforcement Activity

Plaintiffs next contend that even if the Memos were initially pertinent to authorized law

enforcement activity, they must now be expunged from the FBI's files because they are not

pertinent to any *ongoing* law enforcement activity.  The Court is unpersuaded that the law

enforcement activity exception is so limited.

The DC Circuit—the court that reviews the most FOIA and Privacy Act challenges—

considered this issue at length in *J. Roderick MacArthur Found. v. F.B.I.*, 102 F.3d 600, 605 (D.C.

Cir. 1996).  After analyzing the language of the statute itself, the legislative history, and the policy

rationales on both sides, the court concluded that

> the Privacy Act does not prohibit an agency from maintaining
> records about an individual's first amendment activities if the
> information was pertinent to an authorized law enforcement activity
> when the agency collected the information.   The Act does not
> require an agency to expunge records when they are no longer
> pertinent to a current law enforcement activity.

*Id.*; *see also Afifi v. Lynch*, 101 F. Supp. 3d 90, 107 (D.D.C. 2015) ("the fact that the investigation

into the plaintiff is now closed does not render the records invalid under Section (e)(7)").

The court reasoned that the statute's plain language does not support any temporal

limitation on the maintenance of the record.  Section 552a(e)(7) states that an agency "shall . . .

maintain no record describing how any individual exercises rights guaranteed by the First

Amendment unless . . .  pertinent to and within the scope of an authorized law enforcement

United States District Court
Northern District of California

24

activity." 5 U.S.C. § 552a(e)(7).  "[T]he provision, as written, can[not] be read to require that the maintenance of a record, as opposed to the record itself, must be pertinent to an authorized law enforcement activity." *J. Roderick*, 102 F.3d at 603.  Congress could have said "maintain no record relating to first amendment activities unless *doing so would be* pertinent to and within the scope of an authorized law enforcement activity" but they did.  *Id.* (emphasis in original).  "Information that was pertinent to an authorized law enforcement activity when collected does not later lose its pertinence to that activity simply because the information is not of current interest (let alone 'necessity') to the agency." *Id.*

Further, a preliminary Senate report stated "that the Privacy Act is aimed at 'preventing collection of protected information not immediately needed, about law-abiding Americans, on the off-chance that Government or the particular agency might possibly have to deal with them in the future.'" *Id*. at 604 (quoting Senate Report No. 1183, 93d Cong., 2d Sess. 57 (Sept. 26, 1974).  The emphasis on *collection* does not support a secondary inquiry regarding maintenance.  *J. Roderick*, 102 F.3d at 608.

Finally, *J. Roderick* reasoned that imposing a temporal limitation would "place new and daunting burdens, both substantive and administrative, upon the FBI and other government agencies, with little or no gain to individual privacy." *Id*. at 604.  "If a law enforcement agency were required to purge its files of information regarding an individual so requesting whenever it had closed a particular investigation, then its ability to accomplish its mission would inevitably suffer." *Id*.  The FBI would undoubtedly be "inundated with requests" to purge records which would pose a significant administrative burden.  *Id*.  Moreover, purging such records is unlikely "to contribute appreciably to individual privacy" because there are considerable procedural limitations on the ability of law enforcement to share this information so that "[t]o say that an agency may maintain such information [] is not to say that it may disseminate it." *Id*. at 605 ("a federal law enforcement agency (such as the FBI) may disclose information to another law enforcement agency (such as a local police department) only if the head of the latter agency has made a written request to the federal agency that maintains the record specifying the 'particular portion' wanted and the authorized law enforcement activity for which it is wanted.").

United States District Court
Northern District of California

1    Indeed, the Ninth Circuit recognized this burden in *MacPherson*. The court stated that "[t]o

2  forbid 'incidental' surveillance of innocent people or to require excision of references to such

3  people in surveillance records would be administratively cumbersome and damaging to the

4  completeness and accuracy of the agency records." *MacPherson*, 803 F.2d at 484.  Similarly, to

5  require the FBI to comb its records to excise descriptions of First Amendment activities when no

6  longer pertinent to ongoing law enforcement activity "would be administratively cumbersome and

7  damaging to the completeness and accuracy of the agency records." *Id*.  The Court thus follows *J.*

8  *Roderick*.

9    *Becker v. IRS*, 34 F.3d 398, 408-09 (7th Cir. 1994), does not persuade the Court otherwise.

10  Moreover, the Seventh Circuit has distinguished *Becker* on the grounds that in *Becker*, although

11  the government agency at issue asserted that it "maintain[ed] the materials 'for possible future

12  uses,' it did not 'elaborate on how this material would be helpful.'"  *Bassiouni*, 436 F.3d at 725

13  (quoting *Becker*, 34 F.3d at 409).  In *Bassiouni*, in contrast, the FBI had articulated a law

14  enforcement purpose for maintaining the at-issue materials.  So too here.  The FBI attests via the

15  Campi Declaration that maintenance of the April 30 Memo will serve to "inform others should

16  future investigative activity be considered related to those mentioned in the April 30, 2004 EC";

17  "inform ongoing and future investigative activity"; as well as provide "necessary context in which

18  to evaluate new information" if Plaintiffs or Antiwar.com are again brought to the attention of the

19  FBI.  (Dkt. No. 70 at ¶ 12.)  "The Privacy Act does not give any indication that Congress intended

20  law enforcement agencies to begin from scratch with every investigation.  Nor do we believe that

21  Congress meant to deprive such agencies of the benefit of historical analysis."  *Bassiouni*, 436

22  F.3d at 725.  The Court thus declines to adopt Plaintiffs' restrictive interpretation of the law

23  enforcement activity exception.   Summary judgment is therefore entered in the government's

24  favor on Plaintiffs (e)(7) Privacy Act Claim.

25  **III.    Plaintiffs' (d)(2) Privacy Act Claim**

26    Section 552a(d)(2) of the Privacy Act requires each agency that maintains a system of

27  records to allow individuals to request amendment of records pertaining to themselves if the

28  records are inaccurate, irrelevant, untimely, or incomplete.  Further, under Section (e)(1) the

26

1    agency shall  "maintain in its records only such information about an individual as is relevant and

2    necessary to accomplish a purpose of the agency required to be accomplished by statute or by

3    executive order of the President," and under (e)(5) an agency shall maintain records "which are

4    used by the agency in making any determination about any individual with such accuracy,

5    relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the

6    individual in the determination."

7            Pursuant to these sections, Plaintiff Garris seeks amendment and correction of a January

8    2002 Memo which indisputably inaccurately indicates that he threatened to hack the FBI website.

9    Garris also seeks redaction of the portion of the April 30 Memo referencing this false threat.  In

10   response to Garris's administrative request, the FBI conducted an investigation and issued an

11   Electronic Communication ("EC") to correct the inaccuracies in the January 2002 Memo and the

12   April 30 Memo.  (Dkt. No. 71 at ¶ 115.)  The EC states that it is a "corrective notification to all

13   FBI personnel" regarding two documents

14                    which inaccurately report that ERIC GARRIS [] made a threat to
                      hack the FBI's website. As detailed herein, Garris did not threaten to
15                    hack the FBI's website on September 12, 2001. Instead, he
                      contacted the FBI San Francisco Field Office (SFFO) to report a
16                    threat made against his own website, www.antiwar.com.

17   (Dkt. No. 71-4 at 24.)  Garris is not satisfied with this correction and instead contends that the

18   proper remedy is expungement from the FBI files of the January 2002 Memo and excisement of

19   the reference to the false threat in the April 30 Memo.

20           The FBI contends that the records at issue are exempt from Sections (e)(1) and (e)(5) of the

21   Privacy Act because they are maintained in the FBI's Central Records System ("CRS")  and the

22   FBI has exempted the CRS from various provisions of the Privacy Act pursuant to Section

23   552a(j)(2).  It is unnecessary to determine whether the (j)(2) exemption applies because the FBI

24   has corrected the inaccuracies in the January 2002 Memo and the April 30 Memo.  The corrective

25   EC explicitly amends the finding of the January 2002 Memo that Garris threatened to hack the

26   FBI.  Plaintiff postulates that some future FBI personnel will discover the inaccurate documents,

27   but not the corrective EC, and therefore believe that Garris threatened to hack the FBI.  However,

28   the FBI indexed the EC under Garris' name, email address, and Antiwar.com.  (Dkt. No. 71 at ¶

United States District Court
Northern District of California

27

United States District Court
Northern District of California

115.)  Plaintiffs have not identified any authority which suggests that this response is not sufficient "to assure fairness to" Garris.  5 U.S.C. § 552a(e)(5).   Moreover, the EC is more accurate than what Garris seeks because it describes the FBI's error in the first instance—in other words, it corrects history rather than erases it completely.

Summary judgment is therefore entered in the government's favor on Plaintiffs' (d)(2) Privacy Act claim.

## CONCLUSION

For the reasons stated above, government's motion for summary judgment  is GRANTED as to Plaintiffs' third and fourth claims for relief under Sections (e)(7) and (d)(2) of the Privacy Act, respectively.  (Dkt. No. 69.)   Plaintiffs' cross-motion for summary judgment on these same claims is therefore DENIED.  (Dkt. No. 82.)  Both parties' motions for summary judgment on Plaintiffs' first and second claims for relief regarding disclosure under FOIA and the Privacy Act are DENIED WITHOUT PREJUDICE.  The parties shall meet and confer to develop a case management plan for how to proceed with respect to these claims.  The parties shall appear for a Case Management Conference on June 9, 2016 at 10:00 a.m., in Courtroom F, 450 Golden Gate Ave., San Francisco, California to discuss their plan(s).  An updated Joint Case Management Conference statement is due June 2, 2016.

**IT IS SO ORDERED.**

Dated: May 10, 2016

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

28