**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ERIC ANTHONY GARRIS,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>FEDERAL BUREAU OF<br>INVESTIGATION,<br>*Defendant-Appellee.* | No. 18-15416<br><br>D.C. No.<br>CV 13-02295 JSC<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Jacqueline Scott Corley, Magistrate Judge, Presiding

Argued and Submitted June 12, 2019
Anchorage, Alaska

Filed September 11, 2019

Before:  A. Wallace Tashima, William A. Fletcher,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Tashima

## SUMMARY[*]

### Privacy Act

The panel affirmed in part and reversed in part the district court's summary judgment in an action under the Privacy Act seeking expungement of two separate threat assessment memos created by the Federal Bureau of Investigation ("FBI").

The 2004 Memo detailed plaintiff Eric Garris's posting of an FBI "watch list" to Antiwar.com as well as other First Amendment activity. The Halliburton Memo detailed an upcoming Halliburton shareholder's meeting and listed Antiwar.com as part of a catalogue of sources on the meeting.

The panel first addressed discovery and evidentiary challenges. First, the panel held that the district court did not abuse its discretion in granting a protective order to the FBI precluding Garris from deposing certain retired FBI agents. Second, the panel agreed in part with Garris' contention that the district court abused its discretion by relying on a declaration from FBI Special Agent Campi. The panel held that the district court applied the wrong legal standard – by employing a Freedom of Information Act ("FOIA") standard – when it accepted the Campi Declaration in toto, but the error was harmless as to certain parts of the declaration, which were sufficiently based on Campi's personal knowledge. The panel held that those of Campi's statements that went beyond matters of personal knowledge were purely

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

speculative and should not have been admitted.  Third, the panel held that the district court did not abuse its discretion in admitting the Declaration of FBI Special Agent Bujanda. Unlike with the Campi Declaration, the district court correctly recognized that the FOIA-specific knowledge standard did not apply here, and properly applied the traditional personal knowledge standard.

The panel held that unless a record is pertinent to an ongoing authorized law enforcement activity, an agency may not maintain it under section (e)(7) of the Privacy Act, 5 U.S.C. § 552(e)(7).  The panel held that because the FBI had not met its burden of demonstrating that the 2004 Memo was pertinent to an ongoing law enforcement activity, it must be expunged.  The panel further held that the Halliburton Memo, however, need not be expunged because it was pertinent to an ongoing law enforcement activity.

**COUNSEL**

Vasudha Talla (argued), American Civil Liberties Union Foundation of Northern California Inc., San Francisco, California, for Plaintiff-Appellant.

Lewis S. Yelin (argued) and Michael S. Raab, Appellate Staff; Alex G. Tse, United States Attorney; United States Department of Justice, Civil Division, Washington, D.C.; for Defendant-Appellee.

Adam Gershenson, Cooley LLP, Boston, Massachusetts; David Houska and Maxwell Alderman, Cooley LLP, San Francisco, California; for Amicus Curiae First Amendment Coalition.

Aiden Synnott, Luke X. Flynn-Fitzsimmons, William E. Freeland, and Melina M. Memeguin Layerenza, Paul Weiss Rifkind Wharton & Garrison LLP, New York, New York, for Amici Curiae Knight First Amendment Institute at Columbia University, Center for Constitutional Rights, Color of Change.

Aaron Mackey, Camille Fischer, and Adam Schwartz, Electronic Frontier Foundation, San Francisco, California, for Amicus Curiae Electronic Frontier Foundation.

## OPINION

TASHIMA, Circuit Judge:

Plaintiff-Appellant Eric Anthony Garris appeals the district court's grant of summary judgment in favor of the Federal Bureau of Investigation ("FBI") in an action under the Privacy Act, 5 U.S.C. § 552a. Garris discovered that he and the website Antiwar.com had been the subject of two separate "threat assessment" memos (collectively, the "Memos") created by the FBI. The first, the "2004 Memo," detailed Garris' posting of an FBI "watch list" to Antiwar.com as well as other First Amendment activity. The second, the "Halliburton Memo," detailed an upcoming Halliburton shareholder's meeting and listed Antiwar.com as part of a catalogue of sources on the meeting.

Garris seeks expungement of the Memos under the Privacy Act, which provides that federal agencies shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless . . . pertinent to and within the scope of an authorized law

enforcement activity."   5 U.S.C. § 552a(e)(7).   The FBI argues that, although both Memos describe protected First Amendment activity, the records fall under the law enforcement activity exception.   Garris, however, contends that the law enforcement activity exception does not apply because the investigations detailed in both Memos have ended and the Memos are not pertinent to an *ongoing* authorized law enforcement activity.   The question of whether, even if a record's *creation* was permissible under the law enforcement activity exception, the record may not be *maintained* under § (e)(7) unless its *maintenance* is pertinent to an ongoing law enforcement activity, is one of first impression in our Circuit.   We hold that unless a record is pertinent to an ongoing authorized law enforcement activity, an agency may not maintain it under § (e)(7) of the Privacy Act.   Because the FBI has not met its burden of demonstrating that the 2004 Memo is pertinent to an ongoing law enforcement activity, it must be expunged.   The Halliburton Memo, however, need not be, because it is pertinent to an ongoing law enforcement activity.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   Factual Background

Garris is the founder, managing editor, and webmaster of Antiwar.com.[1]   Antiwar.com is "an anti-interventionalist, pro-peace," non-profit news website, the mission of which is to publish news, information and analysis on the issues of war

---

[1] Joseph "Justin" Raimondo, the editorial director of Antiwar.com, was also a plaintiff-appellant in this action but died during the pendency of this appeal. His appeal has been dismissed.   Accordingly, Garris is the only remaining plaintiff-appellant.

and peace, diplomacy, foreign policy, and national security, as an alternative to mainstream media sources.

## A.  The FBI's 2004 Threat Assessment Memo

In March 2004, the FBI's Counterterrorism Division's Terrorism Watch and Warning Unit advised all field offices that a post-9/11 "watch list," that is, an FBI suspect list, called "Project Lookout" had been posted on the Internet and "may contain the names of individuals of active investigative interest."  An FBI agent subsequently discovered a twenty-two-page untitled Excel spreadsheet, dated 10/03/2001, on Antiwar.com.   The spreadsheet contained names and identifying information, and appeared to be a possible FBI watch list.

This discovery prompted the Newark, New Jersey, FBI office to look further at Antiwar.com.  The Newark office subsequently identified on Antiwar.com another document, written in Italian, which was accompanied by a second twenty-two-page spreadsheet, dated 05/22/2002, that also appeared to be an FBI suspect list.  The second spreadsheet was marked "FBI SUSPECT LIST" at the top of each page and "Law Enforcement Sensitive" at the bottom.

The FBI memorialized this information in the 2004 Memo with the subject "threat assessment: . . . Eric Anthony Garris [and] www.antiwar.com."   In addition to detailing the investigation and watch lists described above, the ten-page 2004 Memo described Antiwar.com's mission and listed Garris as the managing editor.  The Memo also detailed the results of law enforcement database searches for Garris and references to Garris and Antiwar.com found in FBI records. The Memo further stated that a Lexis Nexis search was run

for Garris and Antiwar.com, and described six of the articles found by the search, all of which describe articles, opinions, statements, or speeches given by Garris or Raimondo. The majority of these focus on Garris' political views. Additionally, the Memo noted that persons of interest to the FBI had accessed or discussed Antiwar.com.

In a section for "analyst comments," the Memo stated that "[t]he discovery of two detailed Excel spreadsheets posted on www.antiwar.com may not be significant by itself since distribution of the information on such lists are wide spread," but "it is unclear whether www.antiwar.com may only be posting research material compiled from multiple sources or if there is material posted that is singular in nature and not suitable for public release. There are several unanswered questions regarding www.antiwar.com."[2] The 2004 Memo concluded by recommending to the FBI San Francisco Field Office that it further monitor Antiwar.com's postings and open a preliminary investigation to determine if Garris "[was] engaging in, or ha[d] engaged, in activities which constitute a threat to National Security on behalf of a foreign power."

The FBI's San Francisco Field Office declined the recommendation, however, explaining that "it appears the information contained [on Antiwar.com] is public source information and not a clear threat to National Security," and "there does not appear to be any direct nexus to terrorism nor

---

[2] The analyst comments also stated that "Eric Garris has shown intent to disrupt FBI operations by hacking the FBI website." FBI disclosures show that the allegation that Garris threatened to hack the FBI was erroneous and the result of a mistake made by an FBI agent; the charge arose from Garris' having forwarded to the FBI a hacking threat that Antiwar.com had *received*.

the threat of compromising current FBI investigations," and noting that Garris "[was] exercising [his] constitutional right to free speech."

Garris learned of the 2004 Memo in August 2011, after a partially redacted version was released on a website. He contends that his and the public's awareness of the 2004 Memo caused him significant injury, including chilling of speech, damaged reputation, and loss of funding and other resources.

### B. The FBI's 2006 Halliburton Memo

In 2006, the FBI's Oklahoma City Field Office created the Halliburton Memo, a memorandum describing information regarding an upcoming annual Halliburton shareholders' meeting in Duncan, Oklahoma. The Halliburton Memo briefly described the Halliburton company, its contracts with the Department of Defense and prior affiliation with former Vice President Dick Cheney, and the schedule and logistics for the shareholders' meeting, noting that the meeting had been "targeted by multiple organized protest groups." The Halliburton Memo also included a list of websites that had posted information regarding the shareholders' meeting, of which Antiwar.com was one. Garris learned of the Memo during this litigation.

## II. Procedural Background

In October 2011, following his discovery of the redacted 2004 Memo, Garris filed Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and Privacy Act requests seeking disclosure of FBI records about him. After exhausting his administrative remedies, on May 21, 2013, Garris filed this

action seeking disclosure of documents under FOIA and the Privacy Act.   Separately, he filed requests with the FBI pursuant to 5 U.S.C. §§ 552a(e)(7) and (d)(2) of the Privacy Act, seeking expungement of all records maintained by the FBI describing his exercise of his First Amendment rights. The FBI ultimately denied Garris' administrative requests for expungement of records.

Garris subsequently filed his First Amended Complaint, adding, as relevant here, a claim alleging that the FBI's creation and maintenance of the 2004 Memo violates § 552a(e)(7) of the Privacy Act, which provides that an agency shall not maintain any "record describing how any individual exercises rights guaranteed by the First Amendment unless . . . pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7).

In July of 2015, Garris issued deposition subpoenas for the two retired FBI agents who had written the 2004 Memo. The FBI moved for a protective order to preclude the depositions, arguing that depositions are not necessary to decide summary judgment in Privacy Act § (e)(7) cases; that the evidence would be duplicative of the FBI's interrogatory responses and the previously provided redacted files; that it would burden the non-party officers; and that the evidence would be irrelevant.

The district court granted the FBI's motion "without prejudice to Plaintiffs' renewal of their request for additional targeted discovery following receipt of Defendant's Motion for Summary Judgment."   At the hearing on the topic, the court reasoned that it would be premature to depose the former agents before learning what evidence the government

10                         GARRIS V. FBI

would rely on, particularly given that it would be burdensome
to the retired agents.  Garris did not renew his request.

The parties then filed cross motions for summary
judgment on Garris' FOIA disclosure claims and claims
under the Privacy Act, covering, as relevant to this appeal,
expungement of the 2004 Memo and its attachments.  In
support of its motion for summary judgment, the FBI
submitted the declaration of Andrew Campi, an "Assistant
Special Agent in Charge" of the FBI, who was currently
assigned to the Newark office ("the Campi Declaration") and
stated that the 2004 Memo was created to protect national
security.  Garris responded in his cross-motion for summary
judgment that the FBI should be precluded from relying on
the Campi Declaration because Campi was not at the Newark
field office at the time the Memo was compiled and therefore
lacked personal knowledge of the reason it was compiled.

The district court denied both parties' motions with
respect to Garris' disclosure claims under FOIA and the
Privacy Act, but granted summary judgment to the FBI on
Garris' Privacy Act § (e)(7) claim for expungement of the
2004 Memo.  The court also overruled Garris' objections to
the Campi Declaration.

Because of Garris' surviving disclosure claims, the FBI
released further documents.  Based on these documents,
Garris moved for reconsideration of the district court's order
granting summary judgment to the FBI on his § (e)(7) claim,
arguing that new documents produced by the FBI impacted
the pertinence of the 2004 Memo to an authorized law
enforcement activity.  He also argued that two recently
produced documents gave rise to claims under § (e)(7),
including, as relevant here, the Halliburton Memo, reasoning

that the Halliburton Memo's inclusion of Antiwar.com in its list of publicizing sources violated the Privacy Act and requesting expungement. The district court denied his motion for reconsideration regarding the 2004 Memo in part, and ordered further briefing on Garris' arguments regarding the Halliburton Memo.

Both parties then filed motions for summary judgment regarding the Halliburton Memo. The FBI submitted a declaration from Agent Bujanda, the Assistant Special Agent in Charge for National Security, in which Bujanda stated that the Halliburton Memo documented the FBI's collaboration with local law enforcement to prepare for public safety concerns. Garris objected to the declaration on personal knowledge and hearsay grounds. Over these objections, the district court granted summary judgment to the FBI, concluding that the Halliburton Memo's purpose was to protect public safety and that it therefore fell under the law enforcement activities exception.

The parties settled the remaining disclosure issues, and the district court entered judgment on January 12, 2019. Garris timely appealed his Privacy Act claims.

## STANDARD OF REVIEW

This court reviews a grant of summary judgment de novo. *MacPherson v. IRS*, 803 F.2d 479, 480 (9th Cir. 1986). "Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-movant, there is no genuine issue of material fact," *Frudden v. Pilling*, 877 F.3d 821, 828 (9th Cir. 2017), the substantive law was correctly applied, *MacPherson*, 803 F.2d at 480, and the movant is entitled to judgment as a matter of law.

We review evidentiary decisions for abuse of discretion, *Block v. City of Los Angeles*, 253 F.3d 410, 416 (9th Cir. 2001), including a lower court's decision to grant a protective order, *In re Roman Catholic Archbishop of Portland in Or.*, 661 F.3d 417, 423 (9th Cir. 2011). "A court abuses its discretion when it fails to identify and apply the correct legal rule to the relief requested, or if its application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* (citations and quotation marks omitted).

## DISCUSSION

## I.  Discovery and Evidentiary Challenges

### A.  Protective Order

The district court did not abuse its discretion in granting a protective order to the FBI precluding Garris from deposing certain retired FBI agents.  The district court granted the FBI's motion for a protective order without prejudice, reasoning that it would be premature to depose the former agents before learning what evidence the government would rely on, given that it would be burdensome to the retired agents.  The court specifically explained that Garris could renew his request for discovery once the government filed a motion for summary judgment.  But Garris did not renew deposition requests in his first summary judgment motion, in his motion for reconsideration, or in his second motion for summary judgment.  Because the district court "only delayed [Garris'] discovery until after the government filed its summary judgment motion, and [Garris] never requested additional discovery to respond to that motion under Fed. R.

Civ. P. 56(f)," the district court did not abuse its discretion. *Lane v. Dep't of Interior*, 523 F.3d 1128, 1135 (9th Cir. 2008). And, because Garris "failed to follow the proper procedures, it was within the district court's discretion to rule" on the claim at summary judgment. *Id.*

We note that the district court granted the protective order without determining if there was "good cause," as is usually required, *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975), on the basis that in FOIA and Privacy Act disclosure cases, it is generally accepted that discovery is limited and that courts may defer discovery until after summary judgment without abusing their discretion and without demonstrating specific "good cause." *See Lane*, 523 F.3d at 1134 ("[I]n FOIA and Privacy Act [disclosure] cases discovery is limited because the underlying case revolves around the propriety of revealing certain documents. Accordingly, in these cases courts may allow the government to move for summary judgment before the plaintiff conducts discovery." (citation omitted)).

Although the district court did not abuse its discretion in this case, going forward there is good reason to believe that the special consideration afforded to FOIA and Privacy Act *disclosure* cases—which involve a plaintiff's request for documents to be released—should not apply to *substantive* Privacy Act cases—which involve the propriety of the creation of such documents by the agency in the first place, as well as their continued maintenance. *See Lane*, 523 F.3d at 1134–35 (explaining that discovery may have been warranted for Lane's substantive Privacy Act claim because, "[u]nlike the FOIA claim or the access to records Privacy Act claim, the improper access Privacy Act claim did not revolve around the propriety of disclosing certain documents").

## B. Declarations

Garris also argues that the district court abused its discretion by relying on the Campi and Bujanda Declarations. We address each in turn.

### 1. *Campi Declaration*

First, Garris contends that the court abused its discretion by relying on the Campi Declaration. We agree in part. For an affidavit to be admissible to support summary judgment, the affidavit must "be made on personal knowledge." Fed. R. Civ. P. 56(e); *Block*, 253 F.3d at 419.

We agree with Garris that the district court applied the wrong legal standard when it accepted the Campi Declaration in toto. Campi was employed by the FBI at the time the 2004 Memo was written, but he did not work at the Newark office at the time or have any personal involvement with the threat assessment. Despite this, the district court accepted that Campi had adequate personal knowledge for all the statements in his declaration because "[c]ourts routinely deny hearsay and lack of personal knowledge objections in FOIA cases based on agency affidavits similar to those submitted here. . . . The same rationale applies equally here notwithstanding Plaintiffs' assertion of Privacy Act claims in addition to the FOIA claims." In doing so, the district court relied on *Lahr v. Nat'l Transp. Safety Bd.*, which explained that "'[a]n affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy' the personal knowledge requirement of Federal Rule of Civil Procedure 56(e)." 569 F.3d 964, 990 (9th Cir. 2009) (quoting *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 814 (2d Cir.1994)).

This was error.  The rule cited to by the district court is specific to FOIA disclosure cases and exempts agents' affidavits from the personal knowledge requirement.  *See*, *e.g.*, *id.* (allowing agent's affidavit without personal knowledge because claim was a FOIA records request).  But the rationale behind exempting agency affidavits from the personal knowledge requirement in FOIA disclosure cases does not translate to substantive Privacy Act cases.  The purpose of agency affidavits in FOIA cases is to show "whether the agency's search was 'reasonably calculated to discover the requested documents,'" *Maynard v. CIA*, 986 F.2d 547, 559 (1st Cir. 1993) (quoting *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir.1991)), that is, the methodology of the search.  It makes sense that a supervisor who did not personally perform the search would be able to testify to that, as the supervisor would be familiar with the method of storing, searching, and locating the agency's records.  In a § (e)(7) Privacy Act claim, however, Garris seeks to understand the FBI's purpose in creating and maintaining the specific document.  An agent without personal knowledge of these purposes can only speculate about it or rely on hearsay statements of other agents.

The district court's error was harmless, however, as to certain parts of Campi's declaration, which were sufficiently based on personal knowledge.  Campi had experience working as a special agent for the FBI and had reviewed the relevant documents, including the 2004 Memo and attachments.  Consequently, the portions of his declaration discussing general FBI guidelines and procedures, summarizing information clear from the face of the 2004 Memo, and analyzing the current relevance of the 2004 Memos were within his personal knowledge as a seasoned

16                    GARRIS V. FBI

FBI agent.  *See Block*, 253 F.3d at 419 (noting that personal
knowledge could be based on review of documents).

Those of Campi's statements that go beyond those
matters, however, are purely speculative and should not have
been admitted.  For example, Campi speculates after the fact
that the Memo included various articles to "provide context,"
and that Antiwar.com's decision to post the watch list could
have "led to the compromise of then ongoing investigations
or alternatively lead to the harming or harassment of innocent
people."  These statements were offered to explain why the
2004 Memo was created, a fact of which Campi has no
personal knowledge.  Therefore, it was error for the district
court to consider these statements.

### 2.  *Bujanda Declaration*

As for the Bujanda Declaration, the district court did not
abuse its discretion.  First, unlike with the Campi Declaration,
the district court correctly recognized that the FOIA-specific
personal knowledge standard does not apply here—where a
declaration is relied upon to establish the purpose of a
historical document—and applied the traditional personal
knowledge standard.  Bujanda had been an FBI Special Agent
since 2002, although he did not work in the Oklahoma Office
until 2016, ten years after the Halliburton Memo was created.
Therefore, like Campi, Bujanda had sufficient personal
knowledge to opine on FBI policies, field office
responsibilities, and information clear on the face of the
Halliburton Memo.   The declaration contains only one
statement clearly beyond Bujanda's personal knowledge:
Bujanda relays hearsay regarding the Halliburton
shareholders meeting and concludes that local law
enforcement sought to ensure safety and preparedness for the

event as a result.   The district court did not abuse its discretion in overruling Garris' hearsay objections as to this statement, however, because the FBI certified at the hearing that it would be able to submit the hearsay evidence in an admissible form at trial.  *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("at summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial").

## II.  Privacy Act § (e)(7) Claims

Garris contends that the existence of the 2004 and Halliburton Memos violates the Privacy Act.  The Privacy Act provides that federal agencies shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless . . . pertinent to and within the scope of an authorized law enforcement activity."  5 U.S.C. § 552a(e)(7).  This is commonly referred to as the "law enforcement activity" exception to § (e)(7).  The question on appeal is whether the Memos fall within that exception.

Garris argues that the FBI's initial collection of the Memos was not pertinent to an authorized law enforcement activity and therefore violates the Act.  Alternatively, he argues that, regardless of whether the creation of the Memos was justified under § (e)(7), because the investigations underlying the Memos have concluded, the FBI's maintenance of the Memos is not pertinent to an authorized ongoing law enforcement activity and therefore violates the Act.

The question of whether the Privacy Act requires records to be pertinent to an ongoing law enforcement activity to be maintained is one of first impression in this Circuit.  For the reasons described below, we hold that Privacy Act § (e)(7) prohibits the FBI from maintaining records describing First Amendment activity unless the maintenance of the record is pertinent to and within the scope of a currently ongoing authorized law enforcement activity.  We further hold that the FBI has not carried its burden of demonstrating that the maintenance of the 2004 Memo is pertinent to an authorized law enforcement activity; therefore, it must be expunged.  Because we so hold, we need not and do not address the question of whether the creation of the 2004 Memo also violated the Privacy Act.  Finally, we hold that the FBI's maintenance of the Halliburton Memo does not violate the Act.

## A. Ongoing Authorized Law Enforcement Activity Requirement

Accordingly, we turn to the question of whether, assuming the creation of a record did not violate the Privacy Act, the Privacy Act prohibits the FBI from maintaining a record describing First Amendment activity if the record is not pertinent to ongoing authorized law enforcement activity.

We begin by looking to the text of the Privacy Act. Section (e)(7) states that agencies shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment . . . unless pertinent to and within the scope of an authorized law enforcement activity."  5 U.S.C. § 552a(e)(7).  The statute defines "maintain" as "maintain, collect, use, or disseminate."  5 U.S.C. § 552a(a)(3).  The plain meaning of the word "maintain"is "[t]o keep up,

preserve." *Maintain*, Oxford English Dictionary (3d ed. 2000). And the plain meaning of the word "collect" is "to gather, get together." *Collect*, Oxford English Dictionary (3d ed. 2000).

We presume that, because Congress defined maintain to include "maintain" and "collect," Congress intended the provision to apply to distinct activities. *See Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning."). Therefore, we believe the plain meaning of the text is clear. The word maintain, as used in the Act, can be read as it is, or replaced with "collect" (or "use," or "disseminate"). Therefore, an agency may not "maintain" a record describing how any individual's protected First Amendment activity "unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). And an agency may not "collect" a record describing any individual's protected First Amendment activity "unless pertinent to and within the scope of an authorized law enforcement activity." *Id.* Each act of an agency must be justified to fall under the § (e)(7) exception. Therefore, "to give each of these verbs its meaning," the most reasonable reading of the statute as a whole is that the record must be pertinent to an authorized law enforcement activity both "at the time of gathering, i.e., collecting, [and] at the time of keeping, i.e., maintaining." *J. Roderick MacArthur Found. v. FBI*, 102 F.3d 600, 607 (D.C. Cir. 1996) (Tatel, J., concurring in part and dissenting in part). That is, if the agency does not have a sufficient *current* "law enforcement activity" to which the record is pertinent, the agency is in violation of the Privacy Act if it keeps the record in its files.

The FBI contends that the plain meaning of the statute is that the law enforcement exception allows agencies to "collect" *and* to "maintain" records so long as they were pertinent to an authorized law enforcement activity at the time of collection, and that to hold otherwise would be to read a temporal limitation into the statute. But to accept the FBI's preferred reading would be to read the word "maintain" out of the statute. If the FBI were right, Congress could have stated that "an agency shall '*collect* no record describing how any individual exercises rights guaranteed by the First Amendment . . . unless pertinent to and within the scope of an authorized law enforcement activity,'" or, "*compiled for*, and within the scope of, an authorized law enforcement activity." *Id.* at 607 (alteration in original).

Applying the same analysis to one of the other statutory definitions of maintain, "disseminate," demonstrates why a reading that divorces the authorized law enforcement activity clause from the verb is untenable. The FBI's proffered reading would have it such that an agency may "[disseminate] no record describing how any individual exercises rights guaranteed by the First Amendment unless . . . [the record] is pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). This would mean that, presuming the initial collection of the record was relevant to an authorized law enforcement activity, the agency could share the record, regardless of whether the *sharing* of the record was relevant to a law enforcement purpose. But a reading of § (e)(7) that would give blanket approval to an agency to disseminate a record strains credulity. And it would be even more odd for Congress to have included one definition that was superfluous ("maintain") and one that was not ("disseminate"). The same is true for the verb "use," 5 U.S.C. § 552a(a)(3), which is

clearly meant to regulate when an agency may *use* a record it has already collected.

Moreover, this conclusion furthers the purpose of the Act. The passage of the Privacy Act was spurred by congressional concern in response to the explosion of computer technology, which allowed for compilation and storage of data in quantities not seen before, coupled with rightful and broad condemnation of government surveillance programs including Watergate and the FBI's COINTELPRO. *See* Steven W. Becker, *Maintaining Secret Government Dossiers on the First Amendment Activities of American Citizens: The Law Enforcement Activity Exception to the Privacy Act*, 50 DePaul L. Rev. 675, 679 (2000). In fact, the Act was "designed to set in motion a long-overdue evaluation of the needs of the Federal government to acquire *and retain* personal information on Americans, by requiring stricter review within agencies of criteria for *collection and retention*" of such information. S. Rep. No. 93-1183, at 2 (1974) (Conf. Rep.), *as reprinted* in 1974 U.S.C.C.A.N. 6916, 6917 (emphasis added). Thus, Congress was clearly interested in preventing both collection *and* retention of records, with a strong eye to preventing the government from maintaining "information not immediately needed, about law-abiding Americans, on the off-chance that Government or the particular agency might possibly have to deal with them in the future." *MacPherson*, 803 F.2d at 483 (quoting No. 93-1183, at 57 (1974) (Conf. Rep.), *as reprinted* in 1974 U.S.C.C.A.N. 6916, 6971).

Our holding also is consistent with *MacPherson*, our only opinion interpreting the § (e)(7) law enforcement exception. There, IRS agents had compiled notes on and transcriptions of MacPherson's public speeches on tax protesting (refusing

to pay taxes) in a "Tax Protest Project File." *Id.* at 480. MacPherson argued that the IRS' maintenance of the file after the agency realized that MacPherson had not participated in or advocated illegal activity violated § (e)(7) of the Privacy Act. *Id.* at 481–82. In holding that the IRS' retention of the file did not violate the Privacy Act, we did not ask whether the creation of the record violated the Act, but looked only to its maintenance. *Id.* at 484. And, in concluding that we must "consider the factors for and against the maintenance of such records of First Amendment activities on an individual, case-by-case basis," we explained, "[s]ection (e)(7) of the Privacy Act, . . . is intended to restrict the information about individuals' First Amendment activities that the government may collect *and maintain* at all," and therefore a narrow reading of the § (e)(7) exception "better serves the goal of privacy." *MacPherson*, 803 F.2d at 482, 484 (emphasis added).

Our decision also aligns with that of the Seventh Circuit. In *Becker v. IRS*, 34 F.3d 398 (7th Cir. 1994), the Seventh Circuit held that the IRS had "not sufficiently justified the maintenance of the documents in the Beckers' files" because the IRS' proffered justification, that "it may maintain these articles for possible future uses," was untenable, given that "any potential advantage to having these documents in the Beckers' files, at some uncertain date, is minuscule (and the IRS does not elaborate on how this material would be helpful)." *Id.* at 409. And later, the Seventh Circuit in *Bassiouni v. FBI*, 436 F.3d 712 (7th Cir. 2006), concluded that the FBI's continued maintenance of records describing Bassiouni's First Amendment activities did not violate § (e)(7) of the Privacy Act, *not* because the act has no separate and distinct maintenance requirement, but rather because the FBI had demonstrated that the records were of

*continuing relevance* to an authorized law enforcement activity. *See id.* at 724–25 ("Furthermore, although the Privacy Act certainly does not authorize collection and maintenance of information of private citizens on the 'off-hand' chance that such information may someday be useful, it does not require law enforcement agencies to purge, on a continuous basis, properly collected information with respect to individuals *that the agency has good reason to believe may be relevant on a continuing basis* in the fulfillment of the agency's statutory responsibilities.") (emphasis added).

We recognize that the D.C. Circuit, in a split decision, came to the conclusion urged by the FBI in *J. Roderick MacArthur Found.*, 102 F.3d 600. The panel majority reasoned that "[t]he noun 'record' in § (e)(7) is modified in only two ways: the record must be [1] pertinent to and [2] within the scope of an authorized law enforcement activity," and that substituting the word "maintain" for "collect" or "disseminate" "in § (e)(7) does nothing to change what the adjective "pertinent" modifies. 102 F.3d at 603 (internal quotation marks omitted). The panel majority also explained that "the provision, as written, can[not] be read to require that the maintenance of a record, as opposed to the record itself, must be pertinent to an authorized law enforcement activity." *Id.* "One might argue that the Congress meant to say that an agency may 'maintain no record relating to First Amendment activities unless *doing so would be* pertinent to and within the scope of an authorized law enforcement activity.' But the Congress did not say that . . . ." *Id.*

We are not persuaded by this reasoning. First, the "pertinent to . . . an authorized law enforcement activity" clause does not modify only the noun "record," because the

noun "record" cannot be divorced from the verb "maintain." This connection makes sense when one considers the point of the text: § (e)(7) is about what an agency is permitted, or not permitted, to *do*. The verb is key. If we divorce the "pertinent to" clause from the verb, the proscription becomes nonsensical.

This observation is confirmed by reading s§ 552a(e)(7) as a whole. In full, the section directs agencies to: "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). Thus, there are *two* exceptions contained in § (e)(7)—an exception for authorization by statute or by an affected individual, and a law enforcement activity exception. The two exceptions are parallel grammatically. And the first exception necessarily modifies the verb "maintain," not just "record," as it is quite evidently the *maintenance* that must be authorized, not the record. The clause "by the individual about whom the record is *maintained*" (emphasis added) makes that much plain.

Second, the D.C. Circuit majority's reading also requires reading into the text words not written by Congress. The D.C. Circuit majority would have us read the text as "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless [*the record is*]. . . pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). Our reading is that the text requires that an agency "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless [*the maintenance of the record*

*is*]. . . pertinent to and within the scope of an authorized law enforcement activity." *Id.*   Both are clarified by adding implicit text; ours has the added benefit of not also reading all but one of the statutory definitions of the word "maintain" out of the statute.

Third, as Judge Tatel explained in his partial dissent, Congress has demonstrated that when it means only to circumscribe the act of *collection*, it knows how to do so.  *See J. Roderick MacArthur Found.*, 102 F.3d at 607–08; *see also* 5 U.S.C. § 552a(e)(2) (requiring that each agency shall "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs"); § 552a(k)(2) (regulating agency rulemaking for records made up of "investigatory material compiled for law enforcement purposes"); § 552a(k)(5) (regulating agency rulemaking for records made up of "investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment, military service").

**B.  Application to the 2004 Memo**

That ours is the correct reading is illustrated by the application in this case.  Turning first to the 2004 Memo, we ask whether, assuming the creation of the memo was acceptable, the maintenance of the Memo is pertinent to an authorized law enforcement activity.   The 2004 Memo specifically details Garris' protected First Amendment activities, including his political views and articles he wrote, allegedly to conduct a threat assessment prompted by the posting of the FBI watch list.  Notably, as the FBI concedes,

the posting of the list was protected First Amendment activity. The Newark Office then forwarded the 2004 Memo to the San Francisco Office with a recommendation to open a preliminary investigation. The San Francisco Field Office declined to do so, explaining:

> After reviewing the website, it appears the information contained therein is public source information and not a clear threat to National Security. Furthermore, there does not appear to be any direct nexus to terrorism nor the threat of compromising current FBI investigations. San Francisco opines that Eric Garris and Justin Raimondo are exercising their constitutional right to free speech.

The threat assessment and related investigation has therefore definitively ended.

Our analysis does not end there, however. Even if an investigation has ended, the retention of the record could still be pertinent to an authorized law enforcement activity. The government contends that such is the case here, because the maintenance of the 2004 Memo would "serve to inform ongoing and future investigative activity."

"[C]onsider[ing] the factors for and against the maintenance of such records of First Amendment activities," *MacPherson*, 803 F.2d at 484, the FBI's maintenance of the 2004 Memo does not fall within the law enforcement activities exception. The investigation did not merely conclude—it concluded because the threat assessment did not reveal a "threat to National Security," "any direct nexus to terrorism," or a "threat of compromising current FBI

investigations"; rather, the San Francisco Office concluded that Garris and Raimondo were simply "exercising their constitutional right to free speech." Effectively, the threat assessment turned up nothing more than protected First Amendment activity. At that point, the record was no longer—assuming it ever was—pertinent to an authorized law enforcement activity.

Nor is this a case where the threat assessment was relevant to a broader authorized law enforcement activity that might require its maintenance. In *MacPherson*, for example, we held that the IRS' inclusion of MacPherson's speeches in the "Tax Protest Project File" did not violate the Privacy Act. *MacPherson*, 803 F.2d at 480. There, although the file included descriptions of MacPherson's protected First Amendment activity—namely, MacPherson's speeches on tax protesting—and although the IRS had concluded that MacPherson did not engage in or advocate illegal activity—the record was relevant to the larger ongoing undertaking by the IRS of trying to prevent illegal tax protesting, and the record was in a general tax protestor file, *not* under MacPherson's name. *Id.* at 480, 485, 485 n.9. The IRS' maintenance of the record fell within the law enforcement activities exception because it was relevant to a continuing IRS law enforcement effort. As to that effort, MacPherson's speeches both provided context and were "incidental" surveillance. *Id.* at 484.

Similarly, in *Bassiouni*, the Seventh Circuit concluded that the FBI's maintenance of the record on Bassiouni that included excerpts from a speech Bassiouni had given to the Mid-America Arab Chamber of Commerce did not violate the Privacy Act, even though the FBI conceded that Bassiouni was not suspected of being a member of terrorist

organization.  436 F.3d at 719, 724.  The Seventh Circuit
explained that the maintenance of the file was pertinent to an
authorized law enforcement activity because the FBI had
"ongoing investigations into the threats posed by terrorist
groups, specifically those originating in the Middle East" and
"[b]ecause of the nature of these investigative activities, and
because of the breadth of Mr. Bassiouni's contacts with the
Middle East, the FBI anticipates that it will continue to
receive information about Mr. Bassiouni."  *Id.* at 724
(citations omitted). *Bassiouni* concluded that "[t]he Bureau's
file on Mr. Bassiouni will provide context for evaluating that
new information," and "perhaps more importantly, the public
Krupkowski Declaration states that the records are important
for evaluating the continued reliability of its intelligence
sources."  *Id.*

Unlike the files at issue in *MacPherson*, the 2004 Memo
is on Garris specifically and is filed under Garris' name, not
as part of a larger, valid investigation on another topic.  *See
MacPherson*, 803 F.2d at 485 n.9 (noting that the outcome in
MacPherson may have been different if "the records were
filed under his name rather than in a general 'tax protestor'
file").  Here, the threat assessment was prompted by the
posting of the watch list, which was itself protected First
Amendment activity.  The assessment revealed political
views and articles by Garris—also protected First
Amendment activity.  The contents of the Memo, Garris'
political views, are apropos of nothing except Garris' political
views, and the FBI has failed to offer any connection between
Garris' protected First Amendment activity as described in
the Memo and any specific investigation under the FBI's
purview.  *Cf. MacPherson*, 803 F.2d at 484; *Bassiouni*,
436 F.3d at 724.

It cannot be that maintaining a record of purely protected First Amendment activity is relevant to an authorized law enforcement activity simply on the representation that maintaining the record would "serve to inform ongoing and future investigative activity." Maintenance of a record to "inform ongoing and future investigative activity" is acceptable when the record implicates a specific broader law enforcement activity such as preventing terrorism, *see Bassiouni*, 436 F.3d at 724, or preventing tax protests, *MacPherson*, 803 F.2d at 484. But where, as here, the relevance of a record filed under Garris' name details purely protected activity and has at best only speculative relevance to an unstated law enforcement purpose, the agency does not have "good reason to believe [that the record] may be relevant on a continuing basis in the fulfillment of the agency's statutory responsibilities." *Bassiouni*, 436 F.3d at 724–25. Even if "[t]here is a remote possibility that a part of the [2004 Memo] would be helpful in investigation of persons in general," it remains that "any potential advantage to having [the 2004 Memo] . . . at some uncertain date, is minuscule." *Becker*, 34 F.3d at 409. Accordingly, the FBI has not carried its burden to establish that the 2004 Memo is exempt from Privacy Act requirements, and it must be expunged. *See id.*[3]

---

[3] To the extent the 2004 Memo could be pertinent to national security, it would be only because it reveals that there is *no* threat to national security here. But that rationale could justify maintaining literally any record. Such a fishing expedition into First Amendment protected activity is precisely what the Act was meant to prevent. *See Clarkson v. IRS*, 678 F.2d 1368, 1378 (11th Cir. 1982) (Tjoflat, J., concurring) ("[S]ubsection (e)(7)'s prohibition against collecting records that describe how an individual exercises his first amendment rights should not be circumvented by fishing expeditions disguised as 'law enforcement activity.'"). Such a holding would allow the "exception to swallow the rule." *MacPherson*, 803 F.2d at 484.

## C.  Application to the Halliburton Memo

As for the Halliburton Memo, our analysis of that memo illustrates the flipside of our holding regarding the 2004 Memo.  *MacPherson* again is instructive.  Like in *MacPherson*, the Halliburton Memo is not filed under Garris' name or even under Antiwar.com; rather, "Antiwar.com" is listed in the Memo merely to provide context as to where coverage of the shareholders' meeting can be found.  *See MacPherson*, 803 F.2d at 485 n.9; *id.* at 484 (recognizing that incidental surveillance of innocent First Amendment activity may be necessary to ensure "completeness and accuracy of the agency records").  And "[t]here is no allegation and no indication that the records were used or intended to be used for any other purpose than to give a complete picture," *id.* at 484–85, of the necessary protections for the shareholders meeting.  Further, the Memo is of ongoing relevance to coordination with "local law enforcement to prepare for an annual meeting at which arrests had been made in the past."  The Memo, which primarily describes security preparations for an oft-protested meeting, only incidentally includes protected First Amendment activity, and is relevant to preparations for future iterations of the annual shareholders' meeting.  "Under these circumstances," we hold that the FBI's "maintenance of records of [Antiwar.com's] activities fall within the 'law enforcement activities' exception to the proscription of § (e)(7) of the Privacy Act."  *Id.* at 485.

## CONCLUSION

Thus, we hold that to maintain a record, the government must demonstrate that the maintenance of the record is pertinent to a specific authorized law enforcement activity.  We want to be exceedingly clear.  We are *not* holding that

whenever an agency closes an investigation, the agency must expunge the file because the law enforcement activity for which the record was created (or received) has ended. What we are holding is that, if the investigation is closed (or even if it is not), and if the government cannot articulate a sufficient law enforcement activity to which the *maintenance* of the record is pertinent, the maintenance of the record violates the Privacy Act. The reason for maintenance, so long as it is valid and not pretextual, need not be the same reason the record was created. Thus, in plenty of cases, the end of an investigation will not require a record to be expunged because the maintenance of the record will have some pertinence to an articulable, authorized law enforcement activity. *See, e.g.*, *MacPherson*, 803 F.2d at 485. But such is not the case here, where the 2004 investigation was ended because it detailed only First Amendment activity and did not implicate national security. Thus, maintenance of a record that describes only First Amendment activity and does not implicate national security is not pertinent to the FBI's authorized activities. Maintenance for maintenance's sake, without pertinence to national security or other authorized law enforcement activity, is precisely what the Act was intended to prevent.

We recognize that the statute as we understand it may impose a non-negligible burden on the FBI. But this is a feature, not a bug. Section (e)(7) is meant to *limit* what government agencies may collect, maintain, and disseminate; this is, by definition, a burden. The FBI can limit the extent of this burden by being more discerning in deciding what records to create.

Thus, we conclude that for the FBI to maintain a record under § (e)(7) of the Privacy Act, the record's maintenance must be pertinent to and within the scope of an ongoing

authorized law enforcement activity. Because we conclude that the FBI has not carried its burden in establishing that the 2004 Memo is exempt from Privacy Act requirements, the Memo must be expunged. The Halliburton Memo, however, falls within the § (e)(7) exception and therefore may be retained.

· ● ·

The judgment of the district court is **AFFIRMED in part, REVERSED in part, and** the case is **REMANDED** to the district court with instructions to direct the FBI to expunge the 2004 Memo. No costs.